FILED

DEC - 6 2012

Clerk, U.S. District and
Bankruptcy Courts

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ANTHONY HUNTER on his behalf and as parent of his minor daughter, A.H.[1]<br>1709A St., S.E.<br>Washington D.C., 20020,<br><br>Plaintiffs,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA,<br>a municipal corporation<br>1350 Pennsylvania Ave., N.W., Suite #419<br>Washington, D.C. 20004,<br><br>THE COMMUNITY PARTNERSHIP FOR THE PREVENTION OF HOMELESSNESS<br>801 Pennsylvania Ave., S.E., Suite 360<br>Washington, D.C. 20003,<br><br>COALITION FOR THE HOMELESS<br>1234 Massachusetts Ave, N.W., Suite 1015<br>Washington, D.C. 20005,<br><br>and<br><br>COMMUNITY OF HOPE<br>1413 Girard Street, N.W.<br>Washington, D.C. 20009<br><br>Defendants | Case: 1:12-cv-01960<br>Assigned To : Kessler, Gladys<br>Assign. Date : 12/6/2012<br>Description: Civil Rights-Non. Employ |

## COMPLAINT

---

[1] Pursuant to Local Civil Rule 5.4(f)(2), the minor's name will be indicated by initials.

*1*

**INTRODUCTION**

1. Plaintiff Anthony Hunter, on his own behalf and on behalf of his minor daughter, A.H., (collectively, the "Hunter family"), both residents of the District of Columbia, brings this action seeking compensatory damages and punitive damages for the Defendants' violation of Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*., 42 U.S.C. § 12181 *et seq*. (2006); Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq*. (2006); and the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq*. (2006); the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01 *et seq*. (2001) (effective March 14, 2007); the Homeless Services Reform Act ("HSRA"), D.C. Code § 4-751.01 *et seq*. (2001) (effective April 8, 2011); and for negligence.

2. When the Hunter family, faced with immediate homelessness, sought shelter at the Virginia Williams Family Resource Center (hereinafter "Center") on December 7, 2011, A.H. was six years old and suffered from cri-du-chat syndrome and spina bifida. As a result of those and other conditions, she uses a wheelchair and is particularly prone to infection. When Mr. Hunter applied for shelter at the Center, he advised Center staff that his family required a wheelchair-accessible shelter unit and that his daughter required a clean, non-communal environment that minimized the risk of infection, including a private bathroom. The Hunter family was initially placed in the D.C. General Family Emergency Shelter ("D.C. General"), but the placement did not meet their disability-related needs.

3. On December 29, 2011, the Hunter family was transferred from D.C. General to an apartment-style shelter unit in the Community of Hope Shelter ("Girard Street Shelter"). However, the family was placed in an inaccessible third floor unit without elevator service. Mr. Hunter was forced to carry his daughter in her wheelchair up and down the stairs numerous times each day, causing him a back injury. Neither the entrance to the building nor the unit itself was wheelchair-accessible. Despite repeated requests, the Hunter family was moved to the first floor only after legal counsel intervened on their behalf.

4. From December 7, 2011 to March 12, 2012, the Defendants discriminated against the Hunter family by knowingly and willfully failing to place them in an accessible environment, by failing to maintain sufficient shelter units appropriate for and accessible to persons with immune system and mobility impairments, by failing to place the family in an appropriate and accessible shelter unit, and by failing to provide the family with reasonable accommodations or modifications[2] in the unit to which they were assigned. Defendants' failure to provide an accessible placement and to accommodate A.H. resulted in injuries to her and her father.

## JURISDICTION AND VENUE

5. Jurisdiction over the federal law claims in conferred upon this Court pursuant to 28 U.S.C. § 1331 (2006). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 (2006) to hear and determine Plaintiffs' state law claims because those claims are so related to the Plaintiffs' federal law claims that they form part of the same case or controversy under Article III of the United States Constitution. This Court has jurisdiction

---

[2] The terms "reasonable accommodation" and "reasonable modification" are used interchangeably in this complaint.

3

over Plaintiffs' action for declaratory relief pursuant to 28 U.S.C. § 2201 (2006) and Rule 57 of the Federal Rules of Civil Procedure.

## PARTIES

6. Anthony Hunter and his minor daughter, A.H., are residents of the District of Columbia.  Mr. Hunter sues on his own behalf and on behalf of his minor daughter, A.H., as her parent and legal guardian.

7. A.H., who is six years old, has cri-du-chat syndrome, spina bifida and several other medical conditions, including bowel and bladder incontinence.  A.H. was born with these disabilities,[3] conditions which have significantly impaired her ability to stand, walk, use stairs, and participate in other major life activities. Cri-du-chat syndrome is a disabling genetic disorder that causes mental retardation.  Spina bifida is a congenital birth defect of the spinal column which, in A.H.'s case, prevents her from walking and engaging in independent self-care, such as bathing, dressing and eating.  As a result, A.H. has used and continues to use a wheelchair.  These impairments and associated medical conditions have left A.H. susceptible to infection and slow to recover from infections.  Thus, her doctors have recommended that she live in an environment that minimizes exposure to infections and communicable illnesses.

