**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| ANTHONY HUNTER on his behalf and as parent ) | |
| of his minor daughter, A.H.[1] ) | |
| 1709A St., S.E. ) | |
| Washington, D.C. 20020, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 12-1960 GK |
| ) | |
| v. ) | |
| ) | |
| THE DISTRICT OF COLUMBIA, ) | |
| a municipal corporation ) | |
| 1350 Pennsylvania Ave., N.W., Suite #419 ) | |
| Washington, D.C. 20004, ) | |
| ) | |
| THE COMMUNITY PARTNERSHIP FOR THE ) | |
| PREVENTION OF HOMELESSNESS ) | |
| 801 Pennsylvania Ave., S.E., Suite 360 ) | |
| Washington, D.C. 20003, ) | |
| ) | |
| COALITION FOR THE HOMELESS ) | |
| 1234 Massachusetts Ave, N.W., Suite 1015 ) | |
| Washington, D.C. 20005, ) | |
| ) | |
| and ) | |
| ) | |
| COMMUNITY OF HOPE ) | |
| 1413 Girard Street, N.W. ) | |
| Washington, D.C. 20009 ) | |
| ) | |
| Defendants ) | |
| _____) | |

### FIRST AMENDED COMPLAINT

---

[1]   Pursuant to Local Civil Rule 5.4(f)(2), the minor's name will be indicated by initials.

## INTRODUCTION

1. Plaintiff Anthony Hunter, on his own behalf and on behalf of his minor daughter, A.H., (collectively, the "Hunter family"), both residents of the District of Columbia, brings this action seeking declaratory relief, compensatory damages and punitive damages for the Defendants' violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.* (2006); Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"); 29 U.S.C. § 701, *et seq.* (2006); the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq.* (2006); the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01, *et seq.* (2001) (effective March 14, 2007); the Homeless Services Reform Act ("HSRA"), D.C. Code § 4-751.01 *et seq.* (2001) (effective April 8, 2011); and for negligence.

2. When the Hunter family, faced with immediate homelessness, sought shelter at the Virginia Williams Family Resource Center (hereinafter "Center") on December 7, 2011, A.H. was six years old and suffered from cri-du-chat syndrome and spina bifida. As a result of those and other conditions, she uses a wheelchair and is particularly prone to infection. When Mr. Hunter applied for shelter at the Center, he advised Center staff that his family required a wheelchair-accessible shelter unit and that his daughter required a clean, non-communal environment that minimized the risk of infection, including a private bathroom. The Hunter family was initially placed in the D.C. General Family Emergency Shelter ("D.C. General"), but the placement did not meet their disability-related needs.

3. On December 29, 2011, the Hunter family was transferred from D.C. General to an apartment-style shelter unit operated by the Community of Hope, the Girard Street

Apartments.  However, the family was placed in an inaccessible third floor unit without

elevator service.  Mr. Hunter was forced to carry his daughter in her wheelchair up and down

the stairs numerous times each day, causing him a back injury.  Neither the entrance to the

building nor the unit itself was wheelchair-accessible.  Despite repeated requests, the Hunters

were moved to the first floor only after legal counsel intervened on their behalf.

    4. From December 7, 2011 to March 12, 2012, the Defendants discriminated against

the Hunter family by knowingly, willfully and with deliberate indifference failing to place

them in an accessible environment, failing to maintain sufficient shelter units appropriate for

and accessible to persons with immune system and mobility impairments, failing to place the

family in an appropriate and accessible shelter unit, and failing to provide the family with

reasonable accommodations or modifications[2] in the unit to which they were assigned.

Defendants' failure to provide an accessible placement and to accommodate A.H. resulted in

injuries to her and her father.

**<u>JURISDICTION AND VENUE</u>**

    5. Jurisdiction over the federal law claims is conferred upon this Court pursuant to 28

U.S.C. § 1331 (2006).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §

1367 (2006) to hear and determine Plaintiffs' state law claims because those claims are so

related to the Plaintiffs' federal law claims that they form part of the same case or

controversy under Article III of the United States Constitution.  This Court has jurisdiction

over Plaintiffs' action for declaratory relief pursuant to 28 U.S.C. § 2201 (2006) and Rule 57

of the Federal Rules of Civil Procedure.

---

[2]    The terms "reasonable accommodation" and "reasonable modification" are used interchangeably in this complaint.

**PARTIES**

6. Anthony Hunter and his minor daughter, A.H., are residents of the District of Columbia.  Mr. Hunter sues on his own behalf and on behalf of his minor daughter, A.H., as her parent and legal guardian.

7. A.H., who was at times relevant here, six years old, has cri-du-chat syndrome, spina bifida and several other medical conditions, including bowel and bladder incontinence. A.H. was born with these disabilities,[3] conditions which have significantly impaired her ability to stand, walk, use stairs, and participate in other major life activities. Cri-du-chat syndrome is a disabling genetic disorder that causes mental retardation.  Spina bifida is a congenital birth defect of the spinal column which, in A.H.'s case, prevents her from walking and engaging in independent self-care, such as bathing, dressing and eating.  As a result, A.H. has used and continues to use a wheelchair.  These impairments and associated medical conditions have left A.H. susceptible to infections and slow to recover from them. Thus, her doctors have recommended that she live in an environment that minimizes exposure to infections and communicable illnesses.

8. The District of Columbia owns the buildings located at 1900 Massachusetts Avenue, S.E., ("D.C. General") in which the Hunter family resided between December 7, 2011 and December 29, 2011. The District of Columbia also owns the building located at 1413 Girard Street, N.W. ("Girard Street Apartments"), in which A.H. and Mr. Hunter resided between December 29, 2011 and March 12, 2012.  The District of Columbia, through

---

[3]     This complaint uses the terms "disability" and "disabled," except when referring to the FHAA's statutory language, which uses "handicap" and "handicapped," *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146 n. 2 (9th Cir. 2003), legislative history, or in quoting previous court decisions.   These terms are intended to have identical meanings.  *See id.*

its Department of Human Services ("DHS"), a cabinet-level agency of the District of Columbia, sets policy and provides social services for rehabilitation and self-sufficiency for residents of the District of Columbia, including assistance to people who are homeless or at risk of homelessness.  The District of Columbia receives federal funds for homeless programs and other programs and services.  The District funds and coordinates all family shelter services, and most individual services.  There are no privately run family shelters in the District.  DHS, through its Office of Shelter Monitoring, its ADA Coordinator and its contract-monitoring officer is responsible for monitoring and ensuring the homeless shelter system's compliance with the ADA, the Rehabilitation Act, and the FHA.

