**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **ANTHONY HUNTER,** *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. **1:12-cv-01960 (GK)** |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**DISTRICT OF COLUMBIA'S MOTION FOR**
**DISMISSAL OF PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) and Local Civil Rule 7(a), Defendant the District of Columbia (the "District") respectfully submits this memorandum of points and authorities in support of its motion for the dismissal of Plaintiffs' First Amended Complaint ("Amended Complaint"). The Court should dismiss the Amended Complaint because Plaintiffs fail to adequately plead the necessary allegations to support their claims and because many of Plaintiffs' claims do not apply to the District.[1]

**SUMMARY OF PLAINTIFFS' ALLEGATIONS AND CLAIMS**

On May 17, 2013, Plaintiff Anthony Hunter, on his own behalf and on behalf of his minor daughter, A.H. (collectively, "Plaintiffs"), filed a first amended complaint against Defendants District of Columbia, The Community Partnership for the Prevention of Homelessness ("TCP"), Coalition for the Homeless, and Community of Hope ("COH"). TCP

---

[1] The District hereby incorporates by reference and asserts all applicable arguments in its co-Defendants' motions to dismiss.

contracts with the District's Department of Human Services ("DHS") to operate the District's emergency shelter system.  Am. Compl. ¶ 9.  Coalition for the Homeless and COH are two of TCP's subcontractors.  *Id.* ¶¶ 11 & 12.

The Complaint alleges, among other things, violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, the Fair Housing Act, as amended ("FHA"), 42 U.S.C. § 3601 *et seq.*, the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, the District of Columbia Homeless Services Reform Act ("HSRA"), D.C. Code § 4-751.01 *et seq.*, and negligence.  *Id.* ¶ 1.  Plaintiffs make the following allegations.[2]

Plaintiffs lost their previous housing and, on December 7, 2011, applied for placement in a homeless shelter at the Virginia Williams Family Resource Center, the central intake office for families in need of shelter services in the District.  *Id.* ¶ 37.  Pursuant to a contract with TCP, Coalition for the Homeless operates the Virginia Williams Family Resource Center.  *Id.* ¶ 12.

Unfortunately, Mr. Hunter's daughter suffers from disabling medical conditions that require her to use a wheelchair, cause her to be susceptible to infection, and make her dependent on her caregivers for basic needs.  *Id.* ¶ 35.  Accordingly, Williams Center staff prepared a reasonable accommodation request based on Mr. Hunter's daughter's disabilities.  *Id.* ¶ 37.  Although Mr. Hunter told Williams Center staff about both his daughter's mobility impairment and her immune problems, the reasonable accommodation request noted only the need for a

---

[2]  The District accepts these allegations at this stage of the proceedings, as it must.  *See* Fed. R. Civ. P. 12(b).  However, the District in no way concedes the allegations' truth.

wheelchair accessible placement. *Id.* ¶¶ 37 & 39. "Staff at the Center did not deny in writing Mr. Hunter's reasonable accommodation requests." *Id.* ¶ 40.

Williams Center staff then placed Plaintiffs in Building 12 of the D.C. General Shelter, which is "directly operate[d]" by TCP. *Id.* ¶¶ 10 & 41. There, the Hunters, like all families at the shelter, shared eating facilities and multiple communal bathrooms. *Id.* ¶¶ 43 & 50. Mr. Hunter requested that he and his daughter be allowed to eat in a separate room to limit his daughter's exposure to any sick children in the shelter, but shelter staff denied his request. *Id.* ¶ 50.

Because of these problems, Mr. Hunter immediately asked his case manager to move Plaintiffs to an accessible and non-communal placement. *Id.* ¶ 51. His case manager asked that Mr. Hunter submit the necessary medical verifications. *Id.* Mr. Hunter submitted those verifications along with a new request on December 21, 2011. *Id.* ¶ 53. Eight days later, Plaintiffs were placed at the Girard Street Apartments. *Id.* ¶ 56. Pursuant to a contract with TCP, COH "operates and is responsible for the day-to-day management of the Girard Street Apartments, which it leases from the District." *Id.* ¶ 11.

Upon arriving at the Girard Street Apartments, Plaintiffs were placed in a non-wheelchair accessible unit. *Id.* ¶ 69. However, shelter staff "did not deny Mr. Hunter's reasonable accommodation requests in writing," and Mr. Hunter "was told that the only available unit was on the third floor." *Id.* ¶¶ 70 & 71. Mr. Hunter also discovered various issues with the building and unit that prevented A.H. from navigating her wheelchair, including a wheelchair lift that was out of order. *Id.* ¶¶ 72-75. Six days after arriving at the Girard Street Apartments, Mr. Hunter filed another reasonable accommodation request, but staff did not respond. *Id.* ¶ 76.

While still at the Girard Street Apartments, Mr. Hunter requested that a nursing student friend be allowed to visit to help with his daughter's care. *Id.* ¶ 81. COH shelter staff approved a single visit but refused to permit additional ones because Mr. Hunter had not kept a sufficient balance in his escrow account. *Id.* ¶¶ 81 & 83. At the shelter staff's request, Mr. Hunter later withdrew his request for visitors to provide respite care. *Id.* ¶ 85.

After the Hunters had stayed in the third floor unit for six weeks, COH transferred them to a first floor unit. *Id.* ¶ 86. Just over a month later, Plaintiffs were transferred out of the Girard Street Apartments to a permanent supportive housing program. *Id.* ¶ 88.

On the basis of these allegations, Plaintiffs claim that they are entitled to declaratory judgments, compensatory and punitive damages, and attorney's fees. *Id.* at 38.

## STANDARD OF REVIEW

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate when a party has failed to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The determination of whether a dismissal is proper must be made on the face of the pleadings alone. *Telecomms. of Key West, Inc. v. United States*, 757 F.2d 1330, 1335 (D.C. Cir. 1985). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the allegations in the complaint must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Jackson v. Dist. of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C. 2011). Courts need not accept as true "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 679. Critically, for the District's motion in this case, the Court is not bound to adopt "inferences

4

drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."

*Kowal v. MCI Comms. Corp., Inc.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

To bring a claim, the plaintiff bears the burden of demonstrating each of the constitutionally required elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Unlike in a motion to dismiss under Rule 12(b)(6), for a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of "establish[ing] the Court's jurisdiction by a preponderance of the evidence." *Halcomb v. Office of the Senate Sergeant-At-Arms,* 563 F. Supp. 2d 228, 235 (D.D.C. 2008).

## ARGUMENT

I. **The Court Should Dismiss Count I, Alleging Violations of Title II of the ADA, and Count III, Alleging Violations of the Rehabilitation Act, Because Plaintiffs Fail to State a Claim as to Either.**

    A.   Plaintiffs Fail to Plead Adequately that the District Had Actual Knowledge of Allegedly Discriminatory Acts Affecting Plaintiffs.

