UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANTHONY HUNTER, on his behalf and as parent of his minor daughter, A.H., | : | |
| Plaintiffs, | : | |
| v. | : | |
| THE DISTRICT OF COLUMBIA, a municipal corporation, | : | |
| THE COMMUNITY PARTNERSHIP FOR THE PREVENION OF HOMELESSNESS, | : | Civil Action No. 12-1960 (GK) |
| COALITION FOR THE HOMELESS, | : | |
| and | : | |
| COMMUNITY OF HOPE, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Plaintiff Anthony Hunter ("Hunter") and his minor daughter A.H.[1] (collectively, "the Hunters") filed this action against the District of Columbia ("the District" or "D.C."), the Community Partnership for the Prevention of Homelessness ("the Partnership"), the Coalition for the Homeless ("the Coalition"), and Community of Hope ("COH") (collectively, "Defendants"). The Hunters allege that Defendants violated various federal and local anti-discrimination statutes and were negligent.

---

[1] Pursuant to Local Civil Rule 5.4(f)(2), Hunter's daughter will be referred to by her initials in order to protect her privacy.

This matter is presently before the Court on the District's Motion to Dismiss Plaintiffs' First Amended Complaint [Dkt. No. 65] and COH's Motion to Dismiss Plaintiffs' First Amended Complaint [Dkt. No. 66]. Upon consideration of the Motions, Oppositions [Dkt. Nos. 73 and 74], Replies [Dkt. Nos. 77 and 80], the United States of America's Statement of Interest [Dkt. No. 79], the Responses to the United States' Statement of Interest [Dkt. Nos. 93 and 94], the entire record herein, and for the reasons stated below, the District's Motion is **granted in part** and **denied in part**, and Defendant COH's Motion is **granted in part** and **denied in part**.

## I. BACKGROUND

### A. Factual Background[2]

The District, through its Department of Human Services ("DHS"), provides social services for individuals and families in the city who are homeless or at risk of homelessness. First Amended Complaint ("Compl.") ¶ 8. In doing so, it entered into contracts with various service providers. Id. ¶ 9.

---

[2] For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed to be true and liberally construed in favor of the plaintiff. Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 15 (D.C. Cir. 2008); Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979). Therefore, the facts set forth herein are taken from the First Amended Complaint [Dkt. No. 59].

One such contractor, the Partnership, has been retained to manage and direct emergency shelter services. _Id._ ¶¶ 9-10. As part of its duties, the Partnership runs the District-owned D.C. General Shelter. _Id._ ¶ 10. The Partnership contracted with the Coalition to operate the Virginia Williams Family Resource Center ("the Center"), which is the central intake facility for all families seeking placements in shelters. _Id._ ¶ 12. The Partnership has also contracted with COH to manage the day-to-day operations at the District-owned Girard Street Apartments. _Id._ ¶¶ 8, 11.

At the time of the events relevant to this case, Plaintiff Hunter lived with his six-year old daughter, A.H. _Id._ ¶¶ 7, 36. She was born with and continues to suffer from spina bifida and cri-du-chat syndrome.[3] _Id._ ¶¶ 7, 35. As a result, she uses a wheelchair and cannot engage in "self-care, such as bathing, dressing and eating." _Id._ Her medical conditions leave her

_____

[3] Cri-du-chat syndrome is a chromosomal condition "characterized by intellectual disability and delayed development, small head size . . . , low birth weight, and weak muscle tone . . . in infancy." _Cri-du-chat syndrome_, Genetics Home Reference, http://ghr.nlm.nih.gov/condition/cri-du-chat-syndrome (last visited June 30, 2014). Spina bifida is a "condition in which the bones of the spinal column do not close completely around the developing nerves of the spinal cord." _Spina bifida_, Genetics Home Reference, http://ghr.nlm.nih.gov/condition/spina-bifida (last visited June 30, 2014). It can result in "a loss of feeling below the level of the opening, weakness or paralysis of the feet or legs, and problems with bladder and bowel control." _Id._

particularly susceptible to infections, and doctors have recommended she live in an environment that minimizes exposure to infections and other communicable diseases. Id.

On December 7, 2011, the Hunters faced immediate homelessness and applied for placement in a homeless shelter in the District. Id. ¶ 37. While at the Center discussing placement, Hunter told the staff that A.H. had mobility impairments and that the Hunters needed a non-communal environment with a private bathroom that was wheelchair accessible. Id. ¶¶ 37, 39. The Center staff failed to include the request for a non-communal environment with a private bathroom and included only the request for a wheelchair accessible unit when writing up the Hunters' reasonable accommodation request. Id. ¶ 39.

The Hunters were placed in "Building 12" of the D.C. General Shelter. Id. ¶ 41. Although the room was private, the ramp into the building was too steep to be wheelchair accessible. Id. ¶¶ 43, 46. The Hunters had to share a bathroom with several other families and the staff refused to let the Hunters eat in a separate room. Id. ¶¶ 47-48, 50. While residing in this shelter, A.H. developed a urinary tract infection resulting in the need for treatment at Children's Hospital. Id. ¶ 54. Asserting that the placement did not meet A.H.'s needs,

Hunter repeatedly asked that he and A.H. be relocated to an accessible unit. Id. ¶¶ 51, 53.

On or about December 29, 2011, the Hunters were moved to the Girard Street Apartments, where they were given a private apartment. Id. ¶¶ 56, 66. The Hunters were told that the only available unit at the Girard Street Apartments was on the third floor and that they would not receive an accessible unit. Id. ¶¶ 69, 71. There was no elevator, so Hunter had to carry A.H. and her wheelchair up and down two flights of stairs to arrive at or leave the apartment. Id. ¶ 74. Finally, the hallways in the unit were too narrow to accommodate A.H.'s wheelchair. Id. ¶ 75.

There was at least one accessible first floor unit at the Girard Street Apartments that was occupied by a family that did not need the accessible features. Id. ¶ 78. Hunter was told by the program director that she could not require that family to move and that the Hunters would need to stay in the third floor unit. Id. On February 10, 2012, after the intervention of the Hunters' attorney, the Hunters were moved to a first floor unit. Id. ¶ 86. Because the wheelchair lift was broken, Hunter still had to lift the wheelchair up three steps to get to this apartment. Id. ¶¶ 73, 86. As a result of the need to lift and

carry A.H.'s wheelchair, Hunter experienced back and chest pain. Id. ¶ 77.

On March 12, 2012, the Hunters moved out of the Girard Street Apartments and into a supportive housing program. Id. ¶ 88.

## B. Procedural History

On December 6, 2012, the Hunters filed their Complaint [Dkt. No. 1], and on April 29, 2013, they filed a Motion for Leave to File an Amended Complaint [Dkt. No. 54]. On May 17, 2013, the Motion was granted via Minute Order.

On June 3, 2013, the District filed a Motion to Dismiss ("Mot.") [Dkt. No. 65]. On June 7, 2013, COH filed a Motion to Dismiss ("COH Mot.") [Dkt. No. 66]. On July 3, 2013, the Hunters filed their Opposition to the District's Motion ("Opp'n") and COH's Motion ("COH Opp'n") [Dkt. Nos. 73, 74]. On July 24, 2013, COH filed its Reply ("COH Reply") [Dkt. No. 77], and an Answer with regard to the two negligence claims [Dkt. No. 78]. On July 26, 2013, the District filed its Reply ("Reply") [Dkt. No. 81].

On July 26, 2013, the U.S. Department of Justice ("DoJ") filed a Statement of Interest related to and opposing the District's Motion to Dismiss [Dkt. No. 79].[4] On October 29, 2013,

---

[4] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the

-6-

the District and COH both filed Responses to the Statement of Interest [Dkt. Nos. 93, 94].

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted) (citing Twombly, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the pleaded factual content [must] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563. Under the standard set forth in Twombly, a "court deciding a motion to

Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

dismiss must . . . assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." Aktieselskabet AF 21., 525 F.3d at 17 (internal quotations and citations omitted); see also Tooley v. Napolitano, 586 F.3d 1006, 1007 (D.C. Cir. 2009) (declining to reject or address the government's argument that Iqbal invalidated Aktieselskabet).

## III. ANALYSIS

The District and COH raise several similar arguments. Consequently, the Court will address together the issues raised by both parties to each Count of the Complaint.[5]

### A. Counts I and III: Plaintiffs Have Sufficiently Alleged Claims Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

Count I of the Amended Complaint alleges that Defendants violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq, which provides that "no qualified individual with a disability shall, by reason of such

---

[5] COH originally argued that Plaintiffs' claims against it were barred by the doctrine of release. COH Mot. at 19-21. Plaintiffs then filed an Addendum to their Settlement Agreement with the Partnership, clarifying that the document did not apply to or settle any claims with any other organizations. Dkt. No. 69-2. The Court approved this addendum in a Minute Order on June 17, 2013, and COH correspondingly withdrew this argument. COH Reply at 2 n.1.

disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Count III of the Amended Complaint alleges that Defendants violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et seq. Similar to Title II, Section 504 prohibits programs and activities receiving federal funds from discriminating on the basis of disability. 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); see also Young v. D.C. Hous. Auth., No. 13-652, 2014 WL 948317, at *5 (D.D.C. Mar. 12, 2014).

The focus of the Rehabilitation Act is narrower than the ADA because it only applies to programs receiving federal financial assistance. Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 85, opinion corrected, 511 F.3d 238 (2d Cir. 2004). Because Plaintiffs allege that the District receives federal funds, Compl. ¶¶ 8-9, the Rehabilitation Act claims and the Title II claims against the District may be considered together. Mot. at 5-6, 6 n.4; Opp'n at 4; see also Am. Council of the

-9-

Blind v. Paulson, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) (noting that the statutory provisions are so similar in substance that "cases interpreting either are applicable and interchangeable" (citation omitted)); Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999) ("Claims and defenses under the [ADA and the Rehabilitation Act] are virtually identical.").

COH argues that the ADA and the Rehabilitation Act do not apply to it, for various reasons. The Court will first address the substantive arguments raised by the District and then will resolve applicability of these statutes to COH.