8. The District of Columbia owns the buildings located at 1900 Massachusetts Avenue, S.E., ("D.C. General") in which the Hunter family resided between December 7, 2011 and December 29, 2011. The District of Columbia also owns the building located at

---

[3] This complaint uses the terms "disability" and "disabled," except when referring to the FHAA's statutory language, which uses "handicap" and "handicapped," *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146 n. 2 (9th Cir. 2003), legislative history, or in quoting previous court decisions.  These terms are intended to have identical meanings.  *See id.*

4

1413 Girard Street, N.W ("Girard Street Shelter"), in which A.H. and Mr. Hunter resided

between December 29, 2011 and March 12, 2012.  The District of Columbia, through its

Department of Human Services ("DHS"), a cabinet-level agency of the District of Columbia,

sets policy and provides social services for rehabilitation and self-sufficiency for residents of

the District of Columbia, including assistance to people who are homeless or at risk of

homelessness.  The District of Columbia receives federal funds for homeless programs and

other programs and services.  DHS is responsible for monitoring and ensuring the homeless

shelter system's compliance with the ADA, the Rehabilitation Act, and the FHA.

        9. DHS contracts with the Community Partnership for the Prevention of

Homelessness ("the Partnership") to direct and manage emergency shelter services as part of

the homeless services continuum of care.  The Partnership is a nonprofit corporation

established in 1989 with headquarters in Washington, D.C.  The Partnership in turn

subcontracts with other organizations for the provision of services and management of

homeless shelters.  The Partnership receives federal funds for homeless programs and other

programs and services.  The Partnership is responsible for ensuring that its subcontractors

comply with the ADA, the Rehabilitation Act, the FHA, the DCHRA and the HSRA.  The

Partnership directly operates the D.C. General shelter.

        10.  Defendant Community of Hope is a non-profit corporation which provides

shelter, transitional housing, and community support services for people who are homeless.

Community of Hope contracts with the Partnership to provide emergency shelter services to

District of Columbia residents.  Pursuant to a contract with the Partnership, Community of

Hope operates and is responsible for the day-to-day management of the Girard Street Shelter.

On information and belief, Community of Hope receives federal funds for homeless programs and other programs and services.

## STATUTORY BACKGROUND

11. Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and the regulations adopted there under, 28 C.F.R. § 25.130 *et. seq.* (2011), prohibit discrimination against people with disabilities by public entities and their contractors, such as Defendants herein.  They require public entities to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability" and to ensure that all services, programs, and activities are readily accessible to persons with disabilities. 28 C.F.R. § 35.130(b)(7).

12. Title II of the ADA, and the regulations adopted thereunder, also prohibits public entities and their contractors, such as Defendants, from denying "equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g).

13. Title III of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.  42 U.S.C. § 12182(a), (b), *et seq.*

14. Title III of the ADA also prohibits excluding or denying equal goods, services, facilities, and accommodations to an individual because of the known disability of another with whom the individual associates. 42 U.S.C. § 12182(b)(1)(E).

15. In 1988, Congress extended the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, through the Fair Housing Amendments Act of 1988 ("the Amendments") to afford people with disabilities greater protection from housing discrimination. The law defines "handicap" broadly and prohibits housing discrimination against individuals with physical and/or mental disabilities.

16. In passing the Amendments, Congress specifically prohibited "the use of stereotypes and prejudice to deny critically needed housing to handicapped persons." H.R. Rep. 100-711 at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2189. The FHA's ban on disability discrimination reflects a "clear pronouncement of a national commitment to end the unnecessary exclusion of people with handicaps from the American mainstream." *Id.* In amending the FHA, Congress acknowledged the devastating impact that housing discrimination has on individuals with disabilities and recognized that prohibition of such discrimination is absolutely essential to their inclusion in American life. *See id.*

17. The FHA makes it illegal to discriminate on the basis of mental or physical disability in the sale or rental of housing or in the provision of services or facilities. It also places certain affirmative obligations on those involved in providing services related to housing, including requiring that reasonable accommodations be made in rules, policies, practices, and services when such accommodations are necessary to afford individuals with disabilities an equal opportunity to use and enjoy their homes. 42 U.S.C. § 3604(f)(2)(A).

These protections extend to "any person associated with [the] renter or buyer," who is the victim of discrimination. 42 U.S.C. § 3604(f)(1)(C).