9. DHS contracts with the Community Partnership for the Prevention of Homelessness ("the Partnership") to direct and manage emergency shelter services as part of the homeless services continuum of care.  The Partnership is a nonprofit corporation established in 1989 with headquarters in Washington, D.C.  The Partnership in turn subcontracts with other organizations for the provision of services and management of homeless shelters.  The Partnership receives federal and District funds for homeless programs and other programs and services.

10.  Homeless services providers, such as the Community of Hope, Coalition for the Homeless, and the Partnership are required to make reasonable accommodations to their rules, policies, practices and procedures for qualified residents with disabilities and must make reasonable modifications, including changes to the physical structure of facilities, for such residents.  The District of Columbia and the Partnership are responsible for ensuring

that its subcontractors comply with the ADA, the Rehabilitation Act, the FHA, the DCHRA and the HSRA.  In addition, the Partnership directly operates the D.C. General shelter.

11.  Defendant Community of Hope is a non-profit corporation which provides shelter, transitional housing, health care, social services and community support services for people who are homeless.  The majority of its budget is devoted to housing and health care. Community of Hope contracts with the Partnership to provide emergency and other housing and shelter services to District of Columbia residents.  Pursuant to a contract with the Partnership, Community of Hope operates and is responsible for the day-to-day management of the Girard Street Apartments, which it leases from the District.  On information and belief, Community of Hope receives federal and District funds for homeless programs, health programs and other programs and services.  In particular, the Community of Hope has received substantial recent federal grants from both HHS and HUD.

12. Defendant Coalition for the Homeless ("the Coalition") is a non-profit corporation which provides shelter, transitional housing, and community support services for people who are homeless.  Pursuant to a contract with the Partnership, the Coalition operates the Virginia Williams Family Resource Center which is the centralized family intake center responsible for eligibility determinations, placements and transfers of families in the emergency shelter system.  The Coalition receives federal funds for homeless programs and other programs and services.

## STATUTORY BACKGROUND

13. Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and the regulations adopted thereunder, 28 C.F.R. § 35.130 *et. seq.* (2011), prohibit discrimination against people with

disabilities by public entities and their contractors, such as Defendants herein.  They require public entities to make "reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability" and to ensure that all services, programs, and activities are readily accessible to persons with disabilities. 28 C.F.R. § 35.130(b)(7).

14. Title II of the ADA, and the regulations adopted thereunder, also prohibits public entities and their contractors, such as Defendants, from denying "equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  28 C.F.R. § 35.130(g).

15. Title II of the ADA, and the regulations adopted thereunder, bar qualified individuals with a disability from being excluded from participation in, or denied the benefits of services, programs or activities of a public entity due to the entity's facilities being inaccessible or unusable.  28 C.F.R. § 35.149.

16. Title II of the ADA, and the regulations adopted thereunder, require public entities to operate each service, program or activity, when viewed in its entirety, to be readily accessible and usable by individuals with disabilities.  28 C.F.R. § 35.150.

17. In 1988, Congress extended the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, through the Fair Housing Amendments Act of 1988 ("the Amendments") to afford people with "handicaps" greater protection from housing discrimination.  The law defines "handicap" broadly and prohibits housing discrimination against individuals with physical and/or mental disabilities.

18. In passing the Amendments, Congress specifically prohibited "the use of stereotypes and prejudice to deny critically needed housing to handicapped persons." H.R. Rep. 100-711 at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2189. The FHA's ban on disability discrimination reflects a "clear pronouncement of a national commitment to end the unnecessary exclusion of people with handicaps from the American mainstream." *Id.* In amending the FHA, Congress acknowledged the devastating impact that housing discrimination has on individuals with disabilities and recognized that prohibition of such discrimination is absolutely essential to their inclusion in American life. *See id.*

19. The FHA makes it illegal to discriminate on the basis of mental or physical disability in the sale or rental of housing or in the provision of services or facilities in dwellings. It also places certain affirmative obligations on those involved in providing services related to housing, including requiring that reasonable accommodations be made in rules, policies, practices, and services when such accommodations are necessary to afford individuals with disabilities an equal opportunity to use and enjoy their homes. 42 U.S.C. § 3604(f)(2)(A). These protections extend to "any person associated with [the] renter or buyer," who is the victim of discrimination. 42 U.S.C. § 3604(f)(1)(C).

20. The Rehabilitation Act, 29 U.S.C. § 794, *et. seq.,* and the regulations adopted thereunder apply to recipients of federal funds, such as Defendants herein. The Rehabilitation Act prohibits discrimination against people with disabilities, requires a recipient to modify its housing policies and practices to ensure that it does not discriminate on the basis of disability, and requires a recipient to ensure that all services, programs, and activities are readily accessible to persons with disabilities. Ensuring that all programs are

8

readily accessible includes ensuring that a minimum number of units are accessible to persons with mobility impairments.

21. The DCHRA prohibits discrimination on the basis of disability in all aspects of housing including, but not limited to:

    a.   Discrimination of a person with a disability in rental of a dwelling;

    b.   Discrimination of a person associated with a person with a disability residing or intending to reside in a dwelling;

    c.   Discrimination in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability of the renter or person associated with the renter;

    d.   Refusal to make reasonable accommodations in rules, policies, practices, or services, when these accommodations may be necessary to afford any person equal opportunity to use and enjoy a dwelling; and

    e.   Failure to provide the dwelling with features of adaptive design such that it is readily accessible and usable by a person with a disability. D.C. Code § 2-1402.21(d).

22. The DCHRA provides that "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program or benefit to any individual on the basis of an individual's actual or perceived . . . disability . . . ." D.C. Code § 2-1402.73.

9

23. The DCHRA provides that "[a]ll permits licenses, franchises, benefits, exemptions, or advantages issued by or behalf of the government of the District of Columbia, shall specifically require and be conditioned upon full compliance with the provisions of this chapter; and shall further specify that the failure or refusal to comply with any provision of this chapter shall be a proper basis for revocation of such license, franchise, benefit, exemption, or advantage." D.C. Code § 2-1402.67.

24. The DCHRA further states that it is an unlawful discriminatory practice to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" wholly or partially for a discriminatory reason based on the actual or perceived disability.  D.C. Code § 2-1402.31.