The bulk of Plaintiffs' Title II and Rehabilitation Act claims concern how the Hunters were treated during their stays at D.C. General and the Girard Street Apartments. *See* Am. Compl. ¶¶ 101(a)-(c), (f) & 116(a), (b), (d), (f). These claims fail because Plaintiffs do not adequately allege that the District knew of the other Defendants' alleged ADA violations.

To state a claim under the Title II of the ADA or the Rehabilitation Act, Plaintiffs must show that the District was at least deliberately indifferent to such discrimination. *See Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012).[3] Plaintiffs do not allege

---

[3]  The District does not concede that deliberate indifference is sufficient to state a claim under the ADA or the Rehabilitation Act. "There is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA or the [Rehabilitation Act]. However, in order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination." *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002). However, because Plaintiffs' claims fail to meet even the deliberate indifference standard, the District applies that standard in this motion. To the extent that the Court finds that deliberate indifference is adequately pleaded, the District asks that this Court apply the

5

facts demonstrating deliberate indifference by the District, so Counts I and III should be dismissed.[4]

To be deliberately indifferent, a government actor must have actual notice of a violation of these statutes and an opportunity to correct it.  *Id.*; *cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (requiring actual notice and an opportunity to correct for Title IX claims).  In evaluating Plaintiffs' Title II claim, it is important to distinguish between allegations concerning the District's actual knowledge and those concerning the knowledge of other Defendants.  Whether the District is deliberately indifferent depends on the District's knowledge, not what the other Defendants knew or should have known.[5]

For a public entity to comply with the ADA when it contracts with a private entity to provide services, the public entity must contractually require the private entity to meet the requirements of Title II of the ADA and enforce that contractual provision.  *See* U.S. Dep't of Justice, Civil Rights Div., The Americans with Disabilities Act:  Title II Technical Assistance Manual § II-1.3000, illus. 1 & 4, *available at* http://www.ada.gov/taman2.html#II-1.3000 ; *see*

---

proper standard to Plaintiffs' claims—intentional discrimination.  Other than a single conclusory allegation, *see* Am. Compl. ¶ 92, Plaintiffs fail entirely to plead intentional discrimination.

[4]  Because the standard for showing a violation of the Rehabilitation Act is at least as strenuous as for showing a violation of Title II of the ADA, the District refers only to Count III (alleging violations of the Rehabilitation Act) for convenience.  *See Bragdon v. Abbott*, 524 U.S. 624, 632 (1998).

[5]  It is possible for a public entity to be liable under the ADA based on the deliberate indifference of others, but this applies only to employees and agents.  *DeVito v. Chicago Park Dist.*, 83 F.3d 878, 881 (7th Cir. 1996); *see Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001); *see also United States v. Days Inn of Am., Inc.*, No. CIV. S-96-260 WBS/GGH, 1998 WL 461203, at *5 (E.D. Cal. Jan. 12, 1998) (holding that a franchisor-franchisee relationship is insufficient to create vicarious liability under Title III of the ADA).  That principle is inapplicable here because the District's contractor and its subcontractors are not employees or agents of the District.  *See Wood v. Barwood Cab Co.*, 648 A.2d 670, 671 (D.C. 1994) (holding that *respondeat superior* does confer liability for the actions of an independent contractor); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 27 (D.D.C. 2002) ("Broad supervisory control, even on a daily basis, does not suffice to demonstrate control over the physical performance of a contractor."); *Cooper v. U.S. Gov't & Gen. Servs. Admin.*, 225 F. Supp. 2d 1, 4 (D.D.C. 2002); *Wilson v. United States*, 989 F.2d 953, 958-59 (8th Cir. 1993).  At the very least, Plaintiffs have not made the necessary factual allegations to demonstrate an employment or agency relationship.

*also Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (stating that the Manual provides guidance for interpreting the ADA).  Here, the contract between TCP and the District specifically required that TCP comply with the ADA.  Am. Compl. ¶ 96.  Thus, liability under this theory would arise only if the District knew that TCP violated Title II's requirements in its treatment of Plaintiffs but failed to act on that knowledge.

No factual allegation in the Amended Complaint supports an inference that the District knew that TCP or its subcontractors did not provide ADA compliant services to the Hunters.  Plaintiffs' conclusory allegations that the District knew or should have known something are insufficient to state a claim.  *See Iqbal*, 556 U.S. at 680-81.  Instead, Plaintiffs must allege facts showing that the District had actual knowledge of its co-Defendants' discriminatory acts.  *See Liese*, 701 F.3d at 348.  Plaintiffs allege only that the District's "Department of Human Services . . . maintain[s] a database which records each reasonable accommodation request and the providers' response to it."[6]  Am. Compl. ¶ 89.  There is no allegation that any District employee or official ever saw that routine database entry, or even that a District employee or official would have reason to view entries on the Hunters.[7]  *See id.*  Inferring actual knowledge of the contents

---

[6]  To the extent that Plaintiffs rely on the settlement agreement between the District and the U.S. Department of Justice to give the District actual notice of the violations affecting Plaintiffs, such an argument is without merit.  The settlement agreement was signed in 2007.  Am. Compl. ¶ 58.  The alleged ADA violations affecting Plaintiffs occurred between December 7, 2011 and March 12, 2012.  *Id.* ¶ 4.  Knowledge of specific violations in an earlier time period cannot give the District actual notice of different alleged violations occurring in a later one.

[7]  Moreover, even if a District employee or official saw a database entry, that entry would not give the District actual notice of an ADA violation.  Plaintiffs made four reasonable accommodation requests.  An entry regarding the first request would show only that the Hunters requested a wheelchair accessible unit and were placed in a unit in a building with accessible units.  *See* Am. Compl. ¶¶ 39 & 55; *see also id.* ¶ 41.  The entry regarding the second and third requests would show that A.H. required a non-communal environment and was transferred to the Girard Street Apartments, which had private, wheelchair accessible units.  *Id.* ¶¶ 53, 76 & 78.  The entry regarding the fourth request would shown that it was withdrawn.  *Id.* ¶ 85.  The requests and outcomes would not have given the District actual notice of the alleged ADA violations.

of every routine report automatically submitted to the District in connection with every one of the services its contractors or subcontractors provide is both unrealistic and unsupported in law. *See, e.g.*, *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 576 (S.D.N.Y. 2011) (holding that allegations that the defendant had access to a database containing information were "insufficient to establish that [the defendant] actually knew of the" information, particularly absent any reason to review the database entry containing that information); *In re Medtronic Inc., Secs. Litig.*, 618 F. Supp. 2d 1016, 1038 (D. Minn. 2009) (holding that access to information in a database did not establish actual or imputed knowledge of the information).  Because Plaintiffs do not allege facts supporting an inference that the District actually knew of its co-Defendants' alleged ADA violations, they have not adequately alleged deliberate indifference.  *See Liese*, 701 F.3d at 348.