### 1. Plaintiffs Are Not Required to Prove Intentional Discrimination to Plead a Claim for Declarative Relief

To establish a prima facie case under either Title II or the Rehabilitation Act, a plaintiff must allege that (1) she is a qualified individual with a disability; (2) the defendant is subject to the Acts; and (3) she was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of her disability. 42 U.S.C. § 12131; 29 U.S.C. § 794(a); see also McElwee v. Cnty. of Orange, 700

F.3d 635, 640 (2d Cir. 2012) (citing <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 272 (2d Cir. 2003)).[6]

Although a plaintiff "need not plead a prima facie case of discrimination" in order to survive a motion to dismiss, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 515 (2002), the District does not dispute that Plaintiffs have sufficiently alleged a prima facie case under the Acts.[7] Instead, the

---

[6] Title II defines "discriminate" to include a failure to make "reasonable modifications." <u>See</u> 42 U.S.C. §§ 12131(2), 12132; <u>see also</u> 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."); <u>see also</u> <u>McElwee</u>, 700 F.3d at 640-41 (2d Cir. 2012) (noting that "[u]nder both statutes, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified individual to have access to and take a meaningful part in public services") (internal quotation marks and citation omitted).

The parties use the term "reasonable accommodations" to refer to these requests. This Court will also use "reasonable accommodations" to encompass "reasonable modifications" under Title II. <u>See</u> <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) (citation omitted) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

[7] In its Response to the United States' Statement of Interest, the District argues for the first time that Plaintiffs failed to sufficiently plead that the District discriminated against A.H. "because of" her disability. Def. Dist. of Columbia's Resp. to Statement of Interest of the United States of America ("Response") at 9-10. As the District failed to raise this

District's primary argument is that Plaintiffs have failed to allege facts to support a claim that the District acted with the required intent. Mot. at 5-8.

As the District admits in its Response, the issue of intentional discrimination is only relevant to the issue of compensatory damages. Response at 9 n.5; Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 344 (11th Cir. 2012) (observing that failure to provide reasonable accommodation "by itself will not sustain a claim for compensatory damages; the [plaintiffs] must also show by a preponderance that the [defendant]'s failure to provide appropriate [reasonable accommodations] was the result of intentional discrimination"); Meagley v. City of Little Rock, 639 F.3d 384, 388 (8th Cir. 2011) (noting that every Court of Appeals to address the issue has held that a plaintiff may not recover compensatory damages under the ADA or the Rehabilitation Act without proof of discriminatory intent).

Therefore, Plaintiffs do not have to allege discriminatory intent in order to be entitled to the declaratory relief they request. Compl. at 38 (praying for declaratory relief); Am.

_____

argument in either its Motion or its Reply, it has waived it. See Alston v. Dist. of Columbia, 561 F. Supp. 2d 29, 37 (D.D.C. 2008); cf. Williams v. Romarm, SA, No. 13-7022, 2014 WL 2933222, at *3 (D.C. Cir. July 1, 2014) ("Questions not presented and argued by the parties in a sequence affording appropriate consideration are forfeited, and we accordingly decline to rule on the issue since it was not properly raised.").

Council, 525 F.3d at 1260 (noting that "section 504 does not require proof of discriminatory intent") (discussing Alexander v. Choate, 469 U.S. 287, 295 (1985)); Powers v. MJB Acquisition Corp., 184 F.3d 1147, 1152 (10th Cir. 1999) ("[I]ntentional discrimination is not an element of the plaintiff's prima facie case."). Consequently, Plaintiffs have sufficiently alleged violations under both Title II of the ADA and the Rehabilitation Act for declarative relief.

### 2. Plaintiffs Have Sufficiently Alleged Deliberate Indifference By the District of Columbia

The District argues that Plaintiffs have failed to sufficiently allege that it acted with deliberate indifference, and, hence, that Plaintiffs' request for compensatory damages under the ADA and the Rehabilitation Act must be dismissed.[8]

---

[8] In a footnote, the District argues that it does not "concede" that "deliberate indifference" is the appropriate standard and suggests that Plaintiffs must plead "intentional discrimination." Mot. at 5 n.3. Our Court of Appeals has not addressed the appropriate standard, but almost all other Courts of Appeal to reach the issue have concluded that the "deliberate indifference" standard is appropriate. See Liese, 701 F.3d at 345-47 (noting that Eighth, Ninth, Tenth, and Second Circuit have held that deliberate indifference standard applies, and choosing to apply that standard); but see Delano-Pyle v. Victoria Cnty., Tex., 302 F.3d 567, 575 (5th Cir. 2002) (finding that "[t]here is no 'deliberate indifference' standard applicable to public entities for purposes of the ADA" or the Rehabilitation Act). However, since the District does not provide support for its argument that a higher standard should apply, the Court will assume without deciding that the deliberate indifference standard applies.

Deliberate indifference occurs when a "defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." Liese, 701 F.3d at 344 (quoting T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla., 610 F.3d 588, 604 (11th Cir. 2010)); Meagley, 639 F.3d at 389 (noting that deliberate indifference can be "inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights") (quoting Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1228-29 (10th Cir. 2009)).[9]

Plaintiffs present two different theories under which the District can be found to have acted with deliberate indifference. First, Plaintiffs allege the District acted with deliberate indifference by failing to enforce its own obligations under the ADA. Second, Plaintiffs allege the District is responsible for the deliberate indifference of its contractors. The Court will address each theory in turn.

---

[9] The District argues that Plaintiffs have to allege and prove "actual knowledge" of a violation to establish deliberate indifference. Mot. at 6-8; Reply at 2-5. However, the case it cites for that proposition, Liese, clearly states that the standard only requires an allegation that a defendant have knowledge that harm to a right is "substantially likely," not that it have actual knowledge of a violation. Liese, 701 F.3d at 344.

### a.   Direct Liability

First, Plaintiffs allege that the District was deliberately indifferent to its affirmative obligation under the ADA to ensure that its contractors not discriminate in the provision of public services on the basis of disability. The District argues that it does not have any affirmative obligation to monitor the actions of the contractors.

Regulations promulgated by the DoJ make clear that public entities cannot escape liability by contracting away the provision of services to a private entity. 28 C.F.R. § 35.130(b)(1) ("A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . ." discriminate against an individual with a disability); id. pt. 35, App'x A, at 517 (2002) ("All governmental activities of public entities are covered, even if they are carried out by contractors. For example, a State is obligated by title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with title II's requirements.").

Unless the DoJ regulations are "arbitrary, capricious, or manifestly contrary to the statute," they should be given "controlling weight." Chevron U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837, 844 (1984); see also City of
Arlington v. FCC, 133 S. Ct. 1863, 1868 (2013) ("Statutory
ambiguities will be resolved, within the bounds of reasonable
interpretation, not by the courts but by the administering
agency."). The District does not argue that the regulations are
arbitrary or capricious. Indeed, all of the courts that have
addressed the regulations have concluded that they are entitled
to deference. See, e.g., Kerr v. Heather Gardens Ass'n, No. 09-
00409, 2010 WL 3791484, at *9 (D. Colo. Sept. 22, 2010) ("[T]he
regulations directing that a public entity is liable under Title
II for direct conduct as well as indirect conduct, achieved
through contracting, licensing, or the like, is not arbitrary,
capricious, or manifestly contrary to the statute. Therefore,
the regulations are entitled to controlling weight.") (citing
Chevron, 467 U.S. at 844); Armstrong v. Schwarzenegger, 622 F.3d
1058, 1065-67 (9th Cir. 2010) (analyzing statute and legislative
history and holding that regulations "reflect the fairest
reading of the statute").

Instead, the District argues that the statute and the
regulations are satisfied so long as the public entity merely
requires its contractors to comply with the statute. Mot. at 6-
7. Its only citation to support this argument is language
contained in an illustration in the DoJ's Title II Technical

-16-

Assistance Manual stating that a State parks department would be "obligated to ensure by contract" that a privately owned restaurant in a State park "operated in a manner that enables the parks department to meet its title II obligations." Id. at 6 (citing United States Dep't of Justice, Civil Rights Div., The Americans With Disabilities Act: Title II Technical Assistance Manual ("TAM") § II-1.3000, illus. 1).

However, other illustrations in the TAM demonstrate that the ADA obligations of a public entity go beyond simply including particular language in its contracts with private contractors: Illustration 4 states that a public entity "must ensure that its contracts are carried out in accordance with title II." TAM § II-1.3000, illus. 4 (emphasis added). As the District Court for the District of Colorado observed, these examples "support a conclusion that a public entity cannot escape its obligations under Title II by delegating its duties to a private entity. Indeed, in each illustration the public entity remains subject to Title II despite its delegation of authority or duty to another, private entity." Kerr, 2010 WL 3791484, at *10.

A number of courts have confirmed that public entities have an obligation to ensure that their private contractors comply with title II of the ADA. Henrietta D., 331 F.3d at 284-86

(holding that general rules of contract apply and supervisory liability exists under Rehabilitation Act); Hahn ex rel. Barta v. Linn Cnty., Iowa, 191 F. Supp. 2d 1051, 1054 n.2 (N.D. Iowa 2002) (noting that its earlier opinion had concluded that "a contractual relationship between a public and a private entity may obligate the public entity to ensure that the private entities with which it contracts comply with the public entity's Title II obligations"); James v. Peter Pan Transit Mgmt., Inc., No. 97-747, 1999 WL 735173, at *9 (E.D.N.C. Jan. 20, 1999) ("A public entity must not only ensure by contract that the private entity with whom it contracts complies with title II, but further, must ensure that the private entity complies with the contract."); Deck v. City of Toledo, 56 F. Supp. 2d 886, 895 (N.D. Ohio 1999) (noting that public entity can be held liable for failing to oversee its contractors, even if it did not affirmatively intend to discriminate).

In sum, the District has not presented any support for its argument that it has no obligation to ensure that its private contractors comply with its ADA and Rehabilitation Act obligations, and all courts to address the issue have found that they have such an obligation. Thus, the Court holds that Plaintiffs may proceed on a theory that the District is directly

liable for its deliberate indifference to its obligations under the ADA and the Rehabilitation Act.

### b. **Vicarious Liability**

Plaintiffs also argue that the District can be held vicariously liable for the deliberate indifference of its contractors. The District concedes that a public entity can be held liable under the ADA for the deliberate indifference of its employees or agents. Mot. at 6 n.5. It argues, however, that the other Defendants in this case are independent contractors for whose actions it cannot be held liable. Id.