18. The Rehabilitation Act, 29 U.S.C. § 794 *et. seq.* and the regulations adopted thereunder apply to recipients of federal funds, such as Defendants herein. The Rehabilitation Act prohibits discrimination against people with disabilities, requires a recipient to modify its housing policies and practices to ensure that it does not discriminate on the basis of disability, and requires a recipient to ensure that all services, programs, and activities are readily accessible to persons with disabilities. Ensuring that all programs are readily accessible includes ensuring that a minimum number of units are accessible to persons with mobility impairments.

19. The DCHRA prohibits discrimination on the basis of disability in all aspects of housing including, but not limited to:

     a. Discrimination of a person with a disability in rental of a dwelling;

     b. Discrimination of a person associated with person with a disability residing or intending to reside in a dwelling;

     c. Discrimination in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability of the renter or person associated with the renter;

     d. Refusal to make reasonable accommodations in rules, policies, practices, or services, when these accommodations may be necessary to afford any person equal opportunity to use and enjoy a dwelling; and

8

    e.  Failure to provide the dwelling with features of adaptive design such that it is readily accessible and usable by a person with a disability. D.C. Code § 2-1402.21(d).

20. The DCHRA provides that "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program or benefit to any individual on the basis of an individual's actual or perceived . . . disability . . . ." D.C. Code § 2-1402.73.

21. The DCHRA further states that it is an unlawful discriminatory practice to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" wholly or partially for a discriminatory reason based on the actual or perceived disability. D.C. Code § 2-1402.31.

22. The HSRA prohibits homeless service providers, such as Defendants, from discriminating against individuals with disabilities and requires them to treat such individuals in accordance with the DCHRA, D.C. Code § 2-1401 *et seq.*, the ADA, 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*), and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.* D.C. Code § 4-754.21(10).

## FACTS

### Building 12 – D.C. General Hospital

23. A.H. has cri-du-chat syndrome, spina bifida and several associated medical conditions. These disorders are disabling, and she is dependent on her caregivers to meet her daily basic needs. She requires the use of a wheelchair and facilities that are fully wheelchair

accessible. A.H. is susceptible to infection and requires a climate controlled living environment without large numbers of people nearby who may expose her to infection.

24. During the relevant time period, with the exceptions of time during which she was hospitalized, A.H. lived with her father, Anthony Hunter.

25. After losing their previous housing, on December 7, 2011 Mr. Hunter applied for placement in a homeless shelter for himself and his daughter, A.H., at the Virginia Williams Family Resource Center, which is the central intake office for families requesting shelter in D.C. Mr. Hunter explained to intake staff that his daughter had a mobility impairment and was susceptible to infection. Intake staff therefore prepared a written reasonable accommodation request.

26. Mr. Hunter's written reasonable accommodation request stated that A.H. uses a wheelchair and requires a wheelchair accessible unit. Although Mr. Hunter informed staff members at the Center that A.H.'s medical conditions required a noncommunal environment where she could have a private bathroom, Center staff did not record this information and this accommodation request on the reasonable accommodation request form. Staff at the Center concluded that Mr. Hunter's reasonable accommodation request was complete.

27. Mr. Hunter and his daughter were placed in "Building 12" at the D.C. General shelter. The Center staff stated that Building 12 of the D.C. General shelter was recently remodeled, accessible, and that he and his daughter would get their own room. The Center staff also told Mr. Hunter that there was an accessible bathroom near the room and that it was the most private bathroom that was available at the shelter.

28. Upon information and belief, Defendant District of Columbia has never claimed in communications with the Department of Justice ("DOJ") that Building 12 is wheelchair accessible.

29. A.H. is able to operate her own wheelchair without assistance if she is in a wheelchair-accessible environment.

30. The ramp that leads to the front door of D.C. General's Building 12 does not meet accessibility guidelines because its slope is excessively steep and the sidewalk is broken. A.H. was not able to get herself up and down this ramp without assistance.

31. Mr. Hunter and his daughter shared a single bathroom, without a working lock, with five other families. The bathroom had one shower and one toilet.  The shower did not work for A.H.'s needs, because Mr. Hunter could not hold her upright on the shower seat while simultaneously operating the shower.

32. Although the staff claimed to clean the bathroom every other day, it remained filthy.  When the staff did clean it, they used excessive bleach, the smell of which was so strong that it burned Mr. Hunter's eyes.  As a result, Mr. Hunter bathed A.H. as best as he could on her bed instead.

33. On information and belief, there are rooms with private bathrooms elsewhere in the D.C. General shelter complex and accessible, noncommunal options existed outside D.C. General.

34. About fifty families live in D.C. General's Building 12.  All of the families eat in one room.  On a number of occasions, Mr. Hunter asked the staff if he and A.H. could eat in

a separate room to limit A.H.'s exposure to the many children who were sick in the building. The staff refused to allow him to do so.