25. The HSRA requires that clients served with the Continuum of Care be given shelter in "severe weather conditions."  D.C. Code § 4-754.11(5).  Severe weather conditions occur when the actual or forecasted temperature falls below 32 degrees. D.C. Code § 4-751.01(35).  On information and belief, District policy gives families a vested right to remain in shelter regardless of weather conditions once the family is placed, and that family can only lose that placement if it is terminated for cause after the completion of an appeal process. *See, e.g.,* D.C. Code § 4-754.11(18), § 4-754.36.

26. The HSRA gives clients served within the Continuum of Care the right to access services free from discrimination on the basis of disability in accordance with the DCHRA, the ADA, the Rehabilitation Act of 1973, and Title II of the Civil Rights Act of 1964.  D.C. Code § 4-754.11(2); D.C. Mun. Regs. tit. 29, § 2512.2.

27. The HSRA gives clients served within the Continuum of Care the right to receive reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the client's provider demonstrates that the modifications would fundamentally alter the nature of the services. D.C. Code § 4-754.11(3).  D.C. Mun. Regs. tit. 29, § 2512.3.

28. The HSRA requires service providers to collaborate and coordinate with other service providers to meet the homeless client's needs.  D.C. Code § 4-754.21(4).

29. The Office of Shelter Monitoring (OSM) was established by the HSRA pursuant to D.C. Code § 4-754.51, *et seq*. OSM is required to monitor shelters by evaluating, among things, "[a]ccessibility of shelters to clients with disabilities." § 4-754.52(a)(3). OSM is also required to "conduct inspections on the premises of each shelter covered." § 4-754.52(b). The Office is to inspect each program at least once annually.  D.C. Mun. Regs. tit. 29, § 2543.3.

30. The monitoring and inspection reports identify deficiencies, impose corrective actions and set time frames for completing corrective actions.  D.C. Mun. Regs. tit. 29, § 2543.6.  Providers are required to make corrections and to document them.  D.C. Mun. Regs. tit. 29, §§ 2543.8-.10.  Failure to do so will result in further procedures and remedies to enforce the implementation of required corrections.  D.C. Mun. Regs. tit. 29, §§ 2543.11-.16.

31. The HSRA prohibits homeless service providers, such as Defendants, from discriminating against individuals with disabilities and requires them to treat such individuals in accordance with the DCHRA, D.C. Code § 2-1401, *et seq*., the ADA, 42 U.S.C. § 12101, *et seq*., the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.), and Title II of the Civil Rights Act

11

of 1964, 42 U.S.C. § 2000a, *et seq.*. D.C. Code § 4-754.21(10); D.C. Mun. Regs. tit. 29, §

2515.13; 2545.3.

32. No public funds may be used for payment of goods and services from any vendor

or organization that engages in discriminatory practices.  D.C. Code § 4-755.02.

33. A service provider may terminate services to a client only when one of the

provisions listed in D.C. Code § 4-754.36 is satisfied and clients may appeal such decisions

to the D.C. Office of Administrative Hearings.  D.C. Code § 4-754.41.

34. The HSRA defines "temporary shelter" to include "24-hour apartment-style

housing accommodations for individuals or families who are homeless . . . provided directly

by, or through contract with or grant from, the District, for the purpose of providing shelter

and supportive services."  D.C. Code § 4-751.01(40).

## **FACTS**

### Building 12 – D.C. General Hospital

35. A.H. has cri-du-chat syndrome, spina bifida and several associated medical

conditions.  These disorders are disabling, and she is dependent on her caregivers to meet her

daily basic needs. She requires the use of a wheelchair and facilities that are fully wheelchair

accessible. A.H. is susceptible to infection and requires a climate-controlled living

environment without large numbers of people nearby who may expose her to infection.

36. During the relevant time period, with the exceptions of time during which she was

hospitalized, A.H. lived with her father, Anthony Hunter.

37. After losing their previous housing, on December 7, 2011 Mr. Hunter applied for

placement in a homeless shelter for himself and his daughter, A.H., at the Virginia Williams

Family Resource Center, which is the central intake office for families requesting shelter in the District.  Mr. Hunter explained to intake staff that his daughter had a mobility impairment and was susceptible to infection and requested reasonable accommodations for these disabilities.  Intake staff therefore prepared a written reasonable accommodation request.

38. The forecasted or actual temperature during the night of December 7, 2011 was less than 32 degrees, as it was for many of the nights that the Hunter family was in shelter.

39. Mr. Hunter's written reasonable accommodation request stated that A.H. uses a wheelchair and requires a wheelchair accessible unit.  Although Mr. Hunter informed staff members at the Center that A.H.'s medical conditions required a non-communal environment where she could have a private bathroom, Center staff did not record this information and this accommodation request on the reasonable accommodation request form.  Staff at the Center concluded that Mr. Hunter's reasonable accommodation request was complete.

40. Staff at the Center did not conclude that A.H. failed to meet statutory definitions of disabled or handicapped.  Staff at the Center did not conclude that the Hunters' accommodation requests were unreasonable or that making the accommodations requested would fundamentally alter the nature of the services to be provided.  Staff at the Center did not deny in writing Mr. Hunter's reasonable accommodation requests.

41. Failing to collaborate and coordinate with other service providers or to determine how to meet A.H.'s needs, staff placed Mr. Hunter and his daughter in "Building 12" at the D.C. General Shelter. The Center staff stated that Building 12 of the D.C. General Shelter was recently remodeled, accessible, and that he and his daughter would get their own room. The Center staff also told Mr. Hunter that there was an accessible bathroom near the room

and that it was the most private bathroom that was available at the shelter.  The Defendants

knew or reasonably should have known that Building 12 in general and the particular unit to

which the Hunters were assigned would not accommodate A.H.'s disabilities.

42. Defendants did not tell Mr. Hunter in writing or orally that his family's residence

at the D.C. General shelter would end on a particular date or after a particular period of

residence.  As a result, having no other housing options, Mr. Hunter expected to remain in

the D.C. General shelter indefinitely until circumstances permitted him to transition to

alternative housing.

43. About fifty families live in Building 12, each with their own room.  All families

share eating facilities and share multiple bathrooms.  There is no time limit set on how long

residents can remain at D.C. General.  Families are allowed access to their rooms at all times

of the day and return to the same room each day, where they keep all their belongings.

Residents are assigned to a social services staff member from the Partnership throughout

their time in the shelter, and they work with the staff member on long term employment and

housing goals.  Residents are responsible for cleaning their own rooms.