> **B.** **Plaintiffs Fail to State a Claim that the District Must Build More Wheelchair-Accessible, Non-Communal Emergency Homeless Shelter Units.**

Plaintiffs repeatedly assert that the District has violated the ADA and the Rehabilitation Act by "[f]ailing to develop or maintain a sufficient number of units that are appropriate for those with compromised immune systems and accessible to persons using wheelchairs or who have mobility impairments."  *E.g.*, Am. Compl. ¶¶ 101(e) & 116(e).

To the extent that these sub-counts[8] refer to injuries allegedly done to the Hunters, Plaintiffs' own allegations defeat them.  Plaintiffs specifically allege that there were units in the D.C. homeless shelter system that would have met their needs.  *Id.* ¶ 49 ("On information and belief, there are rooms with private bathrooms elsewhere in the D.C. General Shelter complex

---

[8]  Although Plaintiffs' Amended Complaint contains only seven numbered counts—or, as Plaintiffs label them "claims"—each of those counts contains multiple claims, each with a different legal basis or statement of Defendants' allegedly tortious conduct.  *See, e.g.*, Am. Compl. ¶¶ 122(a)-(c); 123(a)-(c) & 124.  For purposes of this motion, the District refers to separate claims within a count as "sub-counts."

and accessible, non-communal options existed outside D.C. General.").  Moreover, Plaintiffs take the position that placement outside the D.C. homeless shelter system would be a reasonable accommodation, meaning that additional units are not necessary for ADA compliance.  *See id.* ¶ 91 ("If no such units existed, the Defendants should have arranged for shelter for the Hunter family outside the shelter system.").  Thus, Plaintiffs fail to allege that the District would have to build more units that would meet the Hunters' particular confluence of disabilities to reasonably accommodate them.[9]

To the extent that these sub-counts refer to injuries allegedly done to others in the homeless shelter system, Plaintiffs lack standing to bring them.  *See Cooper v. Fed. Reserve Bank*, 467 U.S. 867, 877 (1984); *Allee v. Medrano*, 416 U.S. 802, 827 (1984); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005).

C.      Plaintiffs Fail to Allege Certain Sub-counts with Sufficient Specificity to Put
        Defendants on Notice of Their Claims.

Plaintiffs put forth multiple sub-counts—specifically paragraphs 101(c), 101(d), 116(c), and 116(d) of the Amended Complaint—that are so devoid of any detail as to fail to meet the pleading standard of Federal Rule of Civil Procedure 8(a)(2).  That Rule requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotation marks omitted).

---

[9]  Plaintiffs allege that the District violated the ADA by not building units that accommodated both A.H.'s mobility and immune system issues.  However, building shelter units for every possible permutation of every disability would represent a fundamental alteration in the homeless shelter system.  The District may not raise the fundamental alteration defense because, as an affirmative defense, it would be premature at this stage of the proceedings.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999).

One repeated instance of this type of pleading failure is Plaintiffs' assertions that the District failed to adopt and enforce policies to ensure ADA compliance. *See, e.g.*, Am. Compl. ¶¶ 101(c), (d) & 116(c), (d). However, Plaintiffs do not specify anywhere in the Amended Complaint which existing policies were insufficient or what changes would be necessary to bring the District into compliance. *See generally* Am. Compl. Indeed, Plaintiffs' other claims are premised, not on the existence (or lack) of any policy or regulation, but on Defendants' alleged violation of existing policies and regulations. *See, e.g.*, *id.* ¶¶ 29-31, 90 & 101(g). In other words, by alleging that Defendants' conduct violated specific policies, Plaintiffs undercut their own vague allegations that there were insufficient policies in place to prevent that conduct. Having failed to identify a specific policy deficiency, Plaintiffs have failed to state a claim on this basis. *See Twombly*, 550 U.S. at 555.

A particularly egregious example of this is Plaintiffs' allegation that Defendants violated the Rehabilitation Act and its implementing regulations by "[u]sing criteria or methods of administration of their programs, which effectively discriminates because of disability and which defeat or substantially impair the objectives of the program for qualified individuals with a particular disability." *Id.* ¶ 116(c). Plaintiffs do not identify what criteria or methods were problematic, how they discriminated against Plaintiffs, how they defeat objectives of the program, or what objectives of the program were defeated. This is simply insufficient to put Defendants on notice of what actions, omissions, or policies are allegedly tortious.

Another instance of this type of pleading failure is Plaintiffs' allegation that "Defendants have violated Title II of the ADA and implementing regulations by . . . [v]iolating contractual, statutory and regulatory obligations to comply with Title II of the ADA." *Id.* ¶ 101(g). Initially, this allegation utterly fails to identify how Defendants violated their obligations or what statutes,

regulations, or contracts impose those obligations.  Moreover, it is circular—Plaintiffs assert that

Defendants violated Title II by violating Title II.

Because these sub-counts do not give Defendant fair notice of the grounds upon which

they rest, the sub-counts should be dismissed for failing to comply with Rule 8.  *See Twombly*,

550 U.S. at 555.

**II.    The Court Should Dismiss Count II, Alleging Violations of the FHA, Because that
        Statute Does Not Apply to Plaintiffs or the Shelters Where They Stayed and
        Plaintiffs' Allegations of Discrimination Do Not State a Claim.**

Plaintiffs fail to state claims under the FHA because that law applies only to

discrimination against buyers or renters and governs only dwellings.  Under the FHA, Plaintiffs

are neither buyers nor renters, and neither D.C. General Building 12 nor the Girard Street Shelter

is a dwelling.  Moreover, the Amended Complaint does not contain the requisite allegations to

state a claim under the FHA.  Thus, this count must be dismissed.

A.    Plaintiffs Are Neither Buyers nor Renters Under the FHA.

The Complaint fails to establish that Plaintiffs are "buyers" or "renters" within the

meaning of the FHA.  To bring a discrimination claim under 42 U.S.C. § 3604(f), a plaintiff must

be either a "buyer" or "renter."  *See* 42 U.S.C. § 3604(f)(1) (prohibiting discrimination on the

basis of disability "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to

any buyer or renter"); *id.* § 3604(f)(2) (prohibiting discrimination on the basis of disability

"against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the

provision of services or facilities in connection with such dwelling"); *see also Boykin v. Gray*,

895 F. Supp. 2d 199, 210 (D.D.C. 2012) (noting that "the language of [§ 3604(f)] as a whole

appears to evince an exclusive concern with the sale and rental of properties and the provision of

services to renters"); *Johnson v. Dixon*, 786 F. Supp. 1, 4 (D.D.C. 1991) ("[T]he Court observes

that the applicability of the Fair Housing Act to the circumstances of this case is questionable. The Act, in terms, protects only 'buyers' and 'renters' from unlawful discrimination.").