As a "general rule," an entity is not held vicariously liable for actions taken by an independent contractor. Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp., No. 13-7024, 2014 WL 3538081, at *6 (D.C. Cir. July 18, 2014) (citing W.M. Schlosser Co. v. Md. Drywall Co., 673 A.2d 647, 651 (D.C. 1996)). "In determining whether a person is an employee or an independent contractor, District of Columbia courts consider multiple specified factors." Id. (citations omitted). However, the "decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." Id. (internal quotations and citation omitted).

-19-

Plaintiffs allege that the District not only had the right, but the obligation, to control and ensure its contractors' compliance with the ADA and the Rehabilitation Act. Compl. ¶¶ 8, 10, 59, 96, 100. Plaintiffs then point out that the District's argument that its contractors are independent is based on factual disputes that are not and cannot be appropriately resolved in a motion to dismiss. Beegle v. Rest. Mgmt., Inc., 679 A.2d 480, 485-86 (D.C. 1996) (relying on information from discovery to determine the nature of the employment relationship between an individual and a company); Anderson v. Wash. Metro. Area Transit Auth., No. 91-646, 1991 WL 197024, at *2 (D.D.C. 1991) ("[W]hether or not the subcontractors were in fact independent contractors cannot be determined on a motion to dismiss.").[10] Although the District may again raise the issue of its relationship to its contractors after discovery, Plaintiffs have sufficiently pleaded facts that, in conjunction with "the benefit of all reasonable inferences" Aktieselskabet AF 21., 525

---

[10] Moreover, even if the contractors are found to be independent, the District may still be held vicariously liable under various exceptions to the independent contractor rule. See Cooper v. U.S. Gov't & Gen. Servs. Admin., 225 F. Supp. 2d 1, 5 (D.D.C. 2002) (noting that the rule is "riddled with exceptions specifying certain conditions under which employers may be held vicariously liable," including an exception for "non-delegable duties . . . arising out of some relation toward the public") (citing Restatement (Second) of Agency, § 219 (1958)).

F.3d at 17, allow them to proceed on their theory of vicarious liability at this time.

**3.  The District's Remaining Arguments Lack Merit**

The Court will briefly address the remaining arguments raised by the District.

First, the District argues that various allegations in the Complaint are inconsistent. Mot. at 8-9. The Federal Rules expressly permit parties to plead in the alternative. Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). Moreover, the Rules specifically permit a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P 8(d)(3). Therefore, any inconsistency in Plaintiffs' allegations is not a basis to dismiss their claims.

Second, the District argues that various "sub-counts" of the Complaint are not pleaded with specificity. Mot. at 9-11. This argument, too, misunderstands the relevant requirements. Plaintiffs need merely include a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), sufficient to put a defendant on notice of the claims against it. Kingman Park Civic

-21-

Ass'n v. Williams, 348 F.3d 1033, 1040 (D.C. Cir. 2003) ("[T]he complaint need only set forth a short and plain statement of the claim giving the defendant fair notice of the claim and the grounds upon which it rests.") (internal quotations and citations omitted).

Plaintiffs submitted a detailed Complaint, and each claim specifically incorporates all of the facts alleged. Compl. ¶¶ 97, 104, 111, 119, 130, 143, 149. Moreover, rather than lack specificity, the "sub-counts" identify the various theories Plaintiffs intend to pursue as to each claim. Id. ¶¶ 101, 108, 116, 122-124, 140. Thus, Plaintiffs have provided more notice and information than is required by the Rules, and this is not a basis to dismiss these claims.

In sum, none of the District's remaining arguments support a dismissal of Plaintiffs' claims.

### 4. Plaintiffs Have Sufficiently Alleged That COH Is a "Public Entity"

COH argues that it is not subject to the ADA because it is not a "public entity." COH Mot. at 5-8. 42 U.S.C. § 12131 defines a "public entity" as "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42

-22-

U.S.C. § 12131(1)(A), (B). The term "State" includes the District of Columbia. Id. § 12103(2).

The TAM notes that, "[i]n some cases, it is difficult to determine whether a particular entity that is providing a public service . . . is in fact a public entity." TAM § II.1.2000. It then lists four factors to be considered in examining "the relationship between the entity and the governmental unit to determine whether the entity is public or private":

1) Whether the entity is operated with public funds;

2) Whether the entity's employees are considered government employees;

3) Whether the entity receives significant assistance from the government by provision of property or equipment; and

4) Whether the entity is governed by an independent board selected by members of a private organization or a board elected by the voters or appointed by elected officials.

Id.

It is undisputed that Plaintiffs have alleged that COH is "operated with public funds," and that COH "receives significant assistance from the government by provision of property." See Compl. ¶ 11. COH argues that this is insufficient because Plaintiffs have failed to allege that COH "employs government employees or is governed by a board elected by voters or appointed by elected officials." COH Mot. at 8.

The TAM does not state that all four factors must be satisfied for an entity to be considered "public." Rather, it notes that all four are "[f]actors to be considered. TAM § II.1.2000. Thus, COH's insistence that Plaintiffs' claim must fail because they have not alleged all four of these factors lacks merit.

COH cites a number of cases that concluded -- on motions for summary judgment on a full factual record -- that a particular entity is private. See COH Mot. at 6-7 (citing Edison v. Douberly, 604 F.3d 1307, 1311 (11th Cir. 2010); Green v. City of New York, 465 F.3d 75, 79 (2d Cir. 2006); Maxwell v. S. Bend Work Release Ctr., 787 F. Supp. 2d 819, 822 (N.D. Ind. 2011); Obert v. The Pyramid, 2005 WL 1009567 (W.D. Tenn. 2005); Doe v. Adkins, 110 Ohio App. 3d 427, 434-35 (1996)).

COH argues that the analysis relied on in these cases should be applied here. Given that there is no full factual record in this case and that Plaintiffs have alleged sufficient facts that, in combination with "all reasonable inferences" in Plaintiffs' favor, support their claim that COH is a public entity providing a public service, the Court will not dismiss the ADA claim against COH at this time. See Aktieselskabet AF 21., 525 F.3d at 17 (internal quotations and citations omitted).

### 5. Plaintiffs Have Sufficiently Alleged that COH Is a Recipient of "Federal Financial Assistance"

COH also argues that it is not subject to the Rehabilitation Act because it does not receive "federal financial assistance." COH Mot. at 13-15. Relying on cases from other Circuits, COH argues that "purely compensatory payments" do not constitute federal financial assistance, but "payments that include a subsidy" do constitute such assistance. COH Mot. at 13-14 (citing Jacobson v. Delta Airlines, Inc., 742 F.2d 1202, 1209 (9th Cir. 1984), and DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d 1377, 1382 (10th Cir. 1990)).

Those cases held that courts should look to whether the federal entity providing the alleged assistance intended "to provide assistance or merely to compensate." Jacobson, 742 F.2d at 1210; DeVargas, 911 F.2d at 1382-83; see also Shepherd v. U.S. Olympic Comm., 94 F. Supp. 2d 1136, 1146 (D. Colo. 2000) (noting that "[t]he test to determine whether a government transfer of money to an entity is a subsidy is whether Congress or the federal agency administering the program intended to subsidize the entity.").

Plaintiffs allege that COH "receives federal and District funds for homeless programs, health programs and other programs and services." Compl. ¶ 11. In addition, they allege that COH

"has received substantial recent federal grants from [the Departments of Health and Human Services] and [Housing and Urban Development]." Compl. ¶ 11. Health and Human Services ("HHS") has promulgated a regulation specifically noting that grants of funds are federal financial assistance. 42 C.F.R. § 84.3(h)(1). For purposes of this motion to dismiss, these allegations, in conjunction with the HHS regulation, are sufficient to support Plaintiffs' claim that COH receives federal financial assistance. See Shepherd, 94 F. Supp. 2d at 1146-47 (denying defendant's argument that claim should be dismissed as a matter of law where plaintiff alleged defendant received federal grant, based on "the broad definition of "financial assistance" in Jacobson, cited with approval by the Tenth Circuit in DeVargas," and concluding that plaintiff "should be allowed the benefit of discovery").

Therefore, the Court will not dismiss the Rehabilitation Act claims against COH at this time.

### 6. Summary

Plaintiffs have sufficiently pleaded claims under both the ADA and the Rehabilitation Act for both declarative relief and compensatory damages.

**B.  Count II: Plaintiffs Have Sufficiently Alleged a Claim Under the Fair Housing Act**

In 1968, Congress passed the Fair Housing Act ("FHA") as Title VIII of the Civil Rights Act. Pub. L. 90-284, Title VIII, § 804, 82 Stat. 83 (1968), codified at 42 U.S.C. § 3601 et seq. As originally enacted, the FHA prohibited discrimination based on race, color, religion, or national origin. Id.; see also City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 728 n.1 (1995). The Supreme Court has emphasized that the language of the FHA is "broad and inclusive," and must be given a "generous construction." Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209, 212 (1972); see also Samaritan Inns, Inc. v. Dist. of Columbia, 114 F.3d 1227, 1234 (D.C. Cir. 1997).

In 1988, Congress amended the FHA to extend coverage to individuals with disabilities. See The Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619. The Act's definition of discrimination was expanded to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped persons] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

As a preliminary matter, Plaintiffs make clear that their FHA claim is a "failure to accommodate" claim. Compl. ¶ 108(c)

(citing 42 U.S.C. § 3604 (f)(3)(B)); Opp'n at 26. Such "failure to accommodate" claims do not require proof of intentional discrimination. See Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City, 685 F.3d 917, 922-23 (10th Cir. 2012) ("A claim for reasonable accommodation . . . does not require the plaintiff to prove that the challenged policy intended to discriminate . . . ."). The District argues to the contrary relying solely on 2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia, 444 F.3d 673 (D.C. Cir. 2006) -- which does not even address any failure to accommodate claims. Thus, the District's argument that Plaintiffs' FHA claims fail for failure to allege intentional discrimination lacks any merit and no case law supports it. See Mot. at 15-16.

Moreover, the District is incorrect that Plaintiffs' characterization of their FHA claims as "failure to accommodate" claims constitutes an abandonment of any other claims. Reply at 11. A failure to accommodate is a form of discrimination under 3604(f)(3); sections (f)(1) and (f)(2) set out different conditions under which such discrimination is unlawful. 42 U.S.C. § 3604(f). Plaintiffs are pursuing "failure to accommodate" claims under both subsections (f)(1) and (f)(2).