35. As soon as the Hunter Family arrived at D.C. General and Mr. Hunter discovered that the placement did not meet A.H.'s disability-related needs, he asked his case manager to move him to an accessible placement. His case manager, Ms. Moses, informed Mr. Hunter that she could not process his request unless he submitted verification from A.H.'s doctors.

36. The refusal to process a reasonable accommodation request until verification is received is in direct contradiction to the official reasonable accommodation policy and procedure of Defendants, which Defendant District of Columbia submitted to the DOJ pursuant to the settlement agreement, described below.

37. On December 21, 2011, Mr. Hunter renewed his reasonable accommodation request in writing and with doctor's verification letters.

38. While residing at the D.C. General shelter, A.H. developed a urinary tract infection that lasted a few days. She received treatment at Children's Hospital.

39. Mr. Hunter became aware that some D.C. General shelter residents had wheelchair-accessible rooms with private bathrooms, but he was not told why his family was not offered one of those units.

40. On December 29, 2011, Mr. Hunter was told by staff at the D.C. General shelter that his family would be transferred to a wheelchair-accessible and apartment-style shelter unit at the Girard Street Shelter. When Mr. Hunter arrived at the Girard Street Shelter, the staff questioned him about A.H.'s mobility impairments and he described them to the staff. Nonetheless, Girard Street staff told him, contrary to his expectation and understanding, that

12

his family would not receive an accessible unit.  Rather, he was told that the only available unit was on the third floor.

The Department of Justice Settlement

41. In 2007, the DOJ, Civil Rights Division performed a compliance review of the accessibility of the D.C. shelter care system.  As a result of that review and a subsequent settlement agreement, the Defendants have been made aware that the shelter system in general and the D.C General shelter and the Girard Street Shelter (discussed below) in particular failed to comply with federal and local laws which guarantee individuals with disabilities equal access to shelter services.

42. As part of the implementation of the settlement agreement, Defendant District of Columbia, through the DHS, has claimed that it maintains a sufficient inventory of wheelchair-accessible family shelter units. Nonetheless, during the time period relevant here, the Defendants failed to place the Hunter family in any of these accessible units.

43. On information and belief, Defendant District of Columbia has never claimed or demonstrated to DOJ that any wheelchair accessible family shelter units are located at D.C. General Hospital Building 12 or on the third floor of Girard Street Shelter.

The Girard Street Shelter – Accessibility

44. The Defendants were aware of Mr. Hunter's reasonable accommodation requests, A.H.'s impairments and use of a wheelchair, and had received letters explaining A.H.'s medical conditions from her school social worker and doctors.  Nevertheless, they placed Mr. Hunter and his daughter in Unit 303, located on the third floor of the Girard Street Center on or about December 29, 2011.

45. The ramp leading up to the entrance door and the door itself do not meet accessibility guidelines nor were they accessible for A.H.

46. Upon entering the Girard Street Shelter, there are three stairs that lead from the landing up to the lobby, the phone room, the computer room, and several apartments. The landing has a wheelchair lift designed to carry residents with mobility impairments up the three stairs. During the entire time that A.H. resided at the Girard Street Shelter, A.H. could not use the lift because the staff informed Mr. Hunter that it was not operational. Every time Mr. Hunter and A.H. entered the building, Mr. Hunter had to pick up his daughter in the wheelchair to carry her up those steps.

47. The only access to the third floor in the Girard Street Shelter building is via two flights of stairs. The only elevator in the building runs between the basement and the first floor. Consequently, numerous times a day, Mr. Hunter had to carry his daughter and her wheelchair up and down two flights of stairs. Since there was a sign that stated that no one could leave strollers or wheelchairs in the lobby, Mr. Hunter had to carry his daughter in her wheelchair upstairs. This proved particularly difficult when Mr. Hunter also had to carry laundry or groceries. Staff at the shelter observed Mr. Hunter carrying his daughter and her wheelchair from the lobby to the third floor and vice versa every day and did nothing to relocate the family.

48. The hallways within the Hunter family's third floor unit at Girard Street were too narrow to accommodate A.H.'s wheelchair. Therefore, Mr. Hunter had to carry A.H. from the living room to the bedroom and bathroom.

14

49. On January 3, 2012, Mr. Hunter filed yet another reasonable accommodation request, noting A.H.'s need for a wheelchair-accessible unit.  Defendants did not respond to it.

50. On February 4, 2012, Mr. Hunter experienced back and chest pain while carrying A.H. and her wheelchair upstairs.  As a result, he visited the emergency room at Washington Hospital Center, and returned to the Hospital on February 7 with continued severe pain and discomfort.  One of the February 7, 2012 discharge instructions was to avoid heavy lifting. His back discomfort continues.  His condition made it difficult for him to take proper care of A.H.