44. Upon information and belief, Defendant District of Columbia has never claimed

in communications with the Department of Justice ("DOJ") that Building 12 is wheelchair

accessible.

45. A.H. is able to operate her own wheelchair without assistance if she is in a

wheelchair-accessible environment.

46. The ramp that leads to the front door of D.C. General's Building 12 does not meet accessibility guidelines because its slope is excessively steep and the sidewalk is broken. A.H. was not able to get herself up and down this ramp without assistance.

47. Mr. Hunter and his daughter shared a single bathroom, without a working lock, with five other families. The bathroom had one shower and one toilet.  The shower was not suitable for A.H.'s needs because Mr. Hunter could not hold her upright on the shower seat while simultaneously operating the shower.

48. Although the staff claimed to clean the bathroom every other day, it was often filthy.  When the staff did clean it, they used excessive bleach, the smell of which was so strong that it burned Mr. Hunter's eyes.  As a result, Mr. Hunter bathed A.H. as best as he could on her bed instead.

49. On information and belief, there are rooms with private bathrooms elsewhere in the D.C. General Shelter complex and accessible, non-communal options existed outside D.C. General.

50. About fifty families live in D.C. General's Building 12.  All of the families eat in one room.  On a number of occasions, Mr. Hunter asked the staff if he and A.H. could eat in a separate room to limit A.H.'s exposure to the many children who were sick in the building. The staff refused to allow him to do so.

51. As soon as the Hunter family arrived at D.C. General and Mr. Hunter discovered that the placement did not meet A.H.'s disability-related needs, he asked his case manager to move him to an accessible and non-communal placement.  His case manager, Ms. Moses,

informed Mr. Hunter that she could not process his request unless he submitted verification

from A.H.'s doctors.

52. The intentional refusal to process a reasonable accommodation request until

verification is received is in direct contradiction to the official reasonable accommodation

policy and procedure of Defendants, which Defendant District of Columbia submitted to the

DOJ pursuant to the Settlement Agreement, described below.

53. On December 21, 2011, Mr. Hunter renewed his reasonable accommodation

request in writing and with medical verification letters.  The letter from Dr. Laura Tosi

reiterated that "it is imperative that [A.H.] have a safe climate-controlled living environment

and that she not be exposed to large numbers of people as might be encountered in a shelter

situation."  The Defendants did not determine that A.H. did not have a disability or handicap,

that her request was unreasonable or that making the accommodations would fundamentally

alter the nature of the services provided.  The Defendants did not deny that request in writing.

54. While residing at the D.C. General shelter, A.H. developed a urinary tract

infection that lasted a few days. She received treatment at Children's Hospital.

55. Mr. Hunter became aware that some D.C. General Shelter residents had

wheelchair-accessible rooms with private bathrooms, but he was not told why his family was

not offered one of those units.

56. On or about December 29, 2011, Mr. Hunter was told by Mr. Berry, a member of

the staff at the D.C. General shelter, that his family would be transferred to the Girard Street

Apartments.  Mr. Hunter was not informed that the Girard Street Apartments were

inaccessible to those using wheelchairs.  Defendants failed to collaborate and coordinate with

service providers or determine how to meet A.H.'s needs when staff placed the Hunter family in the Girard Street Apartments.

57. Defendants did not then or at any time tell Mr. Hunter in writing or orally that his family's residence at the Girard Street Apartments would end at a date certain or after a particular period of residence.  As a result, having no other housing options, Mr. Hunter expected to remain in the Apartments indefinitely until circumstances permitted him to transition to alternative housing.

The Department of Justice Settlement

58. In 2007, the DOJ Civil Rights Division performed a compliance review of the accessibility of the D.C. shelter care system.  The DOJ inspected fifteen shelters, including the D.C. General Shelter and the Girard Street Apartments.  As a result of that review and a subsequent settlement agreement, the Defendants have been made aware that the shelter system in general and the D.C General Shelter and the Girard Street Apartments (discussed below) in particular failed to comply with federal and local laws which guarantee individuals with disabilities equal access to shelter services.  The Settlement Agreement required the District to develop plans to ensure that the shelters are accessible and usable by people with disabilities.  Subsequent litigation by private parties also alleged violation federal and local anti-disability discrimination laws in these shelters.

59. Paragraph 24 of the DOJ Settlement Agreement further required the District of Columbia to "create and implement procedures for ensuring that any contractor or subcontractor of the District providing services in the Shelter Program is providing these services in compliance" with Title II of the ADA. Among other activities, this paragraph

requires that the District execute "scheduled and unscheduled visits to intake site and Shelters" and that it develop "sanctions for contractors or subcontractors."

60. As part of the implementation of the Settlement Agreement, Defendant District of Columbia, through the DHS, has claimed that it maintains a sufficient inventory of wheelchair-accessible family shelter units. Nonetheless, during the time period relevant here, the Defendants failed to place the Hunter family in any of these accessible units.

61. On information and belief, Defendant District of Columbia has never claimed or demonstrated to DOJ that any wheelchair accessible family shelter units are located at D.C. General Hospital Building 12 or on the third floor of Girard Street Apartments.

The Girard Street Apartments – Generally

62. When Mr. Hunter and his daughter moved into the Girard Street Apartments, he received a Resident Handbook by defendant Community of Hope governing the Girard Street Program.

63. The Handbook states that the Girard Street Apartments are a "temporary shelter" for families, as defined in the Homeless Services Reform Act.

64. The Handbook provides that the head of the family receives a key to their apartment and Mr. Hunter was provided one.

65. The Handbook requires all adult residents to pay 30% of their income into an escrow account. The Handbook permits residents to make maintenance requests and requires staff to give notice before entering apartment units.

66. The Girard Street Apartments are constructed as a traditional apartment building, with approximately 20 separate keyed apartment units for residents containing kitchens, bedrooms, living areas and bathrooms.

67. Residents at the Girard Street Apartments are permitted to decorate their units and place personal items in them.  Mr. Hunter brought his television set to his apartment.

68. Mr. Hunter was responsible for cleaning his apartment and was entitled to notice before shelter staff entered his apartment.

The Girard Street Apartments – Accessibility

69. The Defendants were aware of Mr. Hunter's reasonable accommodation requests, A.H.'s impairments and use of a wheelchair, and had received letters explaining A.H.'s medical conditions from her school social worker and doctors.  Nevertheless, they placed Mr. Hunter and his daughter in Unit 303, located on the third floor of the Girard Street Apartments on or about December 29, 2011.