As the Southern District of New York has already held, the FHA does not apply to individuals seeking placement in homeless shelters because they are not "renters" within the meaning of the statute.  *See Jenkins v. N.Y. City Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 519 (S.D.N.Y. 2009), *aff'd on other grounds*, 391 F. App'x 81 (2d Cir. 2010).  There, the Southern District granted a municipal agency's motion to dismiss after concluding that "[a] far more plausible reading of the [FHA] would limit the word 'rent' to consideration paid by the person who has the right to occupy the dwelling."  *Id.*  The court explained that the plaintiff was "seek[ing] a government service[,] . . . not offering any consideration in exchange for a room in the shelter," so he was not "a 'renter' within the meaning of the FHA."  *Id.*  Here, as in *Jenkins*, Plaintiffs received government housing and services free of cost.[10]  Thus, they are not "renters" and cannot bring their claim under the FHA.

B.     Neither D.C. General Building 12 nor the Girard Street Shelter Is a Dwelling Under the FHA.

The Complaint fails to establish that D.C. General Building 12 or the Girard Street Shelter is a dwelling under the FHA.  The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by

---

[10]  Not only do Plaintiff fail to allege that they are buyers or renters within the meaning of the FHA, *they affirmatively claim to be homeless* as defined by D.C. Code. Sec. 4-751.01(18). Am. Compl. ¶ 135.  In other words, Plaintiffs allege that they "lack[ed] a fixed, regular residence that provides safe housing, and lack[ed] the financial means to acquire such a residence immediately."  D.C. Code. § 4-751.01(18)(A). By admitting that they did not have the financial means to obtain housing, Plaintiffs concede that they could not rent or buy a home.  They also concede that the shelters where the Hunters stayed were funded in whole or in part by District agencies.  *See* Am. Compl. ¶ 9 ("[TCP] receives federal and District funds for homeless programs and other services."); *id.* ¶ 11 ("[COH] receives federal and District funds for homeless programs, health programs and other programs and services.").

one or more families, and any vacant land which is offered for sale or lease for the construction

or location thereon of any such building, structure, or portion thereof."  42 U.S.C. § 3602(b).

To determine whether a building or structure qualifies as a dwelling under the FHA,

courts distinguish between "place[s] of temporary sojourn or transient visit" from "a temporary

or permanent dwelling place, abode or habitation to which one intends to return."  *United States*

*v. Hughes Mem'l Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975); *see also Lakeside Resort*

*Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 F.3d 154, 158 (3d Cir. 2006); *Garcia v.*

*Condarco*, 114 F. Supp. 2d 1158, 1160 n.10 (D.N.M. 2000).  Notably, the determination of

whether a structure is a dwelling is made objectively, not based on the occupant's subjective

intent.  *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717 F. Supp. 2d

1101, 1111 (D. Idaho 2010) (citing *Lakeside Resort*, 455 F.3d at 158).

Courts have used this framework to exclude numerous types of short-term housing from

FHA coverage.  For example, courts have determined that hotels and motels, hospitals, and

detention centers do not constitute dwellings within the meaning of the FHA.  *See, e.g.*, *Patel v.*

*Holley House Motels*, 483 F. Supp. 374, 381 (S.D. Ala. 1979) (excluding a motel from FHA

coverage); *United States v. City of Boca Raton*, No. 06-80879-CIV, 2008 WL 686689 (S.D. Fla.

Mar. 12, 2008) (distinguishing between a dwelling and a hospital); *Garcia*, 114 F. Supp. 2d at

1163 (finding that detention centers are not dwellings within the meaning of the FHA).

Similarly, homeless shelters do not qualify as dwellings for purposes of the FHA.  In

*Intermountain*, the District Court of Idaho held that a temporary homeless shelter was "neither

intended nor designed for occupants who intend to remain there for any significant period of

time."  717 F. Supp. 2d at 1111.  Concluding that the shelter clients' "subjective intent of

returning to the shelter" was irrelevant, the court looked to objective factors, including the

dormitory-style lodgings and the shelter's policy of not charging a fee, to determine that the shelter was not a dwelling under the FHA.  *Id.* (citing *Lakeside Resort*, 455 F.3d at 158). Although not reaching a legal holding, this Court has also concluded that it is "doubtful" that the FHA applies to emergency homeless shelters.  *Johnson*, 786 F. Supp. at 4.

Here, Plaintiffs fail to meet their burden of making factual allegations regarding the objective living conditions at either shelter.  To the contrary, Plaintiffs concede that factors similar to those relied upon by the court in *Intermountain* exist here.  For example, while at D.C. General Building 12, Plaintiffs were "assigned a bed in a dormitory-style room" similar to the shelter in *Intermountain*.  *Intermountain*, 717 F. Supp. 2d at 1111; *see, e.g.*, Am. Compl. ¶ 43 ("About fifty families live in Building 12, each with their own room.  All families share eating facilities and share multiple bathrooms.").  Similarly, Plaintiffs do not allege that they were charged for their lodging at either shelter.  *See Intermountain*, 717 F. Supp. 2d at 1111.

Plaintiffs also fail to make factual allegations regarding the typical length of stay of the shelters' occupants, other than that neither shelter imposed a time limit.  *See, e.g.*, *id.* ("There is no time limit set on how long residents can remain at D.C. General."); *id.* ¶ 57 ("Defendants did not then or at any time tell Mr. Hunter . . . that his family's residence at the Girard Street Apartments would end at a date certain or after a particular period of residence.").  Notably, the length of the Hunters' stay at the Girard Street Shelter—from December 29, 2011 to March 12, 2012—was under two-and-a-half months.  *See id.* ¶¶ 69 & 88.  In cases in which courts have found a building to be a dwelling for the purposes of the FHA, plaintiffs occupied the building for substantially longer periods of time.  *See, e.g.*, *Cohen v. Twp. of Cheltenham*, 174 F. Supp. 2d 307, 323 (E.D. Pa. 2001) (finding that a group home with an average stay of nine or ten months was a dwelling within the meaning of the FHA); *Hughes*, 396 F. Supp. at 549 (finding that a

children's home with an average stay of four years was a dwelling within the meaning of the FHA).

Because neither D.C. General Building 12 nor the Girard Street Shelter is a dwelling within the meaning of the FHA, the Court should dismiss this count.