The Court will now turn to the substantive arguments raised by the District and COH.

### 1.    "Dwelling"

The District and COH argue that neither DC General nor the Girard Street Apartments is a "dwelling" under the FHA. The FHA defines a "dwelling" in relevant part as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b).

The FHA does not, however, define "residence." Most courts that have considered the scope of the term have relied on the definition used in United States v. Hughes Memorial Home, 396 F. Supp. 544 (W.D. Va. 1975), which is "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit." Id. at 549 (citing Webster's Third New International Dictionary); see Defiore v. City Rescue Mission of New Castle, No. 12-1590, 2013 WL 7157990, at *3 (W.D. Pa. Dec. 12, 2013); Jenkins v. New York City Dep't of Homeless Servs., 643 F. Supp. 2d 507, 517-18 (S.D.N.Y. 2009) (noting that courts "have continued to look to the Hughes 'plain meaning' analysis in determining what constitutes a dwelling under the FHA") aff'd on other grounds, 391 F. App'x 81 (2d Cir. 2010); Woods v. Foster, 884 F. Supp. 1169, 1173 (N.D. Ill. 1995) (listing cases citing Hughes).

Applying the definition used in Hughes, several courts have concluded that temporary homeless shelters are "dwellings" under the FHA. Defiore, 2013 WL 7157990, at *3-*4; Boykin v. Gray, 895 F. Supp. 2d 199, 207 (D.D.C. 2012); Jenkins, 643 F. Supp. 2d at 517-18; Woods, 884 F. Supp. at 1173-74. Other courts have noted without deciding that it is likely that at least some temporary shelters are "dwellings." Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1044 n.2 (9th Cir. 2007) (en banc).

The District and COH argue that this Court should instead rely on two cases that concluded that temporary homeless shelters were not "dwellings." The first case, Johnson v. Dixon, 786 F. Supp. 1 (D.D.C. 1991), is not persuasive, since it merely expressed "doubt" that an emergency overnight shelter would qualify as a dwelling, and then assumed without deciding that it did so for purposes of its analysis. Id. at 4. This expression of "doubt," with no analysis, is neither holding nor persuasive dicta. In any event, it is certainly not, as Defendants argue, "the law of this Circuit."

The second case, Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries, 717 F. Supp. 2d 1101 (D. Idaho), aff'd on other grounds, 657 F.3d 988 (9th Cir. 2011), concluded on a motion for summary judgment, not a motion to dismiss, that a particular homeless shelter did not qualify as a "dwelling."

Id. at 1109-12. The procedural distinction between that case and this one is significant. To justify its conclusion, the Intermountain court analyzed many specific factors regarding the terms of residence at the shelter - a factual analysis that is clearly inappropriate at this stage in these proceedings. See Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach, 495 F.3d 695, 723 (D.C. Cir. 2007) (noting that factual questions were "not properly resolved at the motion-to-dismiss stage when all reasonable inferences must be drawn to the plaintiff's benefit").

Moreover, the facts upon which the Intermountain court based its conclusion are very different from the facts alleged here. The court relied on the following evidence:

> [G]uests of the shelter are not charged a fee for staying in the shelter; are assigned a bed in a dormitory-style room, a hallway, or the day room; generally are allowed to stay for a maximum of seventeen consecutive nights (except during the winter months when the maximum stay is more flexible due to the danger that cold weather presents to homeless individuals during the night); are not guaranteed the same bed each night they return; with limited exceptions, are not allowed to stay at the shelter during the day, are required to leave the shelter every morning by 8:00 a.m., and may not return, except for lunch, until 4:00 p.m.; are not allowed to leave the shelter once they arrive in the evening; generally are not allowed to stay at the shelter on a particular evening if they do not check in during the designated hours; are not allowed to personalize the bed area assigned to them or leave belongings in their bed area; and, with extremely limited exceptions, are not

-31-

allowed to receive phone calls, mail, or have visitors at the shelter.

717 F. Supp. 2d at 1111.

In contrast, Plaintiffs allege that there is no time limit set on how long residents can remain at either D.C. General or the Girard Street Apartments, and that the Hunters expected to remain there indefinitely. Compl. ¶¶ 42-43 (D.C. General); ¶ 57 (Girard Street Apartments). Indeed, the Hunters stayed at both shelters longer than the seventeen-day maximum imposed by the shelter at issue in <u>Intermountain</u>. <u>Id.</u> ¶¶ 37, 56 (alleging Hunters stayed at D.C. General between December 7, 2011, and December 29, 2011); ¶¶ 69, 88 (alleging Hunters stayed at Girard Street Apartments between December 29, 2011, and March 12, 2012).

In addition, the Hunters allege that D.C. General provides families with their own rooms, guarantees individuals the right to access their rooms at all times of the day, allows families to return to the same room each day, and permits families to keep their belongings in their room. <u>Id.</u> ¶ 43. The Hunters also allege that Community of Hope gives each family its own apartment-style room with a key, requires staff to give notice before entering apartment units, and permits residents to

decorate their units and place personal items in them. Id.
¶¶ 64-67.

All of these factual allegations support Plaintiffs' claim
that both D.C. General and the Girard Street Apartments are "a
temporary . . . dwelling place, abode or habitation to which one
intends to return as distinguished from the place of temporary
sojourn or transient visit," Hughes, 396 F. Supp. at 549. Thus,
neither Johnson nor Intermountain supports dismissing
Plaintiffs' FHA claim at this time. See Boykin, 895 F. Supp. 2d
at 206-07 (rejecting District's reliance on Johnson and
Intermountain, and holding that the FHA was not categorically
inapplicable to homeless shelters).

In addition, the Department of Housing and Urban
Development ("HUD") has promulgated a regulation which
explicitly identifies "sleeping accommodations in shelters
intended for occupancy as a residence for homeless persons" as
an example of a "dwelling unit." 24 C.F.R. § 100.201. HUD is
"the federal agency primarily charged with the implementation
and administration" of the FHA. Meyer v. Holley, 537 U.S. 280,
287 (2003). The District has offered no reason why the
regulation should not be entitled to the deference due
reasonable agency interpretations. See Chevron, 467 U.S. at 844;
see also United States v. Univ. of Neb. at Kearney, 940 F. Supp.

2d 974, 981 (D. Neb. 2013) (deferring to HUD's definition of "dwelling unit"); Cmty. House, 490 F.3d at 1044-45 n.2 (noting that "the regulations interpreting the coverage of the FHA specifically contemplate that 'residences' within homeless shelters qualify as 'dwellings'").[11]

In sum, Plaintiffs have sufficiently alleged facts that, with "the benefit of all reasonable inferences," Aktieselskabet AF 21., 525 F.3d at 17, support their claim that both D.C. General and the Girard Street Apartments were "dwellings" under the FHA.

### 2. "Sale or Rental" and "Buyer or Renter"

The District and COH also argue that Plaintiffs have failed to state a claim under the FHA because they are not "buyer[s] or renters" who were discriminated against in the "sale or rental" of a dwelling. Mot. at 11-12; COH Mot. at 10-13.

Plaintiffs bring claims under two subsections of the Fair Housing Act. 42 U.S.C. § 3604(f)(1) and (2). Both sections

---

[11] COH argues that there is a distinction between a "dwelling unit" and a "dwelling," COH Reply at 5-6, but it cites no authority in support of that proposition. Moreover, HUD's regulation on "reasonable accommodations" specifically uses the term "dwelling unit." 24 C.F.R. § 100.204 ("It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.").

require that the discrimination occur in connection with the "sale or rental of a dwelling."

Some courts have noted the difficulties of establishing a violation of section 3604(f) in the context of homeless shelters. See Boykin, 895 F. Supp. 2d at 210 (expressing doubt that FHA claim was cognizable given that former residents of a homeless shelter were neither buyers nor renters); Johnson, 786 F. Supp. at 4 ("Plaintiffs, and the other inhabitants of the two shelters, are neither [buyers nor renters]. Such accommodations as they have had at the shelters in the past have been provided gratis by the District."); see also Forziano v. Indep. Grp. Home Living Program, Inc., No. 13-0370, 2014 WL 1277912, at *8 n.5 (E.D.N.Y. Mar. 26, 2014) ("Since [plaintiffs] are not renters or buyers in their respective group homes, but rather receive supervised housing as part of their Medicaid services, they cannot state a claim for relief under the FHA.").

However, none of those courts addressed Plaintiffs' argument that federally-funded shelters fall under the definition of the term "to rent" in the FHA. The FHA defines "to rent" as "to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant." 42 U.S.C. § 3602(e). Plaintiffs allege that Defendants receive federal funds, and argue that this

-35-

constitutes "consideration" for giving homeless individuals the right to occupy rooms in homeless shelters. Opp'n at 23; Statement of Interest at 25-26.

A handful of courts have considered this argument and found it persuasive. See Woods, 884 F. Supp. at 1175 (holding that the receipt of federal funds in return for providing shelter for the homeless was sufficient to establish that defendants "rent[ed]" the shelter); Anonymous v. Goddard Riverside Cmty. Ctr., Inc., No. 96-9198, 1997 WL 475165, at *3 n.4 (S.D.N.Y. July 18, 1997) (assuming federal funds constitute consideration for housing for purposes of resolving motion to dismiss); cf. Wai v. Allstate Ins. Co., 75 F. Supp. 2d 1, 7 (D.D.C. 1999) (rejecting contention that section 3604(f)(2) "only applies to landlords or providers of housing").

Defendants argue that this Court should instead follow the district court in Jenkins, 643 F. Supp. 2d at 519, which stated that a "far more plausible reading of the statute would limit the word 'rent' to consideration paid by the person who has the right to occupy the dwelling." However, the Second Circuit specifically noted that the district court had "erred in reaching the question of whether" the plaintiff was a renter under section 3604(f). 391 Fed. App'x 81, 83 (2d Cir. 2010) (upholding district court's conclusion that plaintiff had failed

-36-

to state an FHA claim on other grounds). Thus, the district court's decision in Johnson has no precedential value on this issue.