51. Mr. Hunter reported his back injury to Ruth Schickel, the program director at the Girard Street Shelter.  He asked Ms. Schickel why they had not been moved to a first floor unit.  She responded that, even though the family living in one of the accessible first floor units did not need the accessible features of the unit, she could not require them to transfer to a different unit so that the Hunter family could move in.

52. Ms. Schickel's statement is in direct contradiction with the Defendants' "Accessible Unit Transfer Protocol," as submitted to DOJ as part of the implementation of the settlement agreement.  The Protocol states:

> If a family is placed in a unit that is designed to meet the needs of those persons with physical disabilities and they do not have a need for an accessible unit, the family will be asked to sign the Accessible Unit Transfer Form (Appendix H) at the time of the placement.  If the accessible unit is needed for a family that has accessibility needs the initial family will be relocated to another unit meeting their family size within 24 hours.  A family in need of an accessible unit may submit a request for reasonable accommodation under the standard reasonable accommodation procedures.  If an accessible unit is occupied by a family that does not have a need for that type of unit, that family will be relocated within 24 hours and the unit made available for the

family with an accessibility need within 72 hours or as soon as the unit is ready for occupancy.

The Girard Street Shelter – Respite Care

53. A.H. cannot be left alone while awake without risking her safety.  Her medical conditions sometimes cause her to stop breathing, to vomit and to choke.  Mr. Hunter wanted someone with some medical training to provide occasional respite care.

54. Mr. Hunter requested that staff at the Girard Street Shelter permit his friend, Ricola Jenkins, a nursing student, to visit Girard Street in order to assist with the care of A.H..  Shelter staff asked Mr. Hunter to make his request for a visitor in writing. The request was approved for one day only.

55. Shelter staff denied additional requests to allow Ms. Jenkins to provide respite care.  They said that Mr. Hunter's privileges to receive visitors had been revoked because Mr. Hunter had inadequate funds in his shelter escrow account.

56. Revoking Mr. Hunter's privileges to receive visitors was an unlawful sanction in direct contradiction to both the Homeless Services Reform Act (HSRA) and the Girard Street Shelter's own approved program rules.  Even if the sanction had been lawful, an exception should have been made to reasonably accommodate A.H.'s medical needs.

57. Shelter staff directed Mr. Hunter to withdraw his reasonable accommodation request for a visitor to provide respite care. Even though he did not understand why he was being told to withdraw his request, he withdrew it as asked.

58. On February 10, 2012, after Mr. Hunter's attorney intervened, Defendants finally transferred the Hunter family to Unit 106 on the first floor of the Girard Street Shelter. While this unit was more accessible than the third floor unit, the Defendants' failure to allow

16

the Hunters access to a working wheelchair lift to get up to the first floor of the Shelter

resulted in a continued failure to reasonably accommodate A.H.'s disabilities.

59. On or about February 21, 2012, A.H. was hospitalized at Children's Hospital for

a surgical procedure and post-operative recovery.  She did not return to the Girard Street

Shelter.

60. The Hunter family moved out of the Girard Street Shelter on March 12, 2012 and

was relocated to a permanent supportive housing program located at 1709 V Street, S.E. and

operated by Sasha Bruce Youthwork.  This housing program is part of the homeless services

continuum of care pursuant to the HSRA and is funded and/or operated by Defendant District of

Columbia through the Department of Human Services and Defendant Community Partnership.

61. While A.H. was a resident at the Girard Street Shelter, Defendants knowingly,

willfully and recklessly denied her the benefits of and rights to full access to shelter services

because she has a disability.  Upon information and belief, Defendants failed to maintain

sufficient numbers of wheelchair-accessible apartments in the family emergency shelter

system so as to allow equal access to persons who use wheelchairs.  In addition, Defendants

failed to maintain and/or modify the Girard Street Shelter in a manner that allowed persons

with mobility impairments equal access to the buildings and living units, and failed to meet

or unreasonably delayed responding to A.H.'s numerous requests for reasonable

accommodations.

62. The delay in granting the Hunter family's reasonable accommodation request is

also in direct violation of the DOJ Settlement, which states: "Reasonable modification

requests shall be granted immediately where the denial of the request is reasonably likely to cause serious harm to an individual with a disability." (Paragraph 21(a)(iii)).

63. In acting or in failing to act as alleged in this Complaint, each employee or officer of each Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by one of the Defendants as principal.

64. The shelter units that Mr. Hunter and A. H. occupied at the D.C. General shelter and at Girard Street Shelter, and that are the subject of this litigation, are "dwellings" within the meaning of the FHA, 42 U.S.C. § 3602(b); constitute a service, program or activity of a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131; amount to a program or activity within the meaning of the Rehabilitation Act, 29 U.S.C. § 794; and involve a "transaction in real property" within the meaning of the DCHRA, D.C. Code § 2-1401.02.