70. Defendants did not deny Mr. Hunter's reasonable accommodation requests in writing.  The Defendants were aware or should reasonably been aware that the Girard Street Apartments did not accommodate AH's disability-related needs.  Defendants ignored Mr. Hunter's reasonable accommodation requests.

71. Following Mr. Hunter's arrival at the Girard Street Apartments, the staff questioned him about A.H.'s mobility impairments and he described them to the staff. Nonetheless, Community of Hope staff told him, contrary to his expectation and understanding, that his family would not receive an accessible unit.  Rather, he was told that the only available unit was on the third floor.

19

72. The ramp leading up to the entrance door and the door itself did not meet accessibility guidelines nor were they accessible for A.H.

73. Upon entering the Girard Street Apartments, there are three stairs that lead from the landing up to the lobby, the phone room, the computer room, and several apartments. The landing has a wheelchair lift designed to carry residents with mobility impairments up the three stairs. During the entire time that A.H. resided at the Girard Street Apartments, A.H. could not use the lift because the staff informed Mr. Hunter that it was not operational. Every time Mr. Hunter and A.H. entered the building, Mr. Hunter had to pick up his daughter in the wheelchair to carry her up those steps.

74. The only access to the third floor in the Girard Street Apartments building is via two flights of stairs. The only elevator in the building runs between the basement and the first floor. Consequently, numerous times a day, Mr. Hunter had to carry his daughter and her wheelchair up and down two flights of stairs. Since there was a sign that stated that no one could leave strollers or wheelchairs in the lobby, Mr. Hunter had to carry his daughter in her wheelchair upstairs. This proved particularly difficult when Mr. Hunter also had to carry laundry or groceries. Staff at the shelter observed Mr. Hunter carrying his daughter and her wheelchair from the lobby to the third floor and vice versa every day and did nothing to relocate the family.

75. The hallways within the Hunter family's third floor unit at Girard Street were too narrow to accommodate A.H.'s wheelchair. Therefore, Mr. Hunter had to carry A.H. from the living room to the bedroom and bathroom.

76. On January 3, 2012, Mr. Hunter filed yet another reasonable accommodation request, noting A.H.'s need for a wheelchair-accessible unit.  Although the Defendants have a duty to respond promptly to such requests, the Defendants did not respond to it at all.

77. On February 4, 2012, Mr. Hunter experienced back and chest pain while carrying A.H. and her wheelchair upstairs.  As a result, he visited the emergency room at Washington Hospital Center, and returned to the hospital on February 7 with continued severe pain and discomfort.  One of the February 7, 2012 discharge instructions was to avoid heavy lifting.  His back discomfort continues.  His condition made it difficult for him to take proper care of A.H.

78. Mr. Hunter reported his back injury to Ruth Schickel, the program director at the Girard Street Apartments.  He asked Ms. Schickel why they had not been moved to a first floor unit.  She responded that, even though the family living in one of the accessible first floor units did not need the accessible features of the unit, she could not require them to transfer to a different unit so that the Hunter family could move in.

79. Ms. Schickel's statement is in direct contradiction with the Defendants' "Accessible Unit Transfer Protocol," as submitted to DOJ as part of the implementation of the Settlement Agreement.  The Protocol states:

> If a family is placed in a unit that is designed to meet the needs of those persons with physical disabilities and they do not have a need for an accessible unit, the family will be asked to sign the Accessible Unit Transfer Form (Appendix H) at the time of the placement.  If the accessible unit is needed for a family that has accessibility needs the initial family will be relocated to another unit meeting their family size within 24 hours.  A family in need of an accessible unit may submit a request for reasonable accommodation under the standard reasonable accommodation procedures.  If an accessible unit is occupied by a family that does not have a need for that type of unit, that family will be relocated within 24 hours and the unit made available for the

family with an accessibility need within 72 hours or as soon as the unit is ready for occupancy.

The Girard Street Apartments – Respite Care

80. A.H. cannot be left alone while awake without risking her safety. Her medical conditions sometimes cause her to stop breathing, to vomit and to choke. Mr. Hunter wanted someone with some medical training to provide occasional respite care.

81. Mr. Hunter requested that staff at the Girard Street Apartments permit his friend, Ricola Jenkins, a nursing student, to visit Girard Street in order to assist him with the care of A.H.. Indeed, case manager Tiffany Anderson, observing Mr. Hunter's responsibilities with respect to his daughter, recommended that he request respite care and to discuss it with Ms. Schickel. Community of Hope staff asked Mr. Hunter to make his request for a visitor in writing and he did so. The request was approved for one visit only.

82. The Resident Handbook prohibits visitors during the first month of residence, but states that visits from medical and other professionals are always permitted. The Resident Handbook does not bar visitors to resident who have not made required deposits to their escrow account.

83. Community of Hope staff denied additional requests to allow Ms. Jenkins to provide respite care. They said that Mr. Hunter's privileges to receive visitors had been revoked because Mr. Hunter had inadequate funds in his shelter escrow account.

84. Revoking Mr. Hunter's privileges to receive visitors was not required by the Resident Handbook and was an unlawful sanction in direct contradiction to both the HSRA and the Girard Street Apartments' own approved program rules. Even if the sanction had

22

been lawful, an exception should have been made to reasonably accommodate A.H.'s medical needs.

85. Ms. Schickel informed Mr. Hunter that she intended to deny his reasonable accommodation request for visitors to provide respite care because of the escrow account balance.  As a result, she directed Mr. Hunter to withdraw his reasonable accommodation request for a visitor to provide respite care. Reasonably believing the request to be futile, he withdrew it as asked.  Had a written denial been issued, Mr. Hunter should have been informed of his appeal rights to challenge that determination.  No appeal rights attached to Mr. Hunter's withdrawal of his request.

86. On February 10, 2012, after Mr. Hunter's attorney intervened, Defendants finally transferred the Hunter family to Unit 106 on the first floor of the Girard Street Apartments. While this unit was more accessible than the third floor unit, the Defendants' failure to allow the Hunters access to a working wheelchair lift to get up to the first floor of the Apartments resulted in a continued failure to reasonably accommodate A.H.'s disabilities.

87. On or about February 21, 2012, A.H. was hospitalized at Children's Hospital for a surgical procedure and post-operative recovery.  She did not return to the Girard Street Apartments.