C.    Plaintiffs Fail to Plead Adequately that the District Intentionally Discriminated Against Them on the Basis of Disability.

Even if Plaintiffs were renters and shelters were dwellings, Plaintiffs' FHA claim would still fail because Plaintiffs do not adequately allege that the District *intentionally* discriminated against them on the basis of disability.  Unlike claims brought under the ADA, plaintiffs "alleging disparate treatment [under the FHA] must establish . . . that the defendant intentionally discriminated against them on the basis" of one of the statute's protected classifications.  *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).  This Court has held that the mere fact that plaintiffs belong to a protected class is insufficient to satisfy federal pleading standards.  *See Boykin*, 895 F. Supp. 2d at 209 (holding that these kinds of allegations, "without more, fail[] to supply either direct evidence of discriminatory intent or an inference of discrimination") (citing *Twombly*, 550 U.S. at 557).

As noted above, Plaintiffs fail to establish that the District was even deliberately indifferent.  *See*  § I, *supra.*  At most, Plaintiffs make conclusory allegations or identify scattered incidents of negligence.  *See, e.g.*, Am. Compl. ¶ 4 (alleging that "Defendants discriminated . . . by knowingly, willfully, and with deliberate indifference" failing to make reasonable accommodations); *id.* ¶ 91 (alleging that the District "knew or reasonably should have known that the shelters to which the Hunter family was assigned" were inadequate, but failing to specify

15

how the District should have known).  Significantly, the word "intentional" appears only once in an allegation against the District, and then only in the most conclusory terms.[11]  *See id.* ¶ 92 ("Defendants knowingly, willfully, intentionally, recklessly and with deliberate indifference denied [A.H.] the benefits of and rights to full access to shelter services because she has a disability.").  This is insufficient to establish the requisite intent.  *See Twombly*, 550 U.S. at 555.

Because the Complaint fails to provide more than bare, conclusory allegations that the District acted with discriminatory intent, Count II (violation of the FHA) must be dismissed.

**III.    The Court Should Dismiss Count IV, Alleging Violations of the DCHRA, Because It Fails to State a Claim.**

Plaintiffs bring two kinds of DCHRA claims.  The first set of DCHRA claims merely duplicates Plaintiffs' claims under the FHA.  *See* Am. Compl. ¶¶ 122-24.  The second set alleges violations of unique provisions of the DCHRA.  *See id.* ¶¶ 126 & 127.  The District addresses each in turn.

**A.    Because Plaintiffs Do Not State Claims Under the FHA, They Cannot State Equivalent Claims Under the DCHRA.**

Plaintiffs' DCHRA claims are largely duplicative of their FHA claims.  Am. Compl. ¶¶ 122-124.[12]  They fail for the same reasons as their FHA counterparts.  *See* § II, *supra*.

---

[11]  "Intentional" is used in one other place in the Amended Complaint, but that was in reference to actions taken by the Hunters' case manager, Mr. Moses, a TCP employee.  Am. Compl. ¶ 52; *see also id.* ¶ 10 (stating that TCP runs the D.C. General Shelter).

[12]  The District notes that—unlike the analogous public accommodations section of the ADA (which affords only injunctive relief)—the DCHRA specifically requires that the discriminatory act be "wholly or partially for a discriminatory reason based on the actual or perceived . . . disability."  *See Doe v. Okla. City Univ.*, 406 F. App'x 248, 251-252 (10th Cir. 2010) ("A claim for injunctive relief under Title III of the ADA, however, is not dependent upon a showing of discriminatory intent."); *see also* 42 U.S.C. § 12188(a) (stating that, unless enforced by the Attorney General, the only remedy for violation of Title III of the ADA is injunctive relief).  Thus, Plaintiffs' allegations under D.C. Code § 2-1402.31(a)(1), like their FHA claims, fail due to the absence of allegations of intentional discrimination in the Amended Complaint.  *See* Am. Compl. ¶ 124; *see also id.* ¶ 108 (alleging violations of the FHA).

This Court has held that "[t]he definition of 'disability' under the DCHRA is virtually identical to that under the ADA and to the definition of 'handicap' under the FHA." *Boykin*, 895 F. Supp. 2d at 218-19 (internal citation omitted); *see also Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1071 (D.C. Cir. 2008) (looking to FHA decisions from the D.C. Court of Appeals in interpreting the DCHRA). Accordingly, the DCHRA "is applied in the same manner as the parallel federal antidiscrimination provisions." *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs*, P.C., 950 F. Supp. 393, 405 (D.D.C. 1996) (internal citations omitted).

As with the FHA, Plaintiffs' claims under § 2-1402.21(d) of the DCHRA must be dismissed because those claims require discrimination against either a buyer or renter in connection with a dwelling. *See* Am. Compl. ¶¶ 122-23 (citing D.C. Code § 2-1402.21(d)). As explained in Section II, *supra*, Plaintiffs are neither buyers nor renters and the shelters in question are not dwellings. Therefore, these DCHRA claims must be dismissed.[13]

**B.** **Because No District Employee or Officer Directly Interacted with Plaintiffs, Plaintiffs Cannot Adequately Allege a Claim for Limiting or Refusing Access to Services.**

Plaintiffs claim that a District government agency or office unlawfully "limited or refused A.H. access to certain facilities, services, and programs." *Id.* ¶ 126 (citing D.C. Code § 2-1402.73). However, Plaintiffs fail to allege that any District agency or office—including DHS and the Office of Shelter Monitoring—provided shelter services at all, much less directly interacted with the Hunters.[14]

---

[13] In addition, Plaintiffs' factual allegations regarding the accessibility of their units are insufficient to establish how those units allegedly failed to comply with the DCHRA. *See, e.g.*, Am. Compl. ¶ 75 (failing to allege that A.H. was unable to maneuver about the space in the kitchen or bathroom of the unit at the Girard Street Apartments).

[14] In addition, homeless shelter services are not the type of services that can support an FHA claim, so they cannot support a DCHRA claim either. *See A Society Without a Name v. Virginia*, 655 F.3d 342, 349 (4th Cir. 2011) ("Intake services to sign up for a homeless shelter are simply not within the type of

In fact, Plaintiffs concede that District contractors or subcontractors were responsible for managing the shelter system and the daily operations of the individual shelters where Plaintiffs stayed.  *See, e.g.*, *id.* ¶ 9 ("DHS contracts with [TCP] to direct and manage emergency shelter services as part of the homeless services continuum of care."); *id.* ¶ 11 (noting that COH "operates and is responsible for the day-to-day management of the Girard Street Apartments"); *id.* ¶ 12 (noting that Coalition for the Homeless "operates the Virginia Williams Family Resource Center").  Similarly, Plaintiffs concede that the Office of Shelter Monitoring is responsible for monitoring and inspections, not providing direct services.  *See id.* ¶ 90.