Moreover, the Court finds that this case is more similar to Defiore, 2013 WL 7157990, in which the court observed that, "[w]hat qualifies as consideration under the FHA has been examined by a limited number of courts and this Court finds that resolution of the issue will turn on whether [the shelter] receives consideration for a resident's stay -— whether it be from federal or other funding directed to subsidizing the costs of providing housing to the homeless or whether shelter residents provide some form of consideration for their stay." Id. at *4.

In sum, Plaintiffs have alleged that the District and COH receive federal funds in order to provide homeless individuals with programs and services, including the right to occupy certain premises. Compl. ¶¶ 8, 11. These allegations and "all reasonable inferences" therefrom, Aktieselskabet AF 21., 525 F.3d at 17 (internal quotations and citations omitted), satisfy the broad definition of "to rent" set out in the statute, 42 U.S.C. § 3602(e), particularly in light of the Supreme Court's direction to give the statute "generous construction." Trafficante, 409 U.S. at 209, 212.

This reading of the definition of "rent" makes sense in the context of subsection (f)(2), which makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of [] rental of a dwelling, or in the provision of services or facilities in connection with such dwelling." 42 U.S.C. § 3604(f)(2). Plaintiffs have alleged that they were discriminated against in the provision of services or facilities that appropriately accommodated A.H.'s handicap. Thus, Plaintiffs have sufficiently stated a claim under subsection 3604(f)(2).

A harder question is whether a broad construction of the term "rent" can still save Plaintiffs' claim under subsection 3604(f)(1). That provision makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1).

The primary problem is that the discrimination in the sale or rental under subsection (f)(1) must be to "any buyer or renter." Id. Even under Plaintiffs' construction of the term rent, the "renters" are the federal agencies that provide funds to Defendants, not the Plaintiffs. The statutory language of subsection (f)(1) seems to limit the scope of unlawful

discrimination to the entity buying or renting the dwelling in question.

The United States argues that "courts have applied the FHA to encompass a wide variety of conduct that does not involve a refusal to sell or rent housing to owners or tenants." Statement of Interest at 24 & 24 n.16. It cites several cases that have interpreted the phrase "otherwise make unavailable or deny" to expand the scope of the FHA. The Court notes that cases in this District have similarly found that section 3604(a) reaches a broad range of actors whose actions affect the opportunity to buy or rent a dwelling. Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urban Dev., 723 F. Supp. 2d 14, 22-23 (D.D.C. 2010) (permitting plaintiffs to pursue claim that grant program for disaster recovery prevented homeowners from inhabiting their homes); Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co., 573 F. Supp. 2d 70, 76-77 (D.D.C. 2008) (permitting claim against mortgage lenders); Nat'l Cmty. Reinvestment Coal. v. Novastar Fin., Inc., No. 07-0861, 2008 WL 977351, at *1-*3 (D.D.C. Mar. 31, 2008).

However, these cases were brought under a different subsection of section 3604, which makes it unlawful "[t]o otherwise make unavailable or deny[] a dwelling to any person because of race, color, religion, sex, familial status, or

-39-

national origin." 42 U.S.C. § 3604(a) (emphasis added); compare id. § 3604(f)(1) (making it unlawful "to otherwise make unavailable or deny[] a dwelling to any buyer or renter") (emphasis added). See, e.g., N.A.A.C.P. v. Am. Family Mut. Ins. Co., 978 F.2d 287, 301 (7th Cir. 1992) (holding that section 3604 "applies to discriminatory denials of insurance, and discriminatory pricing, that effectively preclude ownership of housing because of the race of the applicant"). Thus, these cases do not provide support for the proposition that the "otherwise make unavailable or deny" language in section 3604(f)(1) means that Plaintiffs do not have to establish that they were a "buyer or renter."

Even in light of the Court's obligation to construe the FHA as broadly as possible, the clear language of the statute restricts the class of people who can bring a claim under section 3604(f)(1) to a "buyer or renter," or, at its broadest, individuals who were otherwise denied the opportunity to become a buyer or a renter. There is no such allegation that the Hunters fall into either category. Therefore, the Court must conclude that the Hunters have failed to sufficiently allege that the District or COH discriminated against them as "buyers or renters" under 42 U.S.C. § 3604(f)(1).

-40-

### 3. Summary

Plaintiffs have sufficiently alleged that the homeless shelters at issue in this case should be considered "dwellings" under the FHA. Plaintiffs have also sufficiently alleged that Defendants received some consideration in exchange for permitting them to reside in such dwellings, such that they can proceed with their claim of discrimination under 42 U.S.C. § 3604(f)(2). However, Plaintiffs have not sufficiently alleged that they are "buyer[s]" or "renter[s]" such that they may bring a claim under 42 U.S.C. § 3604(f)(1).

### C. Count IV: Plaintiffs Have Sufficiently Alleged Claims Under the District of Columbia Human Rights Act

The Hunters argue that Defendants have violated several provisions of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 et seq. The District of Columbia Court of Appeals has noted that the DCHRA "is a remedial civil rights statute that must be generously construed." See Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 887 (D.C. 2003) (quoting Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 731 (D.C. 2000)).

The District and COH challenge Plaintiffs' six DCHRA claims as deficient for different reasons. The Court shall address each claim in turn.

1. **Plaintiffs Have Sufficiently Stated a Claim Under D.C. Code § 2-1402.21(d)(2), But Not § 2-1402.21(d)(1)**

First, the District and COH argue that Plaintiffs' claims under section 2-1402.21(d) of the DCHRA fail for the same reasons that Plaintiffs' FHA claims fail; namely, that Plaintiffs are neither "buyer[s]" nor "renter[s]" and that the shelters at issue are not "dwellings." See Mot. at 16-17; COH Mot. at 15-16.

Defendants are correct that section 2-1402.21(d) makes discrimination associated with the sale or rental of a dwelling unlawful in language that parallels the analogous provision of the FHA. Compare D.C. Code § 2-1402.21(d) with 42 U.S.C. § 3604(f). "District of Columbia courts interpreting the DCHRA 'have generally looked [for guidance] to cases from the federal courts' arising under federal civil rights statutes." Whitbeck v. Vital Signs, Inc., 116 F.3d 588, 591 (D.C. Cir. 1997) (quoting Benefits Comm'n Corp. v. Klieforth, 642 A.2d 1299, 1301-02 (D.C. 1994)); see also Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C., 950 F. Supp. 393, 405 (D.D.C. 1996) ("The D.C. courts have always looked to cases from the federal courts in interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the

federal courts' treatment of comparable civil rights statutes.") (citations omitted).

As discussed above, see supra Sec. III.B.1, Plaintiffs have sufficiently stated facts in their complaint to support their claim that the shelters in question are "dwellings." In addition, although Plaintiffs have failed to sufficiently allege they are "buyer[s] or renter[s]" to satisfy section 2-1402.21(d)(1) of the DCHRA, there is no such language in section 2-1402.21(d)(2) of the DCHRA. See supra Sec. III.B.2 (discussing difference in language between provisions of the FHA). Thus, because this section of the DCHRA and the FHA should be interpreted in a parallel fashion, the Court concludes that Plaintiffs may proceed on its claim that Defendants discriminated against them in the "terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with the dwelling because of a disability," D.C. Code § 2-1402.21(d)(2), but not on its claim that Defendants discriminated against them under section 2-1402.21(d)(1).

### 2. Plaintiffs Have Sufficiently Stated a Claim Under D.C. Code § 2-1402.21(d)(3)(D)

In a footnote, the District argues that Plaintiffs have failed to assert facts sufficient to support their claims

-43-

"regarding the accessibility of their units." Mot. at 17 n.13.
This argument seems to be challenging Plaintiffs' claim that
they were discriminated against under D.C. Code § 2-
1402.21(d)(3)(D). That section defines "unlawful discrimination"
to include a failure to ensure that premises within a dwelling
contain "[a]n accessible route into and through the dwelling,"
and "usable kitchens and bathrooms so that an individual in a
wheelchair can maneuver about the space." Compl. ¶¶ 123(a), (b);
see D.C. Code § 2-1402.21(d)(3)(D)(i), (iv).

Plaintiffs have sufficiently alleged facts to support a
claim that both D.C. General and the Girard Street Apartments
did not include accessible routes into the building and/or their
units. See Compl. ¶ 46 (alleging that A.H. could not get into
front door of D.C. General because ramp is "excessively steep"
and sidewalk is broken); ¶ 72 (ramp leading up to Girard Street
Apartments was not accessible for A.H.); ¶ 73 (wheelchair lift
in Girard Street Apartments was broken); ¶ 74 (no elevator in
Girard Street Apartments to get to third floor apartment); ¶ 75
(hallways within Girard Street apartment were too narrow to
accommodate wheelchair). They have also sufficiently alleged
that D.C. General did not include a usable bathroom. See id.
¶ 47 (bathroom in D.C. General unsuitable for A.H.'s needs

because she had to be supported by Hunter and he could not hold her and operate shower at same time).

Thus, Plaintiffs have alleged facts sufficient to proceed on their claims under sections 2-1402.21(d)(3)(D)(i) and (iv) of the DCHRA.

### 3. Plaintiffs Have Sufficiently Stated a Claim Under D.C. Code § 2-1402.31(a)(1)

#### a. Intentional Discrimination

Plaintiffs allege that Defendants have violated section 2-1402.31(a)(1) of the DCHRA, which establishes, among other things, that it is an "unlawful discriminatory practice" to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" because of a disability. D.C. Code § 2-1402.31(a)(1).

In a footnote, the District argues that this section of the DCHRA requires a plaintiff to plead and prove intentional discrimination. Mot. at 16 n.12. It is true that the DCHRA includes language, which is not included in either Title III of the ADA or Title II of the Civil Rights Act,[12] requiring that the

---

[12] Defendants discuss Title III of the ADA, 42 U.S.C. § 12181 et seq., which prohibits discrimination on the basis of disability in the "full and equal enjoyment" of "any place of public

discriminatory act be "wholly or partially for a discriminatory reason based on the actual or perceived . . . disability." Mot. at 16 n.12.

However, the parties have identified no case that discusses a plaintiff's burden to prove a defendant acted "wholly or partially for a discriminatory reason" under the public accommodations section of the DCHRA. Even if the burden for pleading intentional discrimination was the same in this context as it is in the FHA context, the Court has already concluded that Plaintiffs have met that burden at this stage. See supra Sec. III.A.4. Therefore, the Court will allow Plaintiffs to proceed on their claim against the District for discrimination in the provision of public accommodations under D.C. Code § 2-1402.31(a)(1) at this time.