## CLAIMS

### FIRST CLAIM
### Violation of Title II of the Americans with Disabilities Act
### (42 U.S.C. § 12131 *et seq*.)
### (Against All Defendants)

65. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

66. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

67. A.H. is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131(2).

68. Defendant District of Columbia administers shelter services through DHS, a public entity within the meaning of 42 U.S.C. § 12131(1).  The remaining Defendants are public entities within the meaning of 42 U.S.C. § 12131(1) because they are instrumentalities of the District of Columbia.  Accordingly, Defendants are subject to Title II of the ADA.

69. Defendants have violated Title II of the ADA and implementing regulations by:

    a.   Denying A.H., on account of her disability, the benefits of their services, programs, and activities and subjecting her to discrimination. 28 C.F.R. § 35.130(a);

    b.   Refusing to make reasonable modifications in their policies, practices, or procedures necessary to afford A.H. and other individuals with disabilities access to the services and privileges offered by Defendants. 28 C.F.R § 35.130(b)(7);

    c.   Using criteria or methods of administration of their services, programs, or activities, the effect of which discriminated against A.H. on the basis of her disability.  28 C.F.R. § 35.130(b)(3)(i);

    d.   Adopting and enforcing or refusing to adopt and enforce policies and practices designed and intended to ensure that A.H. had access to and enjoyment of emergency shelter services in a manner equal to those without disabilities.  28 C.F.R. § 35.130(b)(7);

    e.   Failing to develop or maintain a sufficient number of units that are appropriate for residents with compromised immune systems and accessible to persons using wheelchairs or who have mobility impairments in order to provide equal access to emergency shelter services for persons with disabilities.  28 C.F.R. § 35.130(b)(1)(ii); and

    f.   Failing to provide A.H. a fully accessible unit compliant with ADA regulations and sufficient to provide her equal access to emergency shelter.  28 C.F.R. § 35.130(b)(1)(ii).

70. Defendants' conduct proximately caused harm to A.H., who suffered discrimination, physical injuries, and emotional distress.

71. Defendants' conduct proximately caused harm to Mr. Hunter, who suffered discrimination and emotional distress.

**SECOND CLAIM**
**Violation of Title III of Americans with Disabilities Act**
**(42 U.S.C. § 12181 *et seq.*)**
**(Against All Defendants)**

72. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

73. Title III of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.  42 U.S.C. § 12182(a), (b).

74. A.H. is a qualified individual with a disability within the meaning of 42 U.S.C. § 12182 and was a client or customer of a covered public accommodation.

75. The D.C. General shelter and the Girard Street Shelter is a "public accommodation" within the meaning of 42 U.S.C. § 12181(7).

76. Defendants own, lease or operate "public accommodations" and are therefore subject to Title III of the ADA.

77. Defendants violated Title III of the ADA by:

   a. Discriminating against A.H. on the basis of her disability by denying her the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation. 42 U.S.C. § 12182;

   b. Affording A.H. with an opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that was not equal to that afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii);

   c. Providing A.H. with a good, service, facility, privilege, advantage, or accommodation that was different or separate from that provided to other individuals. 42 U.S.C. § 12182(b)(1)(A)(iii);

   d. Denying A.H. an opportunity to participate in programs and activities that were not separate or different. 42 U.S.C. § 12182(b)(1)(B);

   e. Utilizing standards or criteria or methods of administration that had the effect of discriminating on the basis of disability or that perpetuate the

discrimination of others who are subject to common administrative control. 42 U.S.C. § 12182(b)(1)(D);

f.   Failing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii);

g.   Failing to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A)(iii);

h.   Failure to remove architectural barriers that are structural in nature, in existing facilities, where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv); and

i.   Excluding or otherwise denying Mr. Hunter equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities because of his known association with a person with disability. 42 U.S.C. § 12182(b)(1)(E).

78. Defendants' conduct proximately caused harm to A.H., who suffered discrimination, physical injuries, and emotional distress.

79. Defendants' conduct proximately caused harm to Mr. Hunter, who suffered discrimination and emotional distress.

**THIRD CLAIM**
**Violations of the Fair Housing Act**

**(42 U.S.C. § 3601 *et seq.*)**
**(Against All Defendants)**

80. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

81. A.H. has a disability within the meaning of the FHA, because she has impairments which substantially limit one or more major life activities.  42 U.S.C. § 3602(h).

82. Emergency shelter units are "dwellings" as defined in 42 U.S.C. § 3602(b).

83. Defendants are subject to the provisions of the FHA because they own or offer for occupancy dwellings pursuant to 42 U.S.C. § 3603(a)(1)(B).