88. The Hunter family moved out of the Girard Street Apartments on March 12, 2012 and was relocated to a supportive housing program located at 1709 V Street, S.E. and operated by Sasha Bruce Youthwork.  This housing program is part of the homeless services continuum of care pursuant to the HSRA and is funded and/or operated by Defendant District of Columbia through the Department of Human Services and Defendant Partnership.

89. Upon information and belief, the Department of Human Services and the Partnership maintain a database which records each reasonable accommodation request and the providers' response to it.  Upon information and belief, DHS and the Partnership maintain records of shelter inventory and information relating to their accessibility to those with disabilities.

90. The Office of Shelter Monitoring, which is an office within DHS, is responsible for performing at least annual inspections of each shelter in the continuum for its accessibility to persons with disabilities. The Office is statutorily required to monitor and inspect shelters and to impose corrective action plans when necessary to ensure that the shelters are accessible and that providers are providing services free of discrimination on the basis of disability.  If a provider fails to comply with the corrective action plan, the Office has authority to resort to remedies to enforce compliance.  Shelter residents and the Hunter family in particular reasonably and justifiably rely upon the District to ensure compliance with federal and local anti-discrimination requirements.

91. The District of Columbia and the Partnership knew or reasonably should have known that the shelters to which the Hunter family was assigned would not and did not accommodate A.H.'s disability-related needs and should have known which, if any, units were available to accommodate the Hunter family's needs.  If no such units existed, the Defendants should have arranged for shelter for the Hunter family outside the shelter system.

92. While A.H. was a resident at the D.C. General Shelter and the Girard Street Apartments, Defendants knowingly, willfully, intentionally, recklessly and with deliberate indifference denied her the benefits of and rights to full access to shelter services because

she has a disability.  Upon information and belief, Defendants failed to maintain sufficient numbers of non-communal and wheelchair-accessible apartments in the family emergency shelter system so as to allow equal access to persons who use wheelchairs and have immune disorders.  In addition, Defendants failed to maintain and/or modify the D.C. General Shelter and Girard Street Apartments in a manner that allowed persons with mobility impairments equal access to the buildings and living units, failed to meet or unreasonably delayed responding to A.H.'s numerous requests for reasonable accommodations and unreasonably failed to accommodate Mr. Hunter's requests for a visitor to provide respite care.

93. The failures and delays in granting the Hunter family's reasonable accommodation request is also in direct violation of the DOJ Settlement, which states: "Reasonable modification requests shall be granted immediately where the denial of the request is reasonably likely to cause serious harm to an individual with a disability." (Paragraph 21(a)(iii)).

94. In acting or in failing to act as alleged in this Complaint, each employee or officer of each Defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by one of the Defendants as principal.

95. The shelter units that Mr. Hunter and A.H. occupied at the D.C. General shelter and at Girard Street Apartments, and that are the subject of this litigation, are "dwellings" within the meaning of the FHA, 42 U.S.C. § 3602(b); constitute a service, program or activity of a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131; amount to a

program or activity within the meaning of the Rehabilitation Act, 29 U.S.C. § 794;  involve a

"transaction in real property" within the meaning of the DCHRA, D.C. Code § 2-1401.02;

and are "public accommodations" within the meaning of the DCHRA, D.C. Code § 2-

1401.02(24).

96. Upon information and belief, DC's contract with Partnership requires the

Partnership to comply with Title II of the ADA, the Rehabilitation Act and the FHA and also

requires it to monitor its contractors for such compliance. It is also Plaintiffs' belief that the

Partnership requires the Coalition for the Homeless and Community of Hope to comply with

Title II of the ADA, the Rehabilitation Act and the Fair Housing Act through its contract and

program requirements.

## CLAIMS

### FIRST CLAIM
### Violation of Title II of the Americans with Disabilities Act
### (42 U.S.C. § 12131 *et seq.*)
### (Against All Defendants)

97. The facts contained in the paragraphs above are hereby repeated and re-alleged as

set forth above.

98. Title II of the ADA provides that "no qualified individual with a disability shall,

by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity."  42 U.S.C. § 12132.

99. A.H. is a qualified individual with a disability within the meaning of 42 U.S.C. §

12131(2).

26

100. Defendant District of Columbia administers shelter services through DHS, a public entity within the meaning of 42 U.S.C. § 12131(1).  The remaining Defendants are public entities within the meaning of 42 U.S.C. § 12131(1) because they are instrumentalities of the District of Columbia.  Accordingly, Defendants are subject to Title II of the ADA.

101. Defendants have violated Title II of the ADA and implementing regulations by:

    a.  Denying A.H., on account of her disability, the benefits of their services, programs, and activities and subjecting her to discrimination. 28 C.F.R. § 35.130(a);

    b.  Refusing to make reasonable modifications in their policies, practices, or procedures necessary to afford A.H. and other individuals with disabilities access to the services and privileges offered by Defendants. 28 C.F.R § 35.130(b)(7);

    c.  Using criteria or methods of administration of their services, programs, or activities, the effect of which discriminated against A.H. on the basis of her disability.  28 C.F.R. § 35.130(b)(3)(i);

    d.  Adopting and enforcing or refusing to adopt and enforce policies and practices designed and intended to ensure that A.H. had access to and enjoyment of emergency shelter services in a manner equal to those without disabilities.  28 C.F.R. § 35.130(b)(7);

    e.  Failing to develop or maintain a sufficient number of units that are appropriate for residents with compromised immune systems and accessible to persons using wheelchairs or who have mobility

impairments in order to provide equal access to emergency shelter

services for persons with disabilities.  28 C.F.R. § 35.130(b)(1)(ii); and

f.   Failing to provide A.H. a fully accessible unit compliant with ADA

regulations and sufficient to provide her equal access to emergency

shelter.  28 C.F.R. § 35.130(b)(1)(ii).

g.   Violating contractual, statutory and regulatory obligations to comply

with Title II of the ADA.  *See*, *e.g.* D.C. Code § 4-754.21(10); § 4-

754.11(2); D.C. Mun. Regs. tit. 29, § 2545.3

102.  Defendants' conduct proximately caused harm to A.H., who suffered

discrimination, physical injuries, and emotional distress.

103.  Defendants' conduct proximately caused harm to Mr. Hunter, who suffered

discrimination, physical injuries and emotional distress.

**SECOND CLAIM**
**Violations of the Fair Housing Act**
**(42 U.S.C. § 3601 *et seq.*)**
**(Against All Defendants)**

104.  The facts contained in the paragraphs above are hereby repeated and re-alleged

as set forth above.