Without any specific factual allegations that any employee or official of the District government ever "limited or refused" access to the Hunters, this claim must fail.

C.      Because Plaintiffs' Claim Regarding the Issuance of Licenses Is Barred by the Doctrine of Sovereign Immunity, It Also Fails to State a Claim.

Without any supporting factual allegations, Plaintiffs assert that the District violated the DCHRA by failing to condition permits, licenses, and other authorizations on compliance with the DCHRA.  *See* Am. Compl. ¶ 127 (quoting D.C. Code § 2-1402.67).  Notably, Plaintiffs fail to identify any permit or license that was not conditioned on DCHRA compliance or how they were allegedly harmed by the District's purported failure to comply with this statute.  Further, this claim is entirely dependent on their other faulty claims that the Defendants failed to comply with the DCHRA.  These inadequacies, in and of themselves, are insufficient to state a claim under *Iqbal*.

---

services covered by the FHA because they are unlike 'services generally provided by governmental units such as police and fire protection or garbage collection.'" (quoting *Southend Neighborhood Improvement Ass'n v. St. Clair Cnty.*, 743 F.2d 1207, 1210 (7th Cir. 1984))); *see also Paralyzed Veterans of Am.*, 950 F. Supp. at 405 (stating that the DCHRA should be interpreted in the same manner as the FHA).

More importantly, however, Plaintiffs' claim is barred by the doctrine of sovereign immunity.  Enforcement of the DCHRA's compliance requirement for permits and licenses is a discretionary function of the D.C. government.  As a result, the District enjoys absolute sovereign immunity against this claim.  *See Tucci v. Dist. of Columbia*, 956 A.2d 684, 698 n.14 (D.C. 2008) ("[T]he doctrine of sovereign immunity precludes the [plaintiffs] from recovering damages for the District's alleged failure to perform the discretionary function of enforcing the regulations relating to litter."); *see also Nealon v. Dist. of Columbia*, 669 A.2d 685, 690 (D.C. 1995) ("In this jurisdiction, the doctrine of sovereign immunity acts as a bar to bringing suit against the District of Columbia for its discretionary functions.").

**IV.   The Court Should Dismiss Count V, Alleging Violations of the HSRA, Because Plaintiffs Fail to State a Claim Against the District.**

   A.   The HSRA Does Not Provide a Private Right of Action Against the District, Other than to Vindicate the Right to Shelter in Severe Weather.

Plaintiffs allege that the District violated Section 12 of the HSRA in various ways.  Am. Compl. ¶ 140.  However, the HSRA does not provide a private right of action, other than to vindicate the right to shelter in severe weather.[15]  The Court should therefore dismiss Plaintiffs' claims not based on severe weather on that basis.  *See id. ¶* 140(a)-(g).

The D.C. Court of Appeals considered and specifically rejected a claim substantively identical to Plaintiffs' claims under Count V (other than the severe weather claim).  *See Baltimore v. Dist. of Columbia*, 10 A.3d 1141, 1151 (D.C. 2011).  Indeed, the portions of the HSRA upon which Plaintiffs rely—D.C. Code §§ 4-754.11, .12, and .21—are the same as those that the Court of Appeals specifically held not to provide a cause of action.  *Compare Baltimore*,

---

[15]  The District will address Plaintiffs' sub-claim based on severe weather separately.  *See* § IV.C___, *infra*.

10 A.3d at 1149 *with* Am. Compl. ¶ 140 (a)-(g).[16]  After reviewing the sections of the HSRA that might create statutory entitlements, the Court of Appeals concluded that "when these sections . . . are read together with § 4-5755.01, it is clear that there is only one statutory entitlement conveyed by the act, and that is shelter in severe or frigid weather."  *Batlimore*, 10 A.3d at 1150-1151.  Thus, Plaintiffs' claims not based on that statutory entitlement should be dismissed.  *See In re Sealed Case* (*Medical Records*), 381 F.3d 1205, 1211 n.5 (D.C. Cir. 2004) (noting that the D.C. Court of Appeals' interpretation of D.C. law is authoritative).

Although the D.C. Court of Appeals' decision is determinative, the standard analysis for determining whether a statute creates a private right of action leads to the same conclusion.  A private right of action will exist only when there is legislative intent to create one.  *See Coates v. Elzie*, 768 A.2d 997, 1001 (D.C. 2001).  Plaintiffs bear "[t]he burden . . . to demonstrate that, in spite of the absence of any explicit authorization, the D.C. Council intended to imply a right to sue for damages for violations" of the HSRA.  *See id.*  Plaintiffs cannot meet this burden.  If the D.C. Council had wanted to create a private right of action to vindicate the rights Plaintiffs claim have been violated, it would have explicitly done so.  *See, e.g.*, D.C. Code § 4-755.01(a); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly.")  The Council did not.[17]  Indeed, it explicitly disclaimed "an[y] entitlement (either

---

[16]  The only purported statutory basis for Plaintiffs' claims that was not specifically rejected in *Baltimore* is D.C. Code § 4-754.37(b), which requires providers to include any alternative sanctions to transfer, suspension, or termination of services in the provider's Program Rules.  This provision does not create a statutory entitlement for all the reasons discussed in this section and in *Baltimore*.  In addition, the provision, by its terms, applies only to providers.

[17]  Defendant notes that it would be odd to create a private right of action to vindicate many of the ill-defined rights included in the HSRA.  *See, e.g.*, D.C. Code § 4-754.11(a) (providing clients with the right to "be treated by providers and the Department with dignity and respect").

direct or implied) . . . to any services within the Continuum of Care," other than the right to

shelter in severe weather.  D.C. Code. § 4-755.01(a); *see also Boykin*, 895 F. Supp. 2d at 219-

220; *Baltimore*, 10 A.3d at 1143.

Even absent this explicit disclaimer, courts will generally not find an implied right of

action when there is an express method of enforcement.  *See Alexander v. Sandoval*, 532 U.S.

275, 290 (2001); *see also Coates*, 768 A.3d at 1001 (expressing "reluctan[ce] to find a private

right of action implicit in a statute that provides for public enforcement").  The HSRA provides

an express method of private enforcement through the right to a fair hearing with the D.C. Office

of Administrative Hearings, D.C. Code § 4-754.41, in addition to the right to lodge complaints

with a provider or the Mayor, *id.* § 4-754.11(11).  The HSRA also provides an express method of

public enforcement through the Mayor and Office of Shelter Monitoring.  *See id.* §§ 4-754.01, 4-

754.31, 4-754.51 & 4-754.52.