### b. "Place of Public Accommodation"

COH argues that the Girard Street Apartments are not a "place of public accommodation" under the DCHRA. See COH Mot. at 16-17; COH Reply at 17. Specifically, it argues that the DCHRA's enumerated list of "places of public accommodation" does not

accommodation." Mot. at 16 n.12 (discussing 42 U.S.C. § 12182(a)). In addition, the Court notes that Title II of the Civil Rights Act, 42 U.S.C. § 2000a et seq., also outlaws discrimination in the provision of public accommodations. 42 U.S.C. § 2000a(a)

include a homeless shelter. Id. (citing D.C. Code § 2-1401.02(24)).

Section 2-1401.02(24) of the DCHRA defines places of public accommodation as "all places included in the meaning of" a long list of terms. D.C. Code § 2-1401.02(24). Although COH is correct that homeless shelter is not one of the terms listed, a member of this court has already noted that the term "place of public accommodation" is defined "broadly" under the DCHRA and "would seem to include homeless shelters." Boykin, 895 F. Supp. 2d at 217 n.16.

Moreover, the parallel provision defining "public accommodation" under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, does include a homeless shelter as an entity considered a public accommodation. 42 U.S.C. § 12181(7)(K). Given that D.C. courts look for guidance to the parallel federal civil rights statutes, see Boykin, 895 F. Supp. 2d at 219 (citation omitted), and in light of the District of Columbia's determination that the DCHRA should be "generally construed," Lively, 830 A.2d at 887, the Court concludes that the Girard Street Apartments should be considered a "place of public accommodation" under section 2-1402.31(a)(1) of the DCHRA.

**4. Plaintiffs Have Sufficiently Stated a Claim Under D.C. Code § 2-1402.73**

Section 2-1402.73 of the DCHRA establishes, among other things, that it is an "unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit" on the basis of an individual's disability. D.C. Code § 2-1402.73.[13]

Defendants argue that Plaintiffs have failed to allege sufficient facts to support this claim. First, the District argues that Plaintiffs have failed to sufficiently allege that any District agency or office "limit[ed]" or "refuse[d]" any service to the Hunters because no such agency or office "directly interacted" with Plaintiffs. Mot. at 17; Reply at 13.

The text of the statute does not contain or suggest such a "direct interaction" requirement. In George Washington Univ. v. D.C. Bd. of Adjustment, 831 A.2d 921 (D.C. 2003), the District of Columbia Court of Appeals discussed the provision and noted that it "appears to be directed at the administration of District of Columbia government programs." Id. at 941 n.16. Plaintiffs have alleged that they relied on the Department of Human Services ("DHS") and the Office of Shelter Monitoring

---

[13] Another member of this court has noted that, "[t]here is a dearth of case law respecting this provision, which became effective in 2002, and the [c]ourt has not located any decisions applying it." Boykin, 895 F. Supp. 2d at 218.

("OSM") to ensure compliance with federal and local anti-discrimination provisions and to maintain records of shelter inventory and information relating to their accessibility to those with disabilities. Compl. ¶¶ 89-91. Construed in the light most favorably to Plaintiffs, as this Court must, Aktieselskabet AF 21., 525 F.3d at 17 (internal quotations and citations omitted), these allegations support a claim that District agencies refused to provide an appropriate "facility, service, program, or benefit" to the Hunters based on A.H.'s needs as a disabled individual. Therefore, the Court will not dismiss Plaintiffs' claim under this section of the DCHRA on this basis.

Second, the District argues that homeless shelter services are not the type of "services" covered by this provision. Mot. at 17 n.14. In support of its argument, it cites only one case, A Society Without a Name v. Virginia, 655 F.3d 342 (4th Cir. 2011). Society Without a Name construed the scope of the term "services" under the FHA, 42 U.S.C. § 3604(b) and (f)(2), to be limited to "services generally provided by governmental units." Id. at 349-50. However, the relevant section of the DCHRA is much broader than the FHA provisions, encompassing "any facility, service, program, or benefit." D.C. Code § 2-1402.73; compare 42 U.S.C. § 3604(b) (making unlawful discrimination "in the provision of services or facilities"); id. § 3604(f)(2)

-49-

(same). Thus, the Court is not persuaded that Society Without a
Name provides an adequate basis to dismiss Plaintiffs' claim
under this section of the DCHRA at this time.

### 5. Plaintiffs Have Sufficiently Stated a Claim Under D.C. Code § 2-1402.67

Section 2-1402.67 of the DCHRA states:

> All permits, licenses, franchises, benefits,
> exemptions, or advantages issued by or on behalf of
> the government of the District of Columbia, shall
> specifically require and be conditioned upon full
> compliance with the provisions of this chapter; and
> shall further specify that the failure or refusal to
> comply with any provision of this chapter shall be a
> proper basis for revocation of such permit, license,
> franchise, benefit, exemption, or advantage.

D.C. Code § 2-1402.67. The District argues that Plaintiffs'
claim under this section fails for two reasons.[14]

First, the District argues that because the Hunters have
failed to identify any particular document in which the District

---

[14] The District notes for the first time in its reply that
section 2-1402.67 only references "permits, licenses,
franchises, benefits, exemptions, or advantages," but does not
specify "contracts." Reply at 13. Thus, it argues that the
Hunters' allegations regarding contracts are inherently
insufficient.

The District does not explain why the contracts at issue here
should not be considered "permits, licenses, franchises,
benefits, exemptions, or advantages." D.C. Code § 2-1402.67
(emphasis added). Moreover, given the fact that the District
raised this argument for the first time in its reply brief, the
Court will not address it here. See supra n.7; see also St. Paul
Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc., 657 F.
Supp. 2d 243, 247 n.1 (D.D.C. 2009) (declining to address
argument that was raised for the first time in reply brief).

did not condition compliance with the DCHRA, their claim must be dismissed. Mot. at 18. However, the Hunters allege that the District had contracts with the operators of the shelters. Compl. ¶ 9-10. They also allege that the operators discriminated against them on the basis of disability, in violation of the anti-discrimination provisions of the DCHRA. Id. ¶ 122. Plaintiffs argue that these allegations that the shelters did not comply with the DCHRA allow the Court to reasonably infer that the District did not condition its contracts with the shelter operators on compliance with the DCHRA. Opp'n at 29.

The Hunters are correct that when these allegations are read together, it is reasonable to infer that the District did not condition the contracts on compliance with the DCHRA.[15] Thus, the Court will not dismiss Plaintiffs' claim under this subsection of the DCHRA on that basis.

Second, the District argues that even if the Hunters have sufficiently alleged a violation of section 2-1402.67, the claim must be dismissed because the District has sovereign immunity

---

[15] Moreover, the Court has already ruled that the contracts between the District and the other Defendants will be reviewed for the purpose of determining the relationship between the Defendants. See supra Sec. III.A.4.b. Whether those contracts contain a provision requiring compliance with the DCHRA can be resolved definitively once those contracts have been exchanged in discovery.

regarding "[e]nforcement of the DCHRA's compliance requirement for permits and licenses." Mot. at 19.

The doctrine of sovereign immunity protects the District of Columbia from suit for its discretionary activities. Nealon v. Dist. of Columbia, 669 A.2d 685, 690 (D.C. 1995) (citing Powell v. Dist. of Columbia, 602 A.3d 1123, 1126 (D.C. 1992)). "Generally, discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy." Nealon, 669 A.2d at 690.

Although the District describes the statute as "refer[ring] to enforcement decisions," Reply at 14, the language of the statute does not support that interpretation. Section 2-1402.67 states that the District "shall" condition its "permits, licenses, franchises, benefits, exemptions, or advantages" on compliance with the statute. D.C. Code § 2-1402.67. The word "shall" creates a mandatory obligation, not a discretionary ability to enforce. See Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107, 123 (D.D.C. 2009) ("It is well-settled that when a statute uses the term 'shall,' it creates a mandatory duty."). The District fails to provide any convincing reason why the use of the word "shall" in this statute suggests anything other than a mandatory duty.

The crux of the Hunters' claim is not that the District failed to enforce a provision it had in any particular contract that required compliance with the DCHRA, but, instead, that it failed to include such a provision at all. Because the statute creates a mandatory duty to include such provisions, it should be considered a ministerial duty and outside the scope of the District's sovereign immunity. Nealon, 669 A.2d at 690 ("If the act is committed in the exercise of a ministerial function, the District is not immune.").

In sum, Plaintiffs have sufficiently alleged that the District failed to comply with its mandatory duty to require compliance with the DCHRA in issuing "permits, licenses, franchises, benefits, exemptions, or advantages," and the Plaintiffs' claim under this subsection of the DCHRA may proceed.

### 6. Summary

Plaintiffs allege claims under six subsections of the DCHRA. Although they may not proceed under section § 2-1402.21(d)(1), they have sufficiently pleaded facts to support their other five claims.

**D. Count V: Plaintiffs Have Not Sufficiently Alleged a Claim Under the Homeless Services Reform Act**

Defendants argue that Plaintiffs have failed to state a claim under the Homeless Services Reform Act ("HSRA"), D.C. Code § 4-751.01 et. seq. The HSRA implements a "continuum of care," defined as "the system of services for individuals and families who are homeless or at imminent risk of becoming homeless and designed to serve clients based on their individual level of need." Id. § 4-751.01(8). The statute establishes standards for all providers of services to the homeless. Id. § 4-754.21 ("Section 21"). The HSRA also requires that the District provide "shelter in severe weather," id. § 4-754.11(5), and specifies additional standards required for providers of severe weather shelter. id. § 4-754.22 ("Section 22").

**1. The District of Columbia Court of Appeals Has Strictly Limited Private Rights of Action Under the HSRA**

The District's first argument is that Plaintiffs do not have a private right of action under the HSRA. Section 4-755.01(a) of the HSRA states that "no provision of this chapter shall be construed to create an entitlement (either direct or implied) . . . to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by § 4-754.11(5)." Thus, the District insists that Plaintiffs'

claims under the HSRA, other than a claim based on a failure to provide shelter during severe weather, are precluded.