84. Defendants injured A.H. and Mr. Hunter, who was associated with a victim of discrimination, in violation of the FHA by:

      a.  Discriminating against them in rental of, or otherwise making unavailable or denying, a dwelling because of a disability.  42 U.S.C. § 3604(f)(1);

      b.  Discriminating against them in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability.  42 U.S.C. § 3604(f)(2); and

      c.  Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

85. Defendants' conduct proximately caused harm to A.H., who suffered discrimination and emotional distress.

86. Defendants' conduct proximately caused harm to Mr. Hunter who suffered physical injuries, discrimination and emotional distress.

## FOURTH CLAIM
### Violation of Section 504 of the Rehabilitation Act
### (29 U.S.C. § 701 *et seq.*)
### (Against All Defendants)

87. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

88. The Rehabilitation Act prohibits recipients of federal funding from denying to qualified persons with disabilities the benefits provided by the recipient, or from subjecting persons with disabilities to discrimination. 29 U.S.C. § 794(a).

89. Defendants receive federal financial assistance in connection with their management of the emergency shelter system and other programs and services, and are therefore subject to 29 U.S.C. § 794(a).

90. Defendants' operations constitute a "program or activity" within the meaning of 29 U.S.C. § 794(b).

91. A.H. is a qualified individual with a disability as defined by 29 U.S.C. § 705(20).

92. Defendants have violated the Rehabilitation Act, 29 U.S.C. §701 *et seq.*, and the implementing regulations, 24 C.F.R. § 8.24, by:

> a. Denying A.H. the opportunity to benefit from the emergency shelter programs or activities, because of her disabilities;

    b.  Discriminating against A.H. because of her disability, including refusing to grant A.H.'s requests for reasonable accommodations or modifications;

    c.  Using criteria or methods of administration of their programs, which effectively discriminates because of disability and which defeat or substantially impair the objectives of the program for qualified individuals with a particular disability;

    d.  Adopting and enforcing policies which failed to ensure that A.H. had access and enjoyment of emergency shelter services in a manner equal to those without disabilities;

    e.  Failing to develop or maintain a sufficient number of units that are appropriate for those with compromised immune systems and accessible to persons using wheelchairs or who have mobility impairments in order to provide equal access to emergency shelter services for persons with disabilities; and

    f.  Failing to provide A.H. a fully appropriate and accessible unit and sufficient to provide her equal access to emergency shelter.

93. Defendants' conduct proximately caused harm to A.H., who suffered discrimination, physical injuries and emotional distress.

94. Defendants' conduct proximately caused harm to Mr. Hunter, who suffered discrimination and emotional distress.

## FIFTH CLAIM
### Violation of the District of Columbia Human Rights Act of 1977

**(D.C. Code § 2-1401.01 *et seq.*)**
**(Against All Defendants)**

95. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

96. A.H. has a disability within the meaning of the DCHRA because she has impairments which substantially limit one or more major life activities.  D.C. Code § 2-1401.02(5A).

97. Defendants have injured A.H. and Mr. Hunter in violation of the DCHRA, D.C. Code § 2-1402.21(d), by:

      a.   Discriminating in the rental of or otherwise making unavailable dwellings because of A.H.'s disability;

      b.   Discriminating in the terms, conditions, or privileges of a rental of a dwelling because of A.H.'s disability;

      c.   Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford person with disabilities equal opportunity to use and enjoy a dwelling.

98. Furthermore, Defendants have violated D.C. Code § 2-1402.21(d)(3)(D) by maintaining dwellings that fail to provide:

      a.   An accessible route into and through the dwelling; and

      b.   Usable kitchens and bathrooms so that an individual in a wheelchair can maneuver about the space.

99. In administering the District of Columbia shelter program, Defendants have promulgated and rigidly enforced against Plaintiffs regulations and policies which discriminate against people with disabilities.

100. Defendants limited or refused A.H. access to certain services and programs in violation of D.C. Code § 2-1402.73.

101. Defendants' conduct proximately caused harm to A.H. who suffered discrimination, physical injuries, and emotional distress.

102. Defendants' conduct proximately caused harm to Mr. Hunter who suffered discrimination and emotional distress.

**SIXTH CLAIM**
**Violation of Section 12 of the Homeless Services Reform Act**
**(D.C. Code § 4-751.01 *et seq.*)**
**(Against All Defendants)**

103. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

104. Defendants serve as a "provider" as defined by D.C. Code § 4-751.01(30).

105. A.H. and Mr. Hunter were "clients" as defined by D.C. Code § 4-751.01(7).

106. A.H. and Mr. Hunter are a "family" as defined by D.C. Code § 4-751.01(16).

107. A.H. and Mr. Hunter were "homeless" as defined by D.C. Code § 4-751.01(18).

108. A.H. and Mr. Hunter are "residents of the District of Columbia" as defined by D.C. Code § 4-205.03.

109. A.H. is an "individual with a disability" as defined by D.C. Code § 4-751.01(22).

110. Section 12 of the HSRA prohibits providers from discriminating against persons with disabilities and requires them to act in accordance with the DCHRA, the ADA, the Rehabilitation Act, and Title II of the Civil Rights Act of 1964.  D.C. Code §§ 4-754.01(a)(1), 4-754.11(2); 4-754.21(10).