105.  A.H. has a "handicap" within the meaning of the FHA, because she has

impairments which substantially limit one or more major life activities.  42 U.S.C. § 3602(h).

106.  Emergency shelter units are "dwellings" as defined in 42 U.S.C. § 3602(b).

107.  Defendants are subject to the provisions of the FHA because they own or offer

for occupancy dwellings pursuant to 42 U.S.C. § 3603(a)(1)(B).

108. Defendants injured A.H. and Mr. Hunter, who was associated with a victim of discrimination, in violation of the FHA by:

    a.  Discriminating against them in rental of, or otherwise making unavailable or denying, a dwelling because of a disability.  42 U.S.C. § 3604(f)(1);

    b.  Discriminating against them in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a disability.  42 U.S.C. § 3604(f)(2); and

    c.  Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford disabled persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

109. Defendants' conduct proximately caused harm to A.H., who suffered discrimination, physical injuries and emotional distress.

110. Defendants' conduct proximately caused harm to Mr. Hunter who suffered physical injuries, discrimination and emotional distress.

**THIRD CLAIM**
**Violation of Section 504 of the Rehabilitation Act**
**(29 U.S.C. § 701 *et seq.*)**
**(Against All Defendants)**

111. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

112. The Rehabilitation Act prohibits recipients of federal funding from denying to qualified persons with disabilities the benefits provided by the recipient, or from subjecting persons with disabilities to discrimination.  29 U.S.C. § 794(a).

113. Defendants receive federal financial assistance in connection with their management of the emergency shelter system and other programs and services, and are therefore subject to 29 U.S.C. § 794(a).

114. Defendants' operations constitute a "program or activity" within the meaning of 29 U.S.C. § 794(b).

115. A.H. is a qualified individual with a disability as defined by 29 U.S.C. § 705(20).

116. Defendants have violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the implementing regulations, 24 C.F.R. § 8.24, by:

> a.  Denying A.H. the opportunity to benefit from the emergency shelter programs or activities, because of her disabilities;
>
> b.  Discriminating against A.H. because of her disability, including refusing to grant A.H's requests for reasonable accommodations or modifications;
>
> c.  Using criteria or methods of administration of their programs, which effectively discriminates because of disability and which defeat or substantially impair the objectives of the program for qualified individuals with a particular disability;

d.  Adopting and enforcing policies which failed to ensure that A.H. had

access and enjoyment of emergency shelter services in a manner equal to

those without disabilities;

e.  Failing to develop or maintain a sufficient number of units that are

appropriate for those with compromised immune systems and accessible

to persons using wheelchairs or who have mobility impairments in order

to provide equal access to emergency shelter services for persons with

disabilities; and

f.  Failing to provide A.H. a fully appropriate and accessible unit and

sufficient to provide her equal access to emergency shelter.

117. Defendants' conduct proximately caused harm to A.H., who suffered

discrimination, physical injuries and emotional distress.

118. Defendants' conduct proximately caused harm to Mr. Hunter, who suffered

discrimination, physical injuries and emotional distress.

**FOURTH CLAIM**
**Violation of the District of Columbia Human Rights Act of 1977**
**(D.C. Code § 2-1401.01 *et seq.*)**
**(Against All Defendants)**

119. The facts contained in the paragraphs above are hereby repeated and re-alleged

as set forth above.

120. A.H. has a disability within the meaning of the DCHRA because she has

impairments which substantially limit one or more major life activities.  D.C. Code § 2-

1401.02(5A).

121. Defendants' homeless shelters, namely the D.C. General Shelter and the Girard Street Apartments are public accommodations within the definition under the DCHRA because they provide family shelter units to accommodate homeless families seeking health, recreation or rest.  D.C. Code § 2-1401.02(24).

122. Defendants have injured A.H. and Mr. Hunter in violation of the DCHRA, D.C. Code § 2-1402.21(d), by:

    a.  Discriminating in the rental of or otherwise making unavailable dwellings because of A.H.'s disability;

    b.  Discriminating in the terms, conditions, or privileges of a rental of a dwelling because of A.H.'s disability;

    c.  Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford person with disabilities equal opportunity to use and enjoy a dwelling.

123. Furthermore, Defendants have violated D.C. Code § 2-1402.21(d)(3)(D) by maintaining dwellings that fail to provide:

    a.  An accessible route into and through the dwelling; and

    b.  Usable kitchens and bathrooms so that an individual in a wheelchair can maneuver about the space.

124. Additionally, Defendants have injured A.H. and Mr. Hunter in violation of the DCHRA, D.C. Code § 2-1402.31(a)(1), by denying Plaintiffs the full and equal enjoyment of

the facilities and accommodations offered by places of public accommodation because of A.H.'s disability.

125. In administering the District of Columbia shelter program, Defendants have promulgated and rigidly enforced against the Plaintiffs regulations and policies which discriminate against people with disabilities.

126. Defendant District of Columbia limited or refused A.H. access to certain facilities, services and programs in violation of D.C. Code § 2-1402.73.

127. Defendant District of Columbia violated § 2-1402.67: "[a]ll permits, licenses, franchises, benefits, exemptions, or advantages issued by or behalf of the government of the District of Columbia, shall specifically require and be conditioned upon full compliance with the provisions of this chapter; and shall further specify that the failure or refusal to comply with any provision of this chapter shall be a proper basis for revocation of such permit, license, franchise, benefit, exemption, or advantage."

128. Defendants' conduct proximately caused harm to A.H. who suffered discrimination, physical injuries, and emotional distress.

129. Defendants' conduct proximately caused harm to Mr. Hunter who suffered discrimination, physical injuries and emotional distress.

**FIFTH CLAIM**
**Violation of Section 12 of the Homeless Services Reform Act**
**(D.C. Code § 4-751.01 *et seq.*)**
**(Against All Defendants)**

130. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

131. Defendants are included in the definition of the "District" which is obligated to provide homeless services based on a Continuum of Care.  D.C. Code § 4-751.01(130; D.C. Code § 4-753.01(a).

132. Defendants each serve as a "provider" as defined by D.C. Code § 4-751.01(30).

133. A.H. and Mr. Hunter were "clients" as defined by D.C. Code § 4-751.01(7).

134. A.H. and Mr. Hunter are a "family" as defined by D.C. Code § 4-751.01(16).

135. A.H. and Mr. Hunter were "homeless" as defined by D.C. Code § 4-751.01(18).

136. A.H. and Mr. Hunter are "residents of the District of Columbia" as defined by D.C. Code § 4-205.03.

137. A.H. is an "individual with a disability" as defined by D.C. Code § 4-751.01(22).

138. When the Plaintiffs requested shelter on December 7, 2011, the District was experiencing "severe weather conditions" as defined in D.C. Code § 4-751.01(35).