For all these reasons, Plaintiffs cannot sue for alleged violations of the HSRA, other than

those relating to severe weather conditions.

 **B.** <u>The HSRA Provisions Relied on by Plaintiffs—Other than the Right to Shelter in Severe Weather—Do Not Apply to the District When the District Does Not Directly Provide Shelter Services.</u>

Plaintiffs allege that "Defendants have violated Section 12 of the HSRA."  Am. Compl.

¶ 140.  Notably, Section 12 of the HSRA explicitly sets "[c]ommon standards for all **providers**."

Homeless Services Reform Act of 2005, effective Oct. 22, 2005 (D.C. 27 Law 16-35; D.C.

Official Code §§ 4-751.01, *et seq.*) (emphasis added).[18]  Indeed, other than providing shelter in

severe weather, obligations pursuant to the HRSA, if any, are the responsibility of "providers" of

---

[18]  *Available at*
http://ich.dc.gov/sites/default/files/dc/sites/ich/publication/attachments/HSRActOf2005.pdf.

services.  *See* D.C. Code, Tit. 4, Ch. 7A, Sub-Ch. IV, Part C ("Provider Standards") & Part D

("Provider Requirements"); *see also* D.C. Code § 4-755.01(a); *Boykin*, 895 F. Supp. 2d at 219-

220; *Baltimore*, 10 A.3d at 1143.

The District did not directly provide homeless shelter services in this instance, so it is not

a provider within the meaning of the HSRA.  Plaintiffs here concede that TCP "directly operates

the D.C. General shelter" and is "responsible for ensuring that its subcontractors comply with the

. . . HSRA."  Am. Compl. ¶ 10.[19]  Plaintiffs also concede that COH, TCP's subcontractor,

operates and manages the Girard Street Shelter.  *Id.* ¶ 11.  In fact, the Complaint lacks any

allegation that the District provided homeless shelter services directly to Plaintiffs.  *See generally*

*id.*

Because it is not a provider, then, the District cannot be liable for failing to meet the

standards of conduct, if any, imposed on providers by the HSRA.  *See* D.C. Code § 4-754.21

(stating that "*Providers* shall" follow certain standards in providing homeless shelter services)

(emphasis added); *see also id.* § 4-754.52(6) (granting the Office of Shelter Monitoring the

authority to monitor and evaluate "[c]ompliance with provider standards established by §§ 4-

754.21 and through 4-754.25").  D.C. law explicitly limits the District's obligations to providing

shelter in severe weather.  *See* D.C. Code § 4-755.01(a) ("No provision of this chapter shall be

construed to create an entitlement (either direct or implied) on the part of any individual or

family to any services within the Continuum of Care, other than shelter in severe weather

---

[19]  The Amended Complaint states that "[t]he District of Columbia and the Partnership are responsible for
ensuring that its subcontractors comply with the ADA, the Rehabilitation Act, the FHA, the DCHRA, and
the HSRA."  Am. Compl. ¶ 10.  However, the reference to the District appears to be inadvertent, given
that the Amended Complaint refers to "its subcontractors," not "their subcontractors."  *Id.*  Moreover, a
subcontract, by definition, does not create privity between the contracting party and the subcontractor,
which means that the District could not have the contractual obligation to ensure TCP's subcontractors'
compliance with the HSRA.  At the very least, Plaintiffs have not alleged any facts that would allow the
inference that the District had such an obligation.

conditions as authorized by § 4-754.11(5).").  Thus, Plaintiffs' claims seeking to apply standards for providers of shelter services to the District are without merit.  Accordingly, Plaintiffs' sub-counts in Count V relating to the provision of services (other than shelter in severe weather) should be dismissed.  *See* Am. Compl. ¶ 140(a)-(g).

      C.      <u>The Obligation to Provide Shelter in Severe Weather Does Not Require Reasonable Accommodations for Disabilities.</u>

Plaintiffs allege that the District "violated Section 12 of the HSRA by . . . [f]ailing to place the Plaintiffs in a shelter that reasonably accommodated A.H.'s disabilities during severe weather conditions."[20]  Am. Compl. ¶ 140(h).  However, the District's obligation to provide shelter in severe weather does not create a concomitant statutory entitlement to reasonable accommodations at severe weather shelters.

Severe weather shelters are subject to the standards applicable to shelters generally, including standards relating to the treatment of clients with disabilities.  *See* D.C. Code §§ 4-754.21 & .22.  However, the D.C. Court of Appeals specifically held that those standards did not create statutory entitlements.  *Baltimore*, 10 A.3d at 1150-51.  Moreover, Plaintiffs' position would lead to a bizarre reading of the HSRA under which there would be a statutory entitlement to reasonable accommodations in severe weather shelters but not an equivalent entitlement in more permanent shelters.

Under *Baltimore*, the only statutory entitlement created by the HSRA is § 4-754.11(5), which confers "the right to . . . [s]helter in severe weather conditions."  The right to shelter does not include the entitlement to reasonable accommodations, which is codified elsewhere.  This is further evident from the fact that the District can comply with its obligation to provide shelter in

---

[20]  Although the requirement that the District provide shelter in severe weather is not contained in Section 12 of the HSRA, the District interprets this allegation to state a claim under the HSRA generally.

severe weather by "mak[ing] available appropriate space in District of Columbia public or private buildings and facilities," even if those spaces are not apartment-style shelters.  D.C. Code §§ 4-753.01(c)(1) & (d)(2).  Because Plaintiffs did not allege in the Amended Complaint that they were denied shelter—only that they were provided with shelter that did not meet their needs—they do not state a claim under the HSRA.

## V.     The Court Should Dismiss Count VI, Alleging Negligence, Because the Public Duty Doctrine Precludes Liability.

"Under the public duty doctrine, 'a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public.'"  *Powell v. Dist. of Columbia*, 602 A.2d 1123, 1129 (D.C.1992) (quoting *Klahr v. Dist. of Columbia*, 576 A.2d 718, 719 (D.C.1990)).  Therefore, Plaintiffs must demonstrate a "special relationship" between themselves and the District.  *See Snowder v. Dist. of Columbia*, 949 A.2d 590, 603-04 (D.C. 2008).  A plaintiff can demonstrate a special relationship "(1) by showing direct or continuing contact between the victim and the governmental agency, along with justifiable reliance by the victim; or (2) by a statute prescribing mandatory acts for the protection of a particular class of persons rather than the public."  *Id.* at 604 (internal citations omitted).  Because Plaintiffs cannot demonstrate either type of special relationship, their negligence claims fail.