The District of Columbia Court of Appeals has directly addressed this section of the HSRA. In Baltimore v. District of Columbia, 10 A.3d 1141 (D.C. 2011), former residents of a homeless shelter brought suit under the HSRA arguing that the District had failed to conform to the standards identified in the statute as part of the "Continuum of Care." Id. at 1146-47. The Court acknowledged that the statute created "standards" in Section 21, but concluded that the legislature did not intend to "create a direct or implied entitlement to any other particular service" than the right to shelter in severe weather. Id. at 1143-44. Consequently, the District is correct that there is no private right of action available to Plaintiffs other than an action to enforce the right to shelter in severe weather.

The Hunters attempt to distinguish Baltimore on the ground that they are not seeking any particular service, but instead are seeking to enforce "non-service rights." Opp'n at 29-30 & 30 n.4. This distinction between service and non-service rights appears nowhere in the statute, which lists all of the standards in a single section without distinguishing between services and non-services. Moreover, it is unclear how one would protect "non-service rights," such as the right to be free from

-55-

discrimination, without putting them in the context of provision of services. Indeed, Section 4-754.21(10) does precisely that by requiring that shelters "[p]rovide _services_ free from discrimination . . . ." D.C. Code § 4-754.21(10) (emphasis added).

The District of Columbia Court of Appeals has interpreted the scope of private rights of action under the HSRA narrowly, and this Court is bound by that determination. See In re Sealed Case (Medical Records), 381 F.3d 1205, 1211 n.5 (D.C. Cir. 2004) (noting that the District of Columbia Court of Appeal's interpretation of District of Columbia law is authoritative). Therefore, Plaintiffs' claims under the HSRA, other than those related to the right to shelter in severe weather, must be dismissed.[16]

### 2. Plaintiffs Have Not Sufficiently Pleaded a Violation of the Right to Shelter in Severe Weather

The Hunters allege that the District failed to place them in a shelter that reasonably accommodated A.H.'s disabilities during severe weather conditions. Compl. ¶ 140(h) (citing D.C. Code § 4-754.11(5); see also id. ¶¶ 38, 138 (alleging that, when

---

[16] Because the Court dismisses these claims, it need not address the District's argument that these claims should also be dismissed because it is not a "provider" under the HSRA. Mot. at 21-23.

the Hunters requested shelter, temperatures were below 32 degrees Fahrenheit); D.C. Code § 4-751.01(35) (defining "severe weather conditions" to include when the temperature falls below 32 degrees Fahrenheit).

The Hunters do not dispute that they were provided with shelter during severe weather, but they argue that they were entitled to shelter that complied with the standards set forth in Section 21 and Section 22. Opp'n at 30. The District responds that its obligation to provide shelter in severe weather does not extend to the provisions of the Continuum of Care in Section 21. Mot. at 23 (citing Baltimore, 10 A.3d at 1150-51).

Section 21 states that providers shall "[p]rovide services free from discrimination on the basis of . . . disability," D.C. Code § 4-754-21(10), and "[provide reasonable modifications," Id. § 4-754-21(11). However, Section 21 is the same section that the District of Columbia Court of Appeals analyzed in Baltimore and found to be a list of standards, rather than a list of rights to which an individual was entitled. Baltimore, 10 A.3d at 1151. Citing both Section 21 and Section 22, the Baltimore court determined that the word "standards" suggested "norms or what is acceptable or desirable, not a statutory entitlement."

The Baltimore court concluded that there was a statutory entitlement to "shelter in severe or frigid weather," id., but

it did not identify the contours of that right because it found that the plaintiffs in that case had failed to allege a denial of shelter during severe weather conditions. Id. (noting that the declarations did not reveal "any specific complaint about the denial of other shelter during severe weather conditions"). Thus, despite the fact that plaintiffs in that case argued they were entitled to a particular shelter during severe weather conditions, the court found that the fact that they had received some shelter was dispositive of their claim.

Similarly, Plaintiffs in this case have failed to allege that they were not provided with shelter during severe weather. Therefore, although there is a private right of action for individuals to enforce their right to shelter in severe weather, Plaintiffs have failed to sufficiently allege a denial of that right.

Plaintiffs insist that mere shelter is insufficient – there must be some substantive content to the right to ensure that the shelter is "appropriate" or the right would be "meaningless." Opp'n at 30-31 (citing D.C. Code § 4-753.01(c)(1)). Although Plaintiffs are correct that there must be some substantive content to the right, it does not follow that such a right encompasses all of the "standards" set out in Section 21 of the HSRA. As the District correctly points out, this would mean that

Plaintiffs would have a statutory entitlement to all services in the Continuum of Care for emergency shelters, but no statutory entitlement to services whatsoever in regular shelters.

Given the clear language of Baltimore, this Court must conclude that, as a legal matter, individuals are not entitled to all of the provisions listed in Section 21 as part of their right to shelter in severe weather. Because the District of Columbia Court of Appeals has held that the only private right of action under the HSRA is a right to severe weather shelter, and Plaintiffs have failed to allege a violation of that right, their claim must be dismissed.

### 3. Exhaustion of Administrative Remedies

In the alternative, COH argues that Plaintiffs' claims under the HSRA must be dismissed for failure to exhaust their administrative remedies. It argues that Plaintiffs failed to "exercise their appeal rights under the HSRA relative to their request for respite care," and, hence, Plaintiffs "failed to comply with the mechanism for relief provided for by the HSRA[.]" COH Mot. at 18-19.

The statutory language of the HSRA does not require a client to appeal a provider's decision. D.C. Code § 4-754.41(b) (stating that "[a] client or client representative may request a fair hearing") (emphasis added). Rather, the HSRA imposes a

-59-

requirement on the Office of Administrative Hearings ("OAH"), stating that OAH "<u>shall</u> grant a fair hearing to any client or client representative who wishes to appeal a decision . . . and who requests such a hearing, orally or in writing, within 90 days of receiving written notice of the adverse action." D.C. Code § 4-754.41(a) (emphasis added). Thus, the Court will not conclude that Plaintiffs' HSRA claims should be dismissed because they failed to exhaust their administrative remedies.

### 4. Summary

Plaintiffs have failed to sufficiently allege facts to support its claim that its right to shelter during severe weather was violated, the only claim under the HSRA for which it has a private right of action.

### E. Count VI: Plaintiffs Have Not Sufficiently Alleged a Negligence Claim Against the District of Columbia[17]

The elements of a cause of action for negligence are: "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." <u>Woods v. Dist. of Columbia</u>, 63 A.3d 551, 553 (D.C. 2013).

---

[17] COH does not argue that the negligence claims against it should be dismissed. <u>See</u> Answer to Counts VI and VII [Dkt. No. 78].

In Count VI, Plaintiffs allege that the District negligently breached duties imposed upon it by the DoJ Settlement and the HSRA. Compl. ¶ 144.[18] In the District of Columbia, a suit against the District alleging negligence will fail as a matter of law absent a "special duty" or "special relationship" between the District and the plaintiff.[19] Id. (quoting Warren, 444 A.2d at 3, 4); see also Klahr v. Dist. of Columbia, 576 A.2d 718, 719 (D.C. 1990) ("Under the public duty doctrine, a person seeking to hold the District of Columbia liable for negligence must allege and prove that the District owed a special duty to the injured party, greater than or different from any duty which it owed to the general public.").

"The threshold for establishing a special relationship is very high." Jefferies v. Dist. of Columbia, 917 F. Supp. 2d 10, 33 (D.D.C. 2013) (internal quotations and citation omitted).

---

[18] Plaintiffs also allege that the District is vicariously liable for the negligence of its contractors and agents in breaching contractual duties. Id. ¶ 147. However, this claim cannot survive because "the mere negligent breach of a contract . . . is not enough to sustain an action sounding in tort." Curry v. Bank of Am. Home Loans Servicing, 802 F. Supp. 2d 105, 109 (D.D.C. 2011) (quoting Towers Tenant Ass'n, Inc. v. Towers Ltd. Partnership, 563 F. Supp. 566, 570 (D.D.C. 1983)). The District cannot therefore be held vicariously liable for its contractors' negligent breach of contract.

[19] "The terms 'special relationship' and 'special duty' may be used interchangeably," because "'a special relationship . . . imposes a special legal duty.'" Powell, 602 A.2d at 1127 n.4 (quoting Warren v. Dist. of Columbia, 444 A.2d 1, 3 (D.C. 1981) (en banc)).

"If, based on reading the Complaint, the public duty doctrine applies, the Court may appropriately dismiss the tort claims under 12(b)(6) for failing to state a claim." Jefferies, 917 F. Supp. 2d at 32 (D.D.C. 2013) (citing Warren, 444 A.2d at 1).

There are two exceptions to the public duty doctrine. Jefferies, 917 F. Supp. 2d at 33; Snowder v. Dist. of Columbia, 949 A.2d 590, 603-04 (D.C. 2008). First, a plaintiff can allege and prove two things: "((1) a direct or continuing contact between [the plaintiff] and a governmental agency or official, and (2) a justifiable reliance on the part of [the plaintiff]." Jefferies, 917 F. Supp. 2d at 33 (quoting Klahr, 576 A.2d at 720). Second, a plaintiff can identify a "specific statute or regulation that prescribes 'mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.'" Jefferies, 917 F. Supp. 2d at 34 (quoting Turner v. Dist. of Columbia, 532 A.2d 662, 667 (D.C. 1987)). The Court will refer to this as the second exception to the public duty doctrine.

Thus, for Plaintiffs' negligence claim to survive, they must sufficiently allege facts to support a conclusion that the claim falls under one of the two exceptions to the public duty doctrine.

## 1. First Exception: Contact and Justifiable Reliance

Plaintiffs argue that they have alleged facts sufficient to support the first exception to the public duty doctrine: namely, that they have sufficiently alleged "direct or continuing contact" between themselves and the District of Columbia and "justifiable reliance." Jefferies, 917 F. Supp. 2d at 33.

To sufficiently allege "contact," Plaintiffs must allege a "direct transaction with the party injured or an arms-length relationship in which the city's agent is dealing directly, in some form, with the person injured." Id. (citing Powell, 602 A.2d at 1130). Plaintiffs argue that "the District, through its agent contractors, maintained direct and continuing contact with the Hunter family from the moment Mr. Hunter sought shelter." Opp'n at 33. Mr. Hunter's first application for housing, as well as his multiple requests for accommodations, all appear to be "direct and personal transaction[s]" that satisfy this prong under District of Columbia precedent. Powell, 602 A.2d at 1131 (finding that application and payment of fee to Bureau of Motor Vehicle Services satisfied "contact" prong); see also Compl. ¶ 37 (alleging Hunter applied for placement in a homeless shelter at the District's central intake office); ¶ 41 (alleging certain statements made by Center staff to Hunter); ¶ 78

(alleging conversation between Hunter and program director at Girard Street Apartments).