111. Defendants have violation Section 12 of the HSRA by:

    a.   Failing to place A.H. in an appropriate and accessible shelter unit because of her disabilities.  D.C. Code §§ 4-754.11(2), 4-754.21(10);

    b.   Failing to provide reasonable modifications to policies, practices, and procedures when the modifications are necessary to avoid discrimination on the basis of disability.  D.C. Code §§ 4-754.11(3), 4-754.21(11);

    c.   Failing to establish procedures to revise practices and policies as may be necessary to ensure that clients may access services free from discrimination on the basis of disability.  D.C. Code § 4-754.21(16);

    d.   Failing to collaborate and coordinate with other service providers to meet the client's needs, as deemed appropriate by the provider and the client.  D.C. Code § 4-754.21(4);

    e.   Failing to develop or maintain a sufficient number of units that are appropriate for those with compromised immune systems and accessible to persons using wheelchairs or who have mobility impairments in order to provide equal access to emergency shelter services for persons with disabilities; and

      f.   Failing to provide temporary shelter that allowed A.H. reasonable privacy in caring for personal needs.  D.C. Code § 4-754.12(5).

      g.   Revoking permission to receive a visitor to provide respite care.  D.C. Code § 4-754.12(1).

112. Defendants' conduct proximately caused harm to A.H. who suffered discrimination, physical injuries, and emotional distress.

113. Defendants' conduct proximately caused harm to Mr. Hunter who suffered discrimination and emotional distress.

### SEVENTH CLAIM
### Negligence and Negligence Per Se

114. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

115. Defendants negligently failed to place A.H. in appropriate and accessible shelter units, to maintain the buildings adequately for her safety as a resident, and to provide her services and shelter free from discrimination on the basis of disability.

116. Defendants were negligent *per se* in failing to meet their obligations under the HSRA, D.C. Code § 4-751.01 *et seq.*

117. By failing to place the Hunter family in an accessible shelter unit, Defendants negligently breached their duty of care to Mr. Hunter who was compelled to carry A.H. and her wheelchair up and down multiple flights of steps and thereby injured his back.

118. Defendants' conduct proximately caused harm to A.H. and Mr. Hunter, who suffered physical injuries and emotional distress.

### EIGHTH CLAIM

29

**Negligence: Vicarious Liability**

119.  The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

120. Defendants are vicariously liable for the acts and omissions of their agents in providing reasonable care for A.H..

121. Defendants' conduct proximately caused harm to A.H. and Mr. Hunter, who suffered physical injuries and emotional distress.

## NINTH CLAIM
### Negligent Supervision

122. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

123. Defendants negligently failed to monitor and supervise the actions of contractors' employees and agents responsible for ensuring that A.H. resided in an appropriate and fully accessible shelter, in safe, clean and sanitary shelter conditions and in shelter free of discrimination based on A.H.'s disability.

124. Defendants' conduct proximately caused damages to A.H. and Mr. Hunter, who suffered physical injuries and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, A.H. and Mr. Hunter respectfully request that the Court enter an order:

1.  Declaring that the Defendants have violated:

   a. Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*;

   b. Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*;

   c. The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

    d. Section 504 of the Rehabilitation Act, 42 U.S.C. § 701 *et seq.*;

    e. The District of Columbia Human Rights Act of 1977, D.C. Code § 2-1401.01

        *et seq.*;

    f. The Homeless Services Reform Act, D.C. Code § 4-751.01 *et seq.*;

2. Declaring that the Defendants have acted negligently or have failed to act;

3. Awarding monetary damages to Plaintiffs in an amount to be determined at trial;

4. Awarding punitive damages from the private Defendants;

5. Awarding reasonable costs and attorneys fees;

6. Awarding any other relief that the court finds just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.

Respectfully submitted,

_____

Jeffrey S. Gutman
D.C. Bar No. 416954
Public Justice Advocacy Clinic
The George Washington University Law School
2000 G Street, N.W.
Washington, D.C. 20052
(202) 994-7463
Fax: (202) 994-4693

_____

Amber W. Harding

D.C. Bar No. 484130
Washington Legal Clinic for the Homeless
1200 U Street, NW, Third Floor
Washington, DC 20009
(202) 328-5500
Fax: (202) 328-5515

Counsel for Plaintiffs

November 16, 2012