139. Section 12 of the HSRA prohibits providers from discriminating against persons with disabilities and requires them to act in accordance with the DCHRA, the ADA, the Rehabilitation Act, and Title II of the Civil Rights Act of 1964.  D.C. Code §§ 4-754.01(a)(1), 4-754.11(2); 4-754.21(10).

140. Defendants have violated Section 12 of the HSRA by:

    a. Failing to place A.H. in an appropriate and accessible shelter unit because of her disabilities.  D.C. Code §§ 4-754.11(2), 4-754.21(10);

    b. Failing to provide reasonable modifications to policies, practices, and procedures when the modifications were necessary to avoid

discrimination on the basis of disability.  D.C. Code §§ 4-754.11(3), 4-754.21(11);

c.   Failing to establish procedures to revise practices and policies as may be necessary to ensure that clients may access services free from discrimination on the basis of disability.  D.C. Code § 4-754.21(16);

d.   Failing to collaborate and coordinate with other service providers to meet the client's needs, as deemed appropriate by the provider and the client.  D.C. Code § 4-754.21(4);

e.   Failing to develop or maintain a sufficient number of units that are appropriate for those with compromised immune systems and accessible to persons using wheelchairs or who have mobility impairments in order to provide equal access to emergency shelter services for persons with disabilities, resulting in violations of federal and local anti-discrimination statutes. D.C. Code §§ 4-754.11(2), 4-754.21(10);

f.   Failing to provide temporary shelter that allowed A.H. reasonable privacy in caring for personal needs.  D.C. Code § 4-754.12(5).

g.   Refusing and revoking permission to receive a visitor to provide respite care.  D.C. Code §§ 4-754.12(1), 4-754.37(b); and

h.   Failing to place the Plaintiffs in a shelter that reasonably accommodated A.H.'s disabilities during severe weather conditions.  D.C. Code § 4-754.11(5).

141. Defendants' conduct proximately caused harm to A.H. who suffered discrimination, physical injuries, and emotional distress.

142. Defendants' conduct proximately caused harm to Mr. Hunter who suffered discrimination and emotional distress.

### SIXTH CLAIM
### Negligence

143. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

144. The DOJ Settlement and HSRA imposed a particular duty upon Defendant District of Columbia to monitor, inspect, oversee and ensure that its contractors, delegees and agents which provide services to homeless families and individuals comply with Title II of the ADA, the FHA, the Rehabilitation Act, the DCHRA and the HSRA, make accessible shelters and the services provided within them to clients with disabilities and modify policies and practices when reasonably necessary to accommodate the needs of disabled individuals seeking and provided services within the Continuum of Care.  The District negligently failed to place or to ensure that the Hunter family was placed in appropriate and accessible shelter units, and that the Hunter family was provided modifications to policies and practices necessary to avoid discrimination on the basis of disability.

145. On information and belief, contractual and other requirements and the HSRA imposed a duty upon Defendant Community Partnership for the Prevention of Homelessness to monitor, inspect, oversee and ensure that its contractors, delegees and agents which provide services to homeless families and individuals, comply with Title II of the ADA, the FHA, the Rehabilitation Act, the DCHRA and the HSRA, make accessible shelters and the

services provided within them to clients with disabilities and to modify policies and practices when reasonably necessary to accommodate the needs of disabled individuals seeking and provided services within the Continuum of Care. The Partnership negligently failed to place or to ensure that the Hunter family was placed in appropriate and accessible shelter units, and that the Hunter family was provided modifications to policies and practices necessary to avoid discrimination on the basis of disability.

146. On information and belief, contractual and other requirements and the HSRA imposed a duty upon The Community Partnership for the Prevention of Homelessness, the Coalition for the Homeless and the Community of Hope to comply with Title II of the ADA, the FHA, the Rehabilitation Act, the DCHRA and the HSRA, make accessible shelters and the services provided within them to clients with disabilities and to modify policies and practices when reasonably necessary to accommodate the needs of disabled individuals seeking and provided services within the continuum of care. These defendants negligently failed to place or to ensure that the Hunter family was placed in appropriate and accessible shelter units, and that the Hunter family was provided modifications to policies and practices necessary to avoid discrimination on the basis of disability.

147. Defendants are vicariously liable for the acts and omissions of their agents, contractors and delegees in failing to comply with statutory and contractual requirements prohibiting discrimination on the basis of disability.

148. Defendants' conduct proximately caused harm to A.H. and Mr. Hunter, who suffered physical injuries and emotional distress.

**SEVENTH CLAIM**
**Negligence Per Se**

149. The facts contained in the paragraphs above are hereby repeated and re-alleged as set forth above.

150. Defendants were negligent *per se* in failing to meet their duties and obligations under the ADA, FHA, Rehabilitation Act, DCHRA and HSRA.

### PRAYER FOR RELIEF

WHEREFORE, A.H. and Mr. Hunter respectfully request that the Court enter an order:

1. Declaring that the Defendants have violated:

    a. Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*;

    b. The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

    c. Section 504 of the Rehabilitation Act, 42 U.S.C. § 701 *et seq.*;

    d. The District of Columbia Human Rights Act of 1977, D.C. Code § 2-1401.01 *et seq.*;

    e. The Homeless Services Reform Act, D.C. Code § 4-751.01 *et seq.*;

2. Declaring that the Defendants have acted negligently or have failed to act;

3. Awarding monetary damages to Plaintiffs in an amount to be determined at trial;

4. Awarding punitive damages from the private Defendants;

5. Awarding reasonable costs and attorneys fees;

6. Awarding any other relief that the court finds just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.

Respectfully submitted,


/s/ Jeffrey S. Gutman
Jeffrey S. Gutman
D.C. Bar No. 416954
Public Justice Advocacy Clinic
The George Washington University Law School
2000 G Street, N.W.
Washington, D.C. 20052
(202) 994-7463
Fax: (202) 994-4693


/s/ Amber W. Harding
Amber W. Harding
D.C. Bar No. 484130
Washington Legal Clinic for the Homeless
1200 U Street, NW, Third Floor
Washington, DC 20009
(202) 328-5500
Fax: (202) 328-5515

Counsel for Plaintiffs

Dated: April 29, 2013