Plaintiffs allege that "[t]he DOJ Settlement and HSRA imposed a particular duty upon Defendant District of Columbia," which the District allegedly violated by failing "to place or to ensure that the Hunter family was placed in appropriate and accessible shelter units, and that the

Hunter family was provided modifications to policies and practices necessary to avoid discrimination on the basis of disability."[21]  Am. Compl. ¶ 144.

The DOJ Settlement did not create the necessary special relationship.  The Settlement is not a statute, so, to state a claim, Plaintiff would have to show contact and justifiable reliance. *Snowder*, 949 A.2d at 604.  However, a failure to act cannot create the necessary relationship. *See id.* ("[W]hile the District may be liable for an official's affirmative act that worsens a victim's condition, it will not be liable for that official's inaction or futile action.").  This alone is sufficient to defeat Plaintiff's negligence claim based on the Settlement.

Further, the DOJ Settlement was between the District and the U.S. Department of Justice, not Plaintiffs.  To demonstrate a special relationship by contact, "[t]he required contact must . . . be a 'direct transaction with the person injured' or 'an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured.'"  *See Powell*, 602 A.2d at 1130 (quoting *City of Tampa v. Davis*, 226 So.2d 450, 454 (Fla. Dist. Ct. App. 1969)).  Plaintiffs were in no way directly involved with the DOJ Settlement.  This fact is only reinforced by the fact that the Settlement by its own terms

> is enforceable only by the parties, no person or entity is intended to be a third party beneficiary of the provisions of this Settlement for purposes of any civil, criminal, or administrative action, and, accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Settlement in any civil, criminal, or administrative action.

DOJ Settlement ¶ 37.[22]  Therefore, the DOJ Settlement cannot amount to the "direct or continuing contact" needed to create a special relationship.  *See Powell*, 602 A.2d at 1130.

---

[21]   The "DOJ Settlement" to which Plaintiffs refer is an agreement between the District and the U.S. Department of Justice whereby the District improved its ADA compliance program in exchange for the Department of Justice's release of any claims relating to allegations in lawsuits under the ADA against the District.  *See* Am. Compl. ¶¶ 58 & 59; Settlement Agreement Between the United States of America and the District of Columbia Under the Americans with Disabilities Act, DJ # 204-16-96 (executed Dec. 10, 2008) ("DOJ Settlement"), *available at* www.ada.gov/dc_shelter.htm#settlement.

Similarly, the HSRA does not create a special relationship.  The HSRA imposes only a single "mandatory act[] for the protection of" the class of homeless persons—the duty to provide shelter in severe weather.  *Id.*; *Baltimore*, 10 A.3d at 1150-51.  Plaintiffs do not allege that they were denied shelter in severe weather.  *See generally* Am. Compl.; § IV.C, *supra*.  Therefore, the actions that Plaintiffs assert the District was negligent in failing to perform were not mandatory acts under the HSRA.

Because they cannot demonstrate the necessary special relationship, Plaintiffs' negligence claim against the District fails.

## VI.     The Court Should Dismiss Count VII Alleging Negligence *Per Se*, Because the Statutes Relied Upon by Plaintiffs Do Not Promote Public Safety and Because Plaintiffs Fail to Allege Violations of Those Statutes.

Plaintiffs allege that the District was "negligent *per se* in failing to meet their duties and obligations under the ADA, FHA, Rehabilitation Act, and HSRA."  Am. Compl. ¶ 150.  However, this claim is meritless.

Negligence *per se* is the judicial adoption of a standard of care in a statute for purposes of a negligence action.  *See McNeil Pharms. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996).  For a statute to provide a potential standard of care, it must (1) "promote public safety," (2) "have been 'enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred,'" and (3) "set forth 'specific guidelines to govern behavior.'"  *Id.* (quoting *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 & 558 (D.C. Cir. 1993)).

Plaintiffs' negligence *per se* claim fails because none of the statutes that Plaintiffs cite promote public safety.  The gravamen of Plaintiffs' claims is discrimination, and the statutes they

---

26

rely upon are intended to combat discrimination.[23]  None of the statutes is intended to prevent physical harm, so none promotes public safety.  *McNeil Pharms.*, 686 A.2d at 579.  Case law on the ADA confirms this.  *See Dalgliesh v. Theatre Mgmt. Grp., Inc.*, No. 96-CA-3985, 1999 WL 638127 (D.C. Super. May 28, 1999) ("Obviously, it would have been error if the court had instructed the jury that evidence of the ADA and the applicable C.F.R. violations constituted negligence *per* se, since the Act was promulgated to prevent discrimination, not physical injury."), *aff'd sub nom. Theatre Mgmt. Grp., Inc. v. Dalgliesh*, 765 A.2d 986 (D.C. 2001); *see also Levin v. Dollar Tree Stores, Inc.*, No. 06-00605, 2006 WL 3538964, at *3 n.2 (E.D. Pa. Dec. 6, 2006) ("Unlike the ADA, OSHA is a public safety statute, which . . . may even serve as the standard in a negligence *per se* claim.").  As a result, Plaintiffs cannot rely on these statutes for purposes of a negligence *per se* claim.

In addition to relying on statutes that do not promote public safety, Plaintiffs' negligence *per se* claim fails because, as discussed in the preceding sections, Plaintiffs have not adequately alleged that the District violated any of these anti-discrimination statutes.  *See* §§ I, II & III, *supra*.  Thus, Plaintiffs' negligence *per se* claim fails.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against the District of Columbia should be dismissed.

DATE:  June 3, 2013                    Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

---

[23]  In the case of the HSRA, the portion of the statute on which Plaintiffs rely concerns discrimination. Other provisions of the HSRA address different concerns, although none of those concerns is public safety.

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

/s/ Grace Graham_____
GRACE GRAHAM [D.C. Bar No. 472878]
Chief, Equity Section
Public Interest Division

/s/ Gary Feldon_____
GARY FELDON [D.C. Bar No. 987142]
Assistant Attorney General
Public Interest Division
Office of the Attorney General for the District of Columbia
441 Fourth Street NW, Suite 600S
Washington, DC 20001
Telephone: (202) 724-5691
Facsimile: (202) 730-0640
Email:  gary.feldon@dc.gov


/s/ Robert Rich_____
ROBERT RICH [D.C. Bar No. Pending[24]]
Assistant Attorney General
Public Interest Division
Office of the Attorney General for the District of Columbia
441 Fourth Street NW, Suite 600S
Washington, DC 20001
Telephone: (202) 724-6622
Facsimile: (202) 741-0659
Email:  robert.rich@dc.gov

---

[24]  D.C. Bar Application pending. Member of Maryland Bar in good standing. Authorized by the Office of the Attorney General for the District of Columbia to provide legal services pursuant to Rules of the United States District Court for the District of Columbia Local Rule 83.2(f).