The District cites Powell for the proposition that "even a series of contacts over a period of time is not enough absent some showing that the agency assumed a greater duty to that person than the duty owed to the public at large." Reply at 16 n.4 (citing Powell, 602 A.2d at 1130). However, the District of Columbia Court of Appeals has clarified that the burden of showing a "greater duty" than one owed to the public is satisfied by also requiring proof of justifiable reliance. Powell, 602 A.2d at 1131; Snowder, 949 A.2d at 604 n.12 (noting that the two-part inquiry "takes this greater duty factor into account by requiring justifiable reliance"). Thus, Plaintiffs have sufficiently alleged "contact" with the District through its agents.[20]

To show "justifiable reliance," Plaintiffs must allege that the District has "specifically undertaken to protect a particular individual and the individual has specifically relied upon the undertaking." Morgan v. Dist. of Columbia, 468 A.2d 1306, 1315 (D.C. 1983). It requires "particular or special reliance," Powell, 602 A.2d at 1131 n.11, on some "affirmative

---

[20] As discussed above, see supra Sec. III.A.4.b, the Hunters have sufficiently alleged that the District's contractors are its "agents" to proceed on that theory at this time.

act[]" that "actually and directly worsened the plaintiff's condition," Woods, 63 A.3d at 554 (internal quotations and citation omitted).

Plaintiffs argue that they justifiably relied on the District's "affirmative obligation" as set forth in Paragraph 24 of its Settlement Agreement with the DoJ. Opp'n at 34. However, the Settlement Agreement specifically states that it is "enforceable only by the parties" and that "no person or entity may assert any claim or right as a beneficiary or protected class" under the Agreement. Settlement Agreement ¶ 37 [Dkt. No. 79-1]. Whatever the scope of the District's duties under the Settlement Agreement, it is clear that signing the Agreement was not an "affirmative act[]" that "actually and directly worsened the plaintiff's condition." Woods, 63 A.3d at 554 (internal quotations and citation omitted).

Plaintiffs identify no other portion of their Complaint that alleges an "affirmatively negligent act" as compared to a "failure to act." Snowder, 949 A.2d at 604. Therefore, Plaintiffs have failed to sufficiently plead justifiable reliance, and, thus, have not satisfied the first exception to the public duty doctrine. See Woods, 63 A.3d at 554 (noting that District of Columbia Court of Appeals "has adhered to a strict interpretation of the special relationship test, including the

justifiable reliance prong") (quoting <u>Taylor v. Dist. of Columbia</u>, 776 A.2d 1208, 1218 (D.C. 2001)).

### 2. Second Exception: Statute

In the alternative, Plaintiffs argue that they have satisfied the second exception to the public duty doctrine, because the HSRA is a specific statute that "prescribes mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." <u>Jefferies</u>, 917 F. Supp. 2d at 34 (quoting <u>Turner</u>, 532 A.2d at 667); <u>see</u> Compl. ¶¶ 144-46 (alleging that HSRA imposes particular duties upon Defendants).

The District of Columbia Court of Appeals stated in <u>Turner</u> that "if a state agency is required by statute or regulation to take a particular action for the benefit for a particular class and fails to do so, or negligently does so, and the plaintiffs justifiably rely to their detriment on the agency's duty to act, a cause of action in negligence will lie against the state or its agency." <u>Turner</u>, 532 A.2d at 672.

In <u>Turner</u>, the District of Columbia Court of Appeals concluded that the Child Abuse Prevention Act imposes "upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abused and neglected children." <u>Id.</u>

at 668. The Child Abuse Prevention Act specifies that District officials act in certain ways to protect a special class, and when officials breach those duties, "that statutorily protected class suffers in a way uniquely different from the public at large." Id.

Plaintiffs argue that the HSRA imposes certain duties and responsibilities on the District in order to protect "disabled individuals seeking shelter." Opp'n at 34 (citing D.C. Code § 4-754.52(a)(3), (b)-(d)). However, the District of Columbia Court of Appeals has concluded that the HSRA does not create legally enforceable obligations, but merely creates a list of standards. See supra Sec. III.D.1. (discussing Baltimore, 10 A.3d 1141). Therefore, the HSRA is not a statute that "prescribes mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole." Jefferies, 917 F. Supp. 2d at 34 (quoting Turner, 532 A.2d at 667).

The one mandatory act that is prescribed by the HSRA is to provide shelter in severe weather. See supra Sec. III.D.2. Plaintiffs failed to allege that they were, in fact, denied shelter in severe weather. Id. Thus, Plaintiffs have not sufficiently alleged that the District was required to "take a particular action for the benefit for a particular class and fail[ed] to do so[.]" Turner, 532 A.2d at 672 (emphasis added).

Consequently, even this portion of the HSRA cannot provide the basis for the second exception to the public duty doctrine.

### 3. **Summary**

Plaintiffs have failed to sufficiently allege facts to support its negligence claim against the District, because it has not demonstrated that either of the exceptions to the public duty doctrine apply.

### F. **Count VII: Plaintiffs Have Not Sufficiently Alleged a Negligence _Per Se_ Claim Against the District of Columbia**

Plaintiffs also allege that Defendants "were negligent _per se_ in failing to meet their duties and obligations under the ADA, FHA, Rehabilitation Act, DCHRA, and HSRA." Compl. ¶ 150.

However, negligence _per se_ is not in and of itself a separate legal claim — rather, it permits a plaintiff under "certain circumstances and under specified conditions," to "rely on a statute or regulation as proof of the applicable standard of care." _McNeil Pharm. v. Hawkins_, 686 A.2d 567, 578 (D.C. 1996) (citation omitted). If the plaintiff can prove that the defendant violated such a statute or regulation, it "renders the defendant negligent as a matter of law . . . so long as the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent." _Id._ (internal quotations and citation omitted).

"The decision to adopt from a statute a standard of care to be applied in determining common law negligence" is a judicial decision for the court to make. Id. at 579 (internal quotations and citation omitted). The Court must decide whether the statute or regulation "promote[s] public safety and [was] enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred." Id. (internal quotation marks and citation omitted).

The District argues that the "gravamen of Plaintiffs' claims is discrimination," and that the statutes they rely on are intended to combat discrimination, not to prevent physical harm. Mot. at 26-27. Plaintiffs identify no precedent supporting their argument that anti-discrimination statutes such as the ADA, the FHA, the DCHRA, and the Rehabilitation Act should be considered statutes that "promote public safety."

Although neither party identifies cases evaluating whether negligence per se should be applied to the FHA, the DCHRA, or the Rehabilitation Act, cases addressing the ADA are instructive. Multiple courts have found that the ADA is not a public safety statute for purposes of the negligence per se doctrine. See, e.g., McCree v. Se. Pa. Transp. Auth., No. 07-4908, 2009 WL 166660, at *12 (E.D. Pa. Jan. 22, 2009) ("[V]iolation of an ADA regulation may not be used as evidence

-69-

of negligence _per se_ in a personal injury action like this one."); White v. NCL Am., Inc., No. 05-22030, 2006 WL 1042548, at *5 (S.D. Fla. Mar. 8, 2006) ("Because the ADA was not designed to protect those with disabilities from personal injuries, Plaintiff is unable to state a claim for _per se_ negligence."); James v. Peter Pan Transit Mgmt., Inc., No. 97-747, 1999 WL 735173, at *9 (E.D.N.C. Jan. 20, 1999) (concluding that ADA was "enacted to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities,' and, thus, it was "unlikely that the North Carolina courts would find that the ADA is a safety statute or that violation of the ADA constitutes negligence per se") (quoting 42 U.S.C. § 12101(b)); Dalgliesh v. Theatre Mgmt. Grp., Inc., No. 96-3985, 1999 WL 638127, at *1 (D.C. Super. May 28, 1999) ("Obviously, it would have been error if the court had instructed the jury that evidence of the ADA and the applicable C.F.R. violations constituted negligence _per se_, since the Act was promulgated to prevent discrimination, not physical injury.").

Plaintiffs argue that accommodating the needs of disabled individuals does have a "public safety" rationale. However, as the court observed in White, "[w]hile protection from injury for the disabled is no doubt a fortunate by-product of the ADA, it

-70-

is clear that the statute was not designed with that purpose in mind[.]" White, 2006 WL 1042548, at *5. The Court agrees and concludes that the same rationale prevents the Rehabilitation Act, the FHA, and the DCHRA from serving as the basis of a negligence per se claim as well.

Plaintiffs argue that the HSRA subsection mandating that the District provide shelter during severe weather is a "public safety" statute. They may be correct, but, as discussed above, see supra Sec. III.D.2, Plaintiffs failed to plead a claim under that subsection. Moreover, in order to adopt a particular standard of care, the statute must be "enacted to . . . prevent the type of accident that occurred[.]" Sibert-Dean v. Washington Metro. Area Transit Auth., 721 F.3d 699, 702-03 (D.C. Cir. 2013) (quoting Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 557 (D.C. Cir. 1993)). The relevant subsection of the HSRA is directed at protecting individuals from exposure to severe weather. There is no allegation that the injuries suffered by the Hunters occurred because they were exposed to severe weather. Therefore, even if that section of the HSRA "promotes public safety," it still does not support a negligence per se claim in this case.

In sum, Plaintiffs have failed to identify a statute that supports its negligence per se claim against the District, and this claim must be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the District's Motion to Dismiss shall be **granted in part** as to Counts V, VI, and VII, the portion of Count II brought under 42 U.S.C. § 3604(f)(1), and the portion of Count IV brought under D.C. Code § 2-1402.21(d)(1), and **denied in part** as to all other arguments; Defendant COH's Motion to Dismiss shall be **granted in part** as to Count V, the portion of Count II brought under 42 U.S.C. § 3604(f)(1), and the portion of Count IV brought under D.C. Code § 2-1402.21(d)(1), and **denied in part** as to all other arguments.

August 18, 2014

